Mario Tafur, Esq. (SBN: 329899)
mario@thebulldog.law
**BULLDOG LAW, P.C.**
500 N. Central Avenue, Ste. 610
Glendale, CA 91203
Telephone: (949) 649-3007
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| HARRO MOEN<br><br>Plaintiff(s),<br><br>vs.<br><br>SOCIALCHAIN INC., PI COMMUNITY COMPANY, NICOLAS KOKKALIS, CHENGDIAO FAN, and DOES 1-50,<br><br>Defendant(s). | Case No.:<br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Harro Moen ("Plaintiff" or "Moen"), by and through his counsel, Bulldog Law, PC, brings this Complaint against Defendants SocialChain Inc., Pi Community Company, Nicolas Kokkalis, Chengdiao Fan, and Does 1-50 (collectively, "Defendants"), and alleges as follows based on personal knowledge as to his own acts, information and belief, extensive investigation of counsel, blockchain transaction logs (PiScan, Stellar Explorer), PiScan data (8,127 uniform wallets), public complaints (Reddit r/PiNetwork: 1,500+ posts; X #PiFraud: 2,000+ posts), crypto news reports (CoinChapter, November 2023; CCN, February 2025), corporate filings (CA Secretary of State File No. 4201964; Cayman Islands Registry), prior litigation records (Santa Clara Case No.

21CV391680), Defendants' Terms of Service (ToS, February 19, 2025, version), and Plaintiff's blockchain analysis (email dated August 4, 2025):

**INTRODUCTION**

1. This action seeks to hold Defendants accountable for a meticulously orchestrated, multi-year scheme that defrauded Plaintiff Harro Moen, an Arizona resident with no prior cryptocurrency experience, who joined the Pi Network platform on April 15, 2020, to mine Pi tokens under Defendants' false promises of a decentralized, globally accessible, and economically valuable cryptocurrency. Defendants' deliberate misconduct—unauthorized token transfers, secret token sales, unauthorized exchange listings, intentional migration delays, and retaliatory dismissal of Plaintiff's complaints—caused Plaintiff a direct financial loss of $2,012,000, lost economic opportunities, and significant emotional distress, necessitating judicial intervention to deliver justice.

2. Plaintiff suffered a $2,012,000 loss, calculated at the peak market valuation of $307.49 per Pi token (CoinMarketCap, September 30, 2022), when 5,137.397257 Pi tokens were transferred without his authorization from his verified wallet (GDJCI6GIKGDUBP3HOKEPVY2O3THA2BWVZBVRVZYNS5YXFLUXDRNIZEAT, "ZEAT") to an unknown address (GDQ4...KIDS) on April 10, 2024, at 15:32 UTC. At the February 2025 valuation of $1.67 per Pi token (CoinGecko), this loss equates to $8,579, compounded by the failure to migrate his remaining 1,403.602743 tokens to the Pi Network Mainnet, rendering them illiquid and valueless.

3. Defendants' actions violated multiple legal frameworks, including: (a) the Securities Act of 1933 (15 U.S.C. §§ 77e, 77l) through the unregistered sale of 2 billion Pi tokens in 2021; (b) the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b), Rule 10b-5) through fraudulent misrepresentations and material omissions; (c) the Sarbanes-Oxley Act (18 U.S.C. § 1514A) by retaliating against Plaintiff's protected whistleblower activities; (d) California common law, specifically fraud, breach of fiduciary duty, and unjust enrichment; and (e) California's Unfair

Competition Law (Cal. Bus. & Prof. Code § 17200) through unlawful, fraudulent, and unfair business practices.

4. Defendants' misconduct, executed with calculated intent, includes the following specific acts:

1. **Unauthorized Token Transfer**: On April 10, 2024, Defendants' centralized validator nodes executed the transfer of 5,137.397257 Pi tokens from Plaintiff's wallet to GDQ4...KIDS, followed by subsequent transfers to wallets V5FF (April 29, 2024, 06:49 UTC, 2,567 π) and FZ7P (two transactions, April 29, 2024), without Plaintiff's consent or notification, as confirmed by blockchain logs (PiScan, April 11, 2024).

2. **Secret Token Sales (2021)**: Defendants sold 2 billion Pi tokens in undisclosed transactions, generating an estimated $4,375,000 for payroll expansion (35 employees at $125,000/year, 2022) and $6,000,000 in trademark and legal expenses, as evidenced by filings in Santa Clara Case No. 21CV391680, without informing Plaintiff or other users.

3. **Unauthorized Exchange Listings (2022)**: Defendants facilitated Pi token listings on XT.COM (June 7, 2022, PI/USDT pair), Huobi (July 15, 2022, $13–$14/π peak), and Bitmart (August 10, 2022), marked as "To Be Determined" (futures/IOUs), inflating valuations to $307.49/π while publicly denying involvement in an X post on July 10, 2022 (@PiCoreTeam, "fake listings"), per CoinChapter (November 2023).

4. **Deliberate Migration Delays**: Defendants failed to migrate Plaintiff's remaining 1,403.602743 Pi tokens to the Mainnet by February 28, 2025, despite his KYC verification completion on December 22, 2022, rendering them illiquid and valueless, in violation of Defendants' app notifications promising migration within 90–180 days.

5. **Retaliation Against Complaints**: Defendants dismissed Plaintiff's exhaustive 10-month recovery effort (April 13, 2024–February 15, 2025), consisting of 12 support tickets (e.g., ticket # [REDACTED], April 13, 2024), 47 in-app chat interactions with moderators (e.g.,

Grunchking, who muted Plaintiff's queries), and three emails to support@socialchain.app, falsely attributing the transfer to "user error" without evidence.

5. Plaintiff seeks: (a) compensatory damages of $10,000,000, comprising $2,012,000 for economic loss (5,137 π at $307.49), $1,500,000 for lost economic opportunities (four years of mining effort), and $6,488,000 in punitive damages for Defendants' willful misconduct; (b) restitution of his full 6,541 Pi tokens; (c) disgorgement of Defendants' illicit profits (estimated $4,375,000+ from 2021–2022); (d) punitive damages to punish and deter Defendants' egregious fraud and retaliation; (e) injunctive relief to halt unauthorized token transfers, ensure immediate Mainnet migration for Plaintiff's tokens, disclose all token transactions since March 14, 2019, and implement blockchain transparency measures; (f) declaratory relief establishing Defendants' violations of federal and California law; and (g) permission to advertise for other similarly situated Pi Network users to form a class under FRCP 23, compliant with CRPC 7.1–7.5.

6. Plaintiff reserves the right to seek class certification under FRCP 23(a) and (b)(3) for a proposed Class of all Pi Network users who mined tokens since March 14, 2019, and suffered similar losses from unauthorized transfers, exclusion from trading profits, or migration delays. Plaintiff intends to advertise ethically through media outlets (e.g., *The Arizona Republic*, *The New York Times*), online platforms (e.g., Reddit r/PiNetwork, X with #PiNetwork and #PiFraud), and cryptocurrency news sites (e.g., CoinDesk, CoinTelegraph) to identify additional plaintiffs, as permitted by *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 349 (1978), and in compliance with CRPC 7.1–7.5, ensuring truthfulness and transparency.

7. Defendants' response, dated May 13, 2025, to Plaintiff's April 14, 2025, demand letter, authored by Kenneth P. Nabity of Delfino Madden O'Malley Coyle & Koewler LLP, denies liability, asserting: (a) the April 2024 transfer resulted from user error; (b) 2022 exchange listings were "fake" and not native Pi tokens; (c) no material misstatements were made in the whitepaper or public statements; (d) Sarbanes-Oxley does not apply, as SocialChain Inc. is not a registered

company and Plaintiff is not an employee; and (e) the ToS arbitration clause and class action waiver (Section 15) are enforceable. Plaintiff counters these defenses with blockchain evidence (GDQ4...KIDS transfer, PiScan's 8,127 uniform wallets), public complaints (Reddit: 1,500+ posts; X: 2,000+ posts), crypto news (CoinChapter, November 2023; CCN, February 2025), and Defendants' documented financial gains ($4,375,000 payroll), which collectively demonstrate Defendants' liability and scienter, rendering their defenses meritless.

8. The ToS arbitration clause and class action waiver (Section 15, February 19, 2025, version) are unenforceable under California law (ToS Section 16.5) due to: (a) procedural unconscionability, as the adhesive, browsewrap ToS lacked negotiation and clear notice; (b) substantive unconscionability, as it favors Defendants with IP carve-outs (Section 15.5) and blocks unwaivable securities rights (*McMahon v. Shearson/Am. Express, Inc.*, 482 U.S. 220, 227 (1987)); (c) lack of mutual assent due to ambiguous consent mechanisms (*Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014)); (d) Defendants' waiver through prior litigation in Santa Clara Case No. 21CV391680 (2021–2022) without invoking arbitration (*St. Agnes Med. Ctr. v. PacifiCare of Cal.*, 31 Cal. 4th 1187, 1196 (2003)); and (e) public policy favoring adjudication of systemic fraud affecting millions (*Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 246 (2013) (Kagan, J., dissenting)).

9. This complaint, filed as a single-plaintiff action, establishes Plaintiff's individual claims while laying the groundwork for a potential class action, supported by extensive evidence and legal precedent to ensure the Court's full understanding of Defendants' egregious misconduct and Plaintiff's entitlement to relief.

## JURISDICTION AND VENUE

10. **Federal Question Jurisdiction (28 U.S.C. § 1331)**: This Court has jurisdiction over Plaintiff's claims under the Securities Act of 1933 (15 U.S.C. §§ 77e, 77l), for Defendants' unregistered sale of 2 billion Pi tokens in 2021; the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b), Rule 10b-5), for fraudulent misrepresentations and omissions in the 2019 whitepaper, app notifications, and public statements (e.g., Kokkalis' $25/π prediction, X, July 15, 2020); and the Sarbanes-Oxley Act (18 U.S.C. § 1514A), for retaliation against Plaintiff's 10-month whistleblower effort (April 13, 2024–February 15, 2025). These federal claims arise from Defendants' actions in California, directly harming Plaintiff in Arizona, establishing a substantial federal question.

11. **Supplemental Jurisdiction (28 U.S.C. § 1367(a))**: The Court has supplemental jurisdiction over Plaintiff's California state law claims—fraud, breach of fiduciary duty, unjust enrichment, and violations of the Unfair Competition Law (Cal. Bus. & Prof. Code § 17200)—because they arise from the same nucleus of operative facts as the federal claims: Defendants' centralized operation of Pi Network, unauthorized transfer of 5,137.397257 Pi tokens on April 10, 2024, secret sales of 2 billion Pi tokens in 2021, unauthorized exchange listings in 2022, deliberate migration delays, and retaliatory dismissal of Plaintiff's complaints. Adjudicating these claims together promotes judicial economy and avoids duplicative litigation (*United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966)).

12. **Diversity Jurisdiction (28 U.S.C. § 1332(a))**: Alternatively, the Court has jurisdiction under diversity of citizenship, as Plaintiff is a resident of Arizona (Maricopa County), while Defendants SocialChain Inc., Nicolas Kokkalis, and Chengdiao Fan are California residents (Sunnyvale and Palo Alto), and Pi Community Company is a Cayman Islands entity, establishing complete diversity. The amount in controversy, $10,000,000, exceeds the $75,000 threshold, based

on Plaintiff's economic loss ($2,012,000), lost opportunities ($1,500,000), and punitive damages ($6,488,000) (*Caterpillar Inc. v. Lewis*, 519 U.S. 61, 68 (1996)).

13. **Personal Jurisdiction:**

1. **General Jurisdiction:** The Court has general jurisdiction over SocialChain Inc., a California corporation incorporated on September 14, 2018 (CA Secretary of State File No. 4201964), with its principal place of business at 1159 Sonora Ct., Suite 140, Sunnyvale, CA 94086, within this District. Nicolas Kokkalis (residing at [REDACTED], Sunnyvale) and Chengdiao Fan (residing at [REDACTED], Palo Alto) are California residents with continuous and systematic contacts, rendering them "at home" in California (Daimler AG v. Bauman, 571 U.S. 117, 137 (2014)).

2. **Specific Jurisdiction:** The Court has specific jurisdiction over all Defendants, including Pi Community Company (Cayman Islands, registered August 8, 2019, Registry No. [Pending Discovery]), due to their purposeful availment of California through: (a) operating Pi Network's blockchain servers in Sunnyvale, processing all transactions, including Plaintiff's 2024 transfer; (b) directing the 2021 sale of 2 billion Pi tokens and 2022 exchange listings (XT.COM, Huobi, Bitmart) from California; (c) targeting an estimated 5 million California users among the 60 million global users, per Pi Network's 2025 demographic reports; (d) maintaining customer support operations in California (support@socialchain.app), which handled Plaintiff's complaints; (e) designating San Mateo County, within this District, for dispute resolution in the ToS (Section 15.3); and (f) deriving substantial profits ($4,375,000 payroll, 2022) from California-based operations. Plaintiff's claims—arising from the 2024 token transfer, 2021 sales, 2022 listings, migration delays, and retaliation—directly relate to these contacts, satisfying due process (*Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945); *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).

3. **Doe Defendants**: Personal jurisdiction over Does 1-50, likely California or Cayman Islands-

based individuals or entities (e.g., blockchain developers, validator node operators, exchange representatives, or financial intermediaries), will be established upon identification through discovery. Plaintiff intends to issue subpoenas to XT.COM, Huobi, Bitmart, and blockchain analytics firms (e.g., Chainalysis) to trace wallet addresses involved in 2021 sales and 2024 transfers. These Defendants acted in concert with named Defendants in California-directed misconduct, supporting jurisdiction (*Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 (1984)).

14. **Venue:** Venue is proper under 28 U.S.C. § 1391(b) because: (a) Defendants SocialChain Inc., Kokkalis, and Fan reside in this District (Sunnyvale and Palo Alto, Santa Clara County); (b) a substantial part of the events giving rise to Plaintiff's claims occurred in this District, including the operation of Pi Network's blockchain servers in Sunnyvale, the execution of the 2021 secret sales and 2022 exchange listings managed from California, the processing of Plaintiff's 2024 unauthorized transfer via Sunnyvale-based validators, and the handling of Plaintiff's complaints through California-based support; and (c) the ToS (Section 15.3) designates San Mateo County, within this District, as the venue for dispute resolution. Additionally, the Securities Act (15 U.S.C. § 77v(a)) and Securities Exchange Act (15 U.S.C. § 78aa) permit venue in any district where Defendants transact business or where the violative acts occurred, as SocialChain Inc.'s operations and Defendants' profits ($4,375,000 payroll, 2022) are centered in Sunnyvale.

15. **Intradistrict Assignment**: Assignment to the San Francisco Division is appropriate under Northern District of California Local Rule 3-2(c), as Defendants' principal operations and misconduct occurred in Santa Clara County (Sunnyvale), within this Division's jurisdiction. The San Francisco Division's expertise in technology and securities litigation further supports assignment, ensuring efficient adjudication. Plaintiff's counsel, Bulldog Law, PC, based in Glendale, CA, consents to this Division for proximity to Defendants and judicial familiarity with complex fraud cases.

## PARTIES

16. **Plaintiff Harro Moen**: An individual residing at [REDACTED], Maricopa County, Arizona. Moen, a 45-year-old retiree with no prior cryptocurrency experience, joined Pi Network on April 15, 2020, via the iOS App Store, creating a wallet (GDJCI6GIKGDUBP3HOKEPVY2O3THA2BWVZBVRVZYNS5YXFLUXDRNIZEAT, "ZEAT") using an invitation code from a friend. Over four years (April 2020–April 2024), Moen mined 6,541 Pi tokens through: (a) 1,460 daily check-ins (5 minutes each, totaling 122 hours), tapping the app's mining button; (b) security circle contributions, recruiting 25 users and managing their onboarding (50 hours); and (c) node operations, running Pi Node software on a dedicated Dell laptop (4GB RAM, dual-core CPU, 500+ hours, constant uptime with stable 50 Mbps internet), incurring $1,200 in electricity and data costs (estimated at $25/month over 48 months). Moen relied on Defendants' promises of decentralization and token value (e.g., $25/π, X, July 2020), expecting to realize economic gains upon Mainnet launch. On April 10, 2024, 5,137.397257 tokens were transferred without authorization, causing a $2,012,000 loss ($307.49/π, CoinMarketCap, September 2022) or $8,579 ($1.67/π, CoinGecko, February 2025). Moen has Article III standing: injury-in-fact (economic loss, emotional distress), traceability (Defendants' validator control, misrepresentations), and redressability (damages, restitution, injunctive relief) (*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).

17. **Defendant SocialChain Inc.**: A California corporation incorporated on September 14, 2018 (CA Secretary of State File No. 4201964), with its principal place of business at 1159 Sonora Ct., Suite 140, Sunnyvale, CA 94086, within this District. SocialChain Inc. developed Pi Network's blockchain infrastructure, operates its servers in Sunnyvale, controls three validator nodes processing all transactions, issues and manages Pi tokens, oversees user wallets, and orchestrated the 2021 sale of 2 billion Pi tokens and 2022 exchange listings (XT.COM, Huobi, Bitmart). It retained profits, evidenced by a $4,375,000 payroll for 35 employees (2022) and $6,000,000 in

trademark and legal expenses, per filings in Santa Clara Case No. 21CV391680. SocialChain Inc. also managed Plaintiff's KYC verification and dismissed his complaints, directly contributing to his harm.

18. **Defendant Pi Community Company**: A Cayman Islands entity, incorporated on August 8, 2019 (Registry No. [Pending Discovery]), with operations directed by SocialChain Inc., Kokkalis, and Fan from Sunnyvale, California. Pi Community Company served as a shell entity to facilitate the 2021 sale of 2 billion Pi tokens and 2022 exchange listings, shielding profits offshore while executing California-directed activities through Sunnyvale servers and communications (ToS Section 15.3). Its role in token transfers and listings directly harmed Plaintiff, as confirmed by blockchain logs tracing sales to wallets linked to Pi Community Company.

19. **Defendant Nicolas Kokkalis**: An individual residing at [REDACTED], Sunnyvale, CA, co-founder and Chief Technology Officer of SocialChain Inc. Kokkalis, a Stanford PhD, authored the 2019 Pi Network whitepaper, falsely claiming "decentralized governance" and an "open blockchain," and publicly predicted a $25/π value (X post, @PiCoreTeam, July 15, 2020). He oversaw the design and operation of validator nodes, personally profited from 2021 sales and 2022 listings (estimated $1,000,000+, per payroll records), and failed to disclose these transactions, inducing Plaintiff's reliance and causing his $2,012,000 loss.

20. **Defendant Chengdiao Fan**: An individual residing at [REDACTED], Palo Alto, CA, co-founder and Chief Executive Officer of SocialChain Inc. Fan, a Stanford PhD, directed Pi Network's operations, including KYC verification processes, Mainnet migration protocols, and customer support operations (support@socialchain.app). She issued app notifications promising "imminent" Mainnet launches (2021–2023), failed to disclose 2021 sales and 2022 listings, and dismissed Plaintiff's complaints, contributing to his harm. Fan personally profited alongside Kokkalis (estimated $1,000,000+).

21. **Defendants Does 1-50**: Unknown individuals or entities, likely based in California or the

Cayman Islands, including blockchain developers who coded validator nodes, support staff who dismissed Plaintiff's complaints, exchange representatives who facilitated 2022 listings, and financial intermediaries who laundered proceeds from 2021 sales. Their identities will be uncovered through discovery, including subpoenas to XT.COM, Huobi, Bitmart, and blockchain analytics firms (e.g., Chainalysis, Elliptic) to trace wallets (e.g., GDQ4...KIDS, V5FF, FZ7P). These Defendants acted in concert with named Defendants, executing California-directed misconduct that directly caused Plaintiff's losses.

## FACTUAL ALLEGATIONS

### A. Background of PI Network

22. Pi Network, launched on March 14, 2019, by Defendants, is a mobile application available on iOS and Android platforms, marketed as a revolutionary, decentralized cryptocurrency platform that enabled users to mine Pi tokens using smartphones without the energy-intensive hardware required by Bitcoin or Ethereum. By February 28, 2025, Pi Network had amassed over 60 million registered users across 190 countries, including an estimated 5 million in California, per Pi Network's public demographic reports and app analytics published on its website (minepi.com).

23. Defendants' 2019 whitepaper, authored by Kokkalis and posted on minepi.com, promised "decentralized governance," an "open blockchain," and "community-controlled" transactions, assuring users that their mining efforts would yield valuable, transferable tokens upon the Mainnet launch. Kokkalis reinforced these promises in public statements, including a July 15, 2020, X post (@PiCoreTeam) predicting a $25/π value and app notifications (2019–2022) emphasizing user ownership and economic potential. These representations were designed to induce users, including Plaintiff, to dedicate significant time and resources to mining.

24. Contrary to Defendants' claims, Pi Network operated as a centralized platform controlled by three validator nodes, all managed by SocialChain Inc. from its Sunnyvale servers. Blockchain transaction logs (PiScan, 2024; Stellar Explorer) confirm that these nodes processed all token

transfers, including Plaintiff's 2024 loss, with no evidence of user-driven governance or decentralized control. The whitepaper's omission of this centralized structure constituted a material misrepresentation, as it directly impacted token security and value, critical to Plaintiff's decision to join and mine.

25. Pi Network's Terms of Service (ToS, February 19, 2025, version), a browsewrap agreement enforced through "continued use" consent (Section 1), governed user interactions. The ToS required Know Your Customer (KYC) verification for Mainnet migration (Section 14) and mandated arbitration and class action waivers (Section 15). The ToS was updated 12 times between March 2019 and February 2025 (Wayback Machine archives), with the arbitration clause introduced in March 2022 without prominent notice to existing users like Plaintiff, who joined in April 2020. The 30-day opt-out provision (Section 15.6, via support@socialchain.app) was ambiguous, requiring users to monitor updates proactively, and was practically inaccessible to Plaintiff after his initial signup.

26. By February 28, 2025, over 50 million of Pi Network's 60 million users had not migrated their tokens to the Mainnet, rendering their tokens illiquid and valueless, per Pi Network's internal reports and PiScan data. Defendants' app notifications (2023–2024) repeatedly promised migration within 90–180 days, but these deadlines were consistently missed, devaluing tokens from a peak of $307.49/π (CoinMarketCap, September 2022) to $1.67/π (CoinGecko, February 2025). Crypto news outlets, including CoinChapter (November 2023, "Pi Network Users Lose PI Coins From Wallets") and CCN (February 2025, "Pi Network: Why Your Coins May Be Worthless"), reported systemic failures and user disenfranchisement, attributing these issues to Defendants' centralized control and deliberate delays.

**B. Plaintiff's Experience**

27. On April 15, 2020, at 14:22 UTC, Plaintiff downloaded the Pi Network iOS app (version

1.2.3) from the Apple App Store, created a wallet (ZEAT) using an invitation code provided by a friend, and began mining Pi tokens. Over four years (April 15, 2020–April 10, 2024), Plaintiff mined 6,541 Pi tokens through: (a) 1,460 daily check-ins, tapping the app's mining button for 5 minutes daily (122 hours total); (b) security circle contributions, recruiting 25 users and managing their onboarding through in-app referrals (50 hours); and (c) node operations, running Pi Node software on a dedicated Dell Latitude E6430 laptop (4GB RAM, Intel Core i5, 500+ hours, requiring constant uptime with a 50 Mbps internet connection). Plaintiff incurred $1,200 in electricity and data costs ($25/month x 48 months) and dedicated over 1,672 hours, relying on Defendants' representations of decentralization and a projected $25/π value (Kokkalis, X, July 2020).

28. On December 22, 2022, at 21:23 UTC, Plaintiff completed KYC verification through the Pi Network app, submitting a scanned Arizona driver's license, U.S. passport, selfie, and proof of address (utility bill), as required by ToS Section 14. Defendants' support team approved his KYC on January 15, 2023, at 09:47 UTC, via an in-app notification, promising Mainnet migration of his 6,541 Pi tokens within 90 days (by April 15, 2023). Despite this assurance, no tokens were migrated by April 2024, leaving Plaintiff's entire balance vulnerable.

29. On April 10, 2024, at 15:32 UTC, Plaintiff discovered that 5,137.397257 Pi tokens were transferred from his ZEAT wallet to an unknown address (GDQ4...KIDS), as recorded in blockchain transaction logs (PiScan, April 11, 2024, transaction ID [REDACTED]). The transfer, valued at $2,012,000 ($307.49/π, September 2022) or $8,579 ($1.67/π, February 2025), occurred without Plaintiff's authorization or notification, despite his KYC-locked wallet. Subsequent transfers moved 2,567 tokens to wallet V5FF (created February 27, 2024, 15:03 UTC) on April 29, 2024, at 06:49 UTC, and then to FZ7P in two transactions on the same day, remaining dormant as of September 30, 2024, per Plaintiff's blockchain analysis (email, August 4, 2025).

30. Plaintiff initiated a 10-month recovery effort from April 13, 2024, to February 15, 2025,

expending 15 hours across: (a) 12 support tickets submitted via support@socialchain.app (e.g., ticket # [REDACTED], April 13, 2024, detailing GDQ4...KIDS transfer); (b) 47 in-app chat interactions with moderators (e.g., Grunchking, who dismissed Plaintiff's claims as "user error" on April 16, 2024, and muted further queries); and (c) three emails to Defendants (May 10, June 15, January 20, 2025). Defendants provided generic responses, citing ToS Section 14.2 ("security protocols") without investigating or providing evidence of user error. Plaintiff's blockchain analysis, shared with counsel on August 4, 2025, confirmed the transfer was executed by a validator node controlled by SocialChain Inc., contradicting Defendants' claims.

31. Plaintiff's remaining 1,403.602743 Pi tokens have not been migrated to the Mainnet as of February 28, 2025, despite repeated assurances, further devaluing his holdings and causing emotional distress from Defendants' dismissive responses.

**C. Defendant's Misconduct**

32. Unauthorized Token Transfers: The April 10, 2024, transfer of 5,137.397257 Pi tokens from Plaintiff's ZEAT wallet to GDQ4...KIDS was executed by Defendants' three validator nodes, controlled by SocialChain Inc. from Sunnyvale servers, as confirmed by PiScan logs (April 11, 2024). Plaintiff's August 4, 2025, blockchain analysis revealed a pattern of laundering through multiple wallets (GDQ4...KIDS to V5FF to FZ7P), indicating deliberate manipulation. PiScan data (2024) further identifies 8,127 wallets with uniform 2,000,001 Pi balances, suggesting systemic, centralized allocation by Defendants, inconsistent with their promised decentralized blockchain.

33. Secret Token Sales (2021): In 2021, Defendants sold 2 billion Pi tokens in undisclosed transactions, generating an estimated $4,375,000 for payroll (35 employees at $125,000/year, 2022) and $6,000,000 in trademark filings (USPTO, 2022) and legal expenses, as evidenced by settlement documents in Santa Clara Case No. 21CV391680. Blockchain logs (PiScan, 2021) show large transfers to wallets controlled by SocialChain Inc. and Pi Community Company (e.g., wallet

[REDACTED]). Defendants failed to disclose these sales to Plaintiff, violating securities laws and depriving him of material information critical to his mining decisions.

34. Unauthorized Exchange Listings (2022): Defendants facilitated Pi token listings on XT.COM (June 7, 2022, PI/USDT pair, deposits "TBD"), Huobi (July 15, 2022, \$13–\$14/π peak), and Bitmart (August 10, 2022), inflating valuations to \$307.49/π (CoinMarketCap, September 30, 2022). Defendants publicly denied involvement, labeling listings "fake" in an X post (@PiCoreTeam, July 10, 2022), but blockchain data and their \$4,375,000 payroll expansion suggest insider trading and trading fee profits. CoinChapter (November 2023) reported "insider manipulation," noting Plaintiff's exclusion from these gains.

35. Deliberate Migration Delays: Defendants failed to migrate Plaintiff's remaining 1,403.602743 Pi tokens to the Mainnet by February 28, 2025, despite his KYC approval on January 15, 2023, and repeated app notifications promising migration within 90–180 days (e.g., notifications on March 1, June 15, September 10, 2023). Defendants' centralized validators, controlled from Sunnyvale, stalled migration, rendering Plaintiff's tokens illiquid, as reported by CCN (February 2025, "Pi Network: Why Your Coins May Be Worthless").

36. Retaliation Against Complaints: Defendants dismissed Plaintiff's 10-month recovery effort, refusing to investigate the 2024 transfer or provide blockchain evidence, instead citing "user error" (ToS Section 14.2) and muting his in-app queries (e.g., Grunchking, April 16, 2024). This retaliation violated Plaintiff's whistleblower protections under the Sarbanes-Oxley Act, exacerbating his financial and emotional harm.

37. **Evidence Supporting Misconduct**:

1. **Blockchain Logs**: PiScan (2024) confirms the GDQ4...KIDS transfer (April 10, 2024) and 2 billion π sales (2021) to wallets linked to Defendants.

2. **PiScan Data**: 8,127 wallets with uniform 2,000,001 Pi balances (2024), indicating centralized manipulation.

3. **Public Complaints**: Reddit (r/PiNetwork, 1,500+ posts, 2024) and X (#PiFraud, 2,000+ posts, 2024) report similar losses, with users like AKE1974 and DaCovid noting unauthorized transfers.

4. **Crypto News**: CoinChapter (November 2023) and CCN (February 2025) document systemic issues.

5. **Plaintiff's Analysis**: Moen's August 4, 2025, email identifies wallet pathways (GDQ4...KIDS to V5FF to FZ7P) and a $125,000,000 exchange deposit wallet, confirming Defendants' laundering.

6. **Financial Gains**: Defendants' $4,375,000 payroll (2022), $6,000,000 in expenses (Santa Clara Case No. 21CV391680), and trademark filings (USPTO, 2022) evidence profits.

**D. Plaintiff's Harm**

38. Plaintiff suffered a $2,012,000 economic loss from the 2024 transfer of 5,137.397257 Pi tokens, calculated at $307.49/π (CoinMarketCap, September 2022), or $8,579 at $1.67/π (CoinGecko, February 2025). The failure to migrate his remaining 1,403.602743 tokens devalued his holdings further, costing $431,837 at peak valuation or $2,344 at current valuation.

39. Plaintiff lost economic opportunities valued at $1,500,000, representing the potential profits from trading his 6,541 tokens during the 2022 peak, foregone due to Defendants' misrepresentations and delays. Plaintiff incurred $1,200 in electricity and data costs and 1,672 hours of effort, expecting token value based on Defendants' promises.

40. Plaintiff experienced severe emotional distress, including anxiety and frustration, from Defendants' dismissive responses and the loss of his four-year investment, exacerbated by their refusal to investigate or rectify the 2024 transfer.

41. Plaintiff's August 4, 2025, blockchain analysis confirms Defendants' centralized control over validator nodes, enabling the unauthorized transfer and contradicting their decentralization claims, further supporting his claims of fraud and harm.

**E. Defendants' Defenses and Plaintiff's Rebuttal**

42. In their May 13, 2025, response to Plaintiff's April 14, 2025, demand letter, Defendants, through counsel Kenneth P. Nabity, denied liability, asserting: (a) the April 2024 transfer resulted from Plaintiff's error in wallet management; (b) 2022 exchange listings were "fake" and not native Pi tokens; (c) no material misstatements were made in the whitepaper or public statements; (d) Sarbanes-Oxley does not apply, as SocialChain Inc. is not a registered public company and Plaintiff is not an employee; and (e) the ToS arbitration clause and class action waiver (Section 15) are enforceable, precluding litigation and class claims.

43. Plaintiff rebuts these defenses as follows:

- **User Error**: Blockchain logs (PiScan, April 11, 2024) and Plaintiff's analysis (August 4, 2025) confirm the 2024 transfer was executed by Defendants' validator nodes, not Plaintiff, who had a KYC-locked wallet (ZEAT, approved January 15, 2023). PiScan's 8,127 uniform wallets further evidence centralized manipulation, negating user error claims.
- **"Fake" Listings**: Defendants' $4,375,000 payroll expansion (2022) and blockchain data showing large token movements to exchange-linked wallets contradict their "fake" listing claim. CoinChapter (November 2023) reported insider trading, consistent with Plaintiff's exclusion from profits.
- **No Misstatements**: The 2019 whitepaper's "decentralized governance" claim and Kokkalis' $25/π prediction (X, July 2020) were false, as three validator nodes controlled all transactions (PiScan, 2024). Defendants' app notifications (2021–2023) promising "imminent" Mainnet launches were misleading, as Plaintiff's tokens remain unmigrated.
- **Sarbanes-Oxley Applicability**: Plaintiff's 10-month recovery effort (12 tickets, 47 chats, 3 emails) constitutes protected whistleblower activity reporting securities violations, and SocialChain Inc.'s operations under Exchange Act Section 12 (public token trading) trigger protections, despite non-registration (*Lawson v. FMR LLC*, 571 U.S. 429, 440 (2014)).

- **Arbitration/Class Waiver**: The ToS provisions are unenforceable due to:
  - **Procedural Unconscionability**: The adhesive, browsewrap ToS (Section 1) lacked negotiation, and the arbitration clause, added in March 2022 (Wayback Machine), was not prominently disclosed to Plaintiff, who joined in 2020. The 30-day opt-out (Section 15.6) was illusory, requiring proactive monitoring (*Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 114 (2000)).
  - **Substantive Unconscionability**: The clause favors Defendants, allowing court access for intellectual property disputes (Section 15.5) while forcing users into arbitration, and blocks unwaivable securities rights (*McMahon v. Shearson/Am. Express, Inc.*, 482 U.S. 220, 227 (1987)).
  - **Lack of Mutual Assent**: The browsewrap "continued use" consent (Section 1) lacks affirmative agreement, and Plaintiff was not notified of 2022 ToS updates (*Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014)).
  - **Defendants' Waiver**: Defendants litigated Santa Clara Case No. 21CV391680 (2021–2022) without invoking arbitration, settling claims related to Pi Network operations, waiving enforcement (*St. Agnes Med. Ctr. v. PacifiCare of Cal.*, 31 Cal. 4th 1187, 1196 (2003)).
  - **Public Policy**: The class waiver undermines adjudication of systemic fraud potentially affecting 60 million users, favoring federal court resolution (*Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 246 (2013) (Kagan, J., dissenting)).

## <u>CAUSES OF ACTION</u>

**COUNT I: Violation of Securities Act of 1933, 15 U.S.C. §§ 77e, 77l (Unregistered Securities)**

44. Plaintiff incorporates paragraphs 1–43 by reference.

45. Section 5 of the Securities Act of 1933 (15 U.S.C. § 77e(a), (c)) prohibits offering or selling securities through interstate commerce without SEC registration or an exemption. No

exemption applies, as Pi tokens were offered to a global public (60 million users) without restricted eligibility (SEC v. Ralston Purina Co., 346 U.S. 119, 125 (1953)).

46. Defendants sold 2 billion Pi tokens in undisclosed transactions in 2021, as evidenced by blockchain logs (PiScan, 2021, transfers to wallet [REDACTED]) and financial gains ($4,375,000 payroll, 2022), violating 15 U.S.C. § 77e(a), (c). Pi tokens constitute securities under SEC v. W.J. Howey Co., 328 U.S. 293, 301 (1946), based on:

- **Investment of Money**: Plaintiff invested substantial time (1,672 hours over four years, including 1,460 check-ins, 50 hours on referrals, 500+ hours on node operations) and resources ($1,200 in electricity and data costs), akin to labor recognized as an investment in *SEC v. Shavers*, 2013 WL 4028182, at *2 (E.D. Tex. 2013).

- **Common Enterprise**: Defendants' centralized validator pools (three nodes, Sunnyvale) and token reserves tied the value of Pi tokens to Defendants' management, as shown by PiScan data (8,127 uniform 2,000,001 Pi wallets, 2024), establishing a horizontal commonality (*SEC v. SG Ltd.*, 265 F.3d 42, 49 (1st Cir. 2001)).

- **Expectation of Profits**: Defendants' whitepaper (2019, minepi.com) promised a "community-controlled" blockchain, and Kokkalis' public prediction of $25/π (X, July 15, 2020, @PiCoreTeam) induced Plaintiff to mine 6,541 tokens, expecting economic gains upon Mainnet launch.

- **Efforts of Others**: Defendants' control over three validator nodes and orchestration of 2022 exchange listings (XT.COM, Huobi, Bitmart) solely determined token value, as confirmed by blockchain logs showing transfers to exchange-linked wallets.

47. Defendants' failure to register the 2021 token sales or disclose material risks (e.g.,

centralized control, potential misallocations) deprived Plaintiff of critical information, inducing him to mine tokens under false pretenses. Plaintiff relied on Defendants' representations when joining in April 2020 and completing KYC on December 22, 2022, expecting secure migration and token value.

48. Defendants acted with scienter, leveraging their expertise (Kokkalis and Fan, Stanford PhDs in computer science) and control over validators to execute undisclosed sales while profiting ($4,375,000 payroll, $6,000,000 expenses). The sales occurred through interstate means (Pi Network app, accessible globally via Apple App Store and Google Play, and blockchain transactions across state lines).

49. The unregistered sales directly caused Plaintiff's $2,012,000 loss, as his tokens were misallocated in a system lacking regulatory oversight, and prevented him from realizing profits during the 2022 peak valuation.

50. Plaintiff seeks rescission of his investment (time and resources), compensatory damages of $2,012,000, pre- and post-judgment interest from the 2021 sale date (estimated January 15, 2021), and costs under 15 U.S.C. § 77l(a)(1).

**COUNT II: Violation of Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), Rule 10b-5 (Securities Fraud)**

51. Plaintiff incorporates paragraphs 1–43 by reference.

52. Section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. § 78j(b)) and Rule 10b-5 (17 C.F.R. § 240.10b-5) prohibit manipulative or deceptive devices in connection with the purchase or sale of securities. The elements are: (a) material misrepresentation or omission; (b) scienter; (c) connection with a purchase or sale; (d) reliance; (e) economic loss; and (f) loss causation (*Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341 (2005)).

53. **Material Misrepresentations and Omissions**: Defendants made false statements and

omissions, including: (a) claiming "decentralized governance" and an "open blockchain" in the 2019 whitepaper (minepi.com), despite controlling all transactions via three Sunnyvale-based validator nodes (PiScan, 2024); (b) promising token utility and imminent Mainnet launch in 12 app notifications (e.g., March 1, June 15, September 10, 2021–2023), contradicted by delays until February 2025; (c) Kokkalis' $25/π prediction (X, July 15, 2020), inflating user expectations; (d) omitting the 2021 sale of 2 billion Pi tokens, generating $4,375,000+ in profits; and (e) denying involvement in 2022 exchange listings (X, July 10, 2022, "fake listings"), despite blockchain evidence of token movements. These statements and omissions were material, as a reasonable investor would consider them critical to mining decisions (*Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988)).

54. **Scienter**: Defendants acted with intent or reckless disregard for the truth, leveraging their expertise (Stanford PhDs), control over validators, and financial gains ($4,375,000 payroll, $6,000,000 expenses). Their denial of 2022 listings, despite evidence of insider trading (CoinChapter, November 2023), and failure to disclose validator control demonstrate deliberate deception (*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007)).

55. **Connection with Purchase or Sale**: The misrepresentations and omissions occurred in connection with the 2021 sale of 2 billion Pi tokens and 2022 exchange listings, executed through interstate means (Pi Network app, X posts, blockchain transactions accessible globally).

56. **Reliance**: Plaintiff relied on Defendants' whitepaper, app notifications, and Kokkalis' $25/π prediction when joining in April 2020, mining 6,541 tokens over four years (1,672 hours, $1,200 costs), and completing KYC in December 2022, expecting token value and secure migration. Plaintiff's reliance is presumed under the fraud-on-the-market theory, as Defendants' public statements created a market expectation of value (*Basic Inc. v. Levinson*, 485 U.S. at 247).

57. **Economic Loss and Causation**: Plaintiff suffered a $2,012,000 loss from the 2024

unauthorized transfer, directly caused by Defendants' misrepresentations about decentralization and security, which led to his reliance on a vulnerable platform. The failure to migrate his remaining 1,403 tokens further caused losses ($431,837 at peak valuation), as Defendants' false promises prevented Plaintiff from realizing profits during the 2022 peak (*Dura Pharms., Inc. v. Broudo*, 544 U.S. at 342).

58. Plaintiff seeks compensatory damages of $2,012,000, pre- and post-judgment interest from April 10, 2024 (transfer date), and costs, reflecting the economic harm caused by Defendants' fraudulent conduct.

**COUNT III: Violation of Sarbanes-Oxley Act, 18 U.S.C. § 1514A (Whistleblower Retaliation)**

59. Plaintiff incorporates paragraphs 1–43 by reference.

60. Section 806 of the Sarbanes-Oxley Act (18 U.S.C. § 1514A) protects whistleblowers who report securities violations from retaliation by companies subject to Exchange Act reporting requirements (*Lawson v. FMR LLC*, 571 U.S. 429, 440 (2014)).

61. Plaintiff's 10-month recovery effort (April 13, 2024–February 15, 2025) constituted protected whistleblower activity, as he reported suspected securities violations (unregistered 2021 sales, 2022 listings, 2024 unauthorized transfer) through 12 support tickets (e.g., ticket # [REDACTED], April 13, 2024), 47 in-app chat interactions (e.g., April 16, 2024, with moderator Grunchking), and three emails to support@socialchain.app (May 10, June 15, January 20, 2025). These complaints alerted Defendants to potential fraud and mismanagement affecting Plaintiff's 5,137 Pi tokens.

62. Defendants retaliated by: (a) refusing to investigate the 2024 transfer, dismissing it as "user error" without evidence; (b) muting Plaintiff's in-app queries (e.g., April 16, 2024); (c) failing to provide blockchain data or resolution; and (d) delaying migration of Plaintiff's remaining 1,403

tokens, causing further financial harm ($431,837 at peak valuation) and emotional distress. This retaliation violated Section 806's protections.

63. SocialChain Inc.'s operations, including public trading of Pi tokens on exchanges (2022), trigger Exchange Act Section 12 applicability, despite non-registration, as Sarbanes-Oxley extends to contractors and agents (*Lawson v. FMR LLC*, 571 U.S. at 440). Pi Community Company, Kokkalis, and Fan, as agents, are also liable.

64. Plaintiff seeks: (a) compensatory damages for financial and emotional harm; (b) reinstatement of his 6,541 Pi tokens to his ZEAT wallet; (c) backpay for his mining effort ($1,200 in costs, 1,672 hours valued at $25/hour, totaling $41,800); (d) pre- and post-judgment interest; and (e) costs, including attorneys' fees, to remedy Defendants' retaliatory conduct.

**COUNT IV: Common Law Fraud (California)**

65. Plaintiff incorporates paragraphs 1–43 by reference.

66. Under California law, common law fraud requires: (a) misrepresentation or omission of material fact; (b) knowledge of falsity (scienter); (c) intent to induce reliance; (d) justifiable reliance; and (e) resulting damage (*Lazar v. Superior Court*, 12 Cal. 4th 631, 638 (1996)).

67. **Misrepresentation/Omission:** Defendants misrepresented Pi Network as a decentralized platform in the 2019 whitepaper ("open blockchain," "community-controlled") and app notifications (12 instances, 2021–2023), while operating three centralized validator nodes (PiScan, 2024). They promised token utility and imminent Mainnet launches (e.g., X post, @PiCoreTeam, March 1, 2021, "Mainnet soon"), but failed to deliver by February 2025. Defendants omitted material facts, including the 2021 sale of 2 billion Pi tokens, 2022 exchange listings, and validator control, which would have altered Plaintiff's mining decisions.

68. **Scienter:** Defendants, with expertise (Stanford PhDs), knew their statements were false, as they controlled validators and profited from undisclosed sales ($4,375,000 payroll, 2022).

69. **Intent to Induce Reliance:** Defendants intended Plaintiff to rely on their misrepresentations

to mine tokens, increasing platform engagement and token supply for their 2021 sales and 2022 listings, as evidenced by their aggressive marketing (whitepaper, X posts, app notifications).

70. **Justifiable Reliance:** Plaintiff justifiably relied on Defendants' representations, mining 6,541 tokens over four years (1,672 hours, $1,200 costs), joining security circles, and running a node, based on the whitepaper's decentralization promise and Kokkalis' $25/π prediction.

71. **Resulting Damage:** Plaintiff suffered a $2,012,000 loss from the 2024 transfer, $1,500,000 in lost opportunities (foregone 2022 trading profits), and emotional distress from Defendants' dismissive responses.

72. Plaintiff seeks compensatory damages ($2,012,000 economic, $1,500,000 opportunities), punitive damages ($6,488,000) for Defendants' willful fraud, and costs, reflecting their intentional deception.

**COUNT V: Breach of Fiduciary Duty (California)**

73. Plaintiff incorporates paragraphs 1–43 by reference.

74. Under California law, breach of fiduciary duty requires: (a) existence of a fiduciary duty; (b) breach; and (c) resulting damage (*Michelson v. Duncan*, 407 A.2d 211, 217 (Del. 1979), applied in California).

75. **Fiduciary Duty**: Defendants, as operators of Pi Network and custodians of Plaintiff's wallet (ZEAT), owed fiduciary duties of loyalty and care to safeguard his 6,541 Pi tokens, per ToS Section 14 (security obligations) and their control over validators (*Wolf v. Superior Court*, 107 Cal. App. 4th 25, 29 (2003)).

76. **Breach**: Defendants breached these duties by: (a) executing the unauthorized 2024 transfer of 5,137 Pi tokens; (b) failing to migrate Plaintiff's 1,403 tokens by February 2025; (c) selling 2 billion tokens in 2021 without disclosure; and (d) facilitating 2022 listings, prioritizing profits over Plaintiff's interests.

77. **Resulting Damage**: Plaintiff suffered a $2,012,000 loss, $1,500,000 in lost opportunities, and emotional distress, directly caused by Defendants' breaches.

78. Plaintiff seeks compensatory damages ($2,012,000 economic, $1,500,000 opportunities), restitution of 6,541 Pi tokens, and costs, to remedy Defendants' fiduciary failures.

**COUNT VI: Unjust Enrichment (California)**

79. Plaintiff incorporates paragraphs 1–43 by reference.

80. Under California law, unjust enrichment requires: (a) receipt of a benefit; (b) unjust retention of the benefit at another's expense; and (c) causal connection (*Lectrodryer v. SeoulBank*, 77 Cal. App. 4th 723, 726 (2000)).

81. **Receipt of Benefit**: Defendants received at least $4,375,000 from 2021 token sales (payroll for 35 employees) and $6,000,000 in expenses (Santa Clara Case No. 21CV391680, USPTO filings), derived from Plaintiff's mining efforts (6,541 tokens) and platform engagement.

82. **Unjust Retention**: Defendants retained these profits without compensating Plaintiff, whose tokens were misallocated or devalued, as evidenced by blockchain logs and PiScan data.

83. **Causal Connection**: Plaintiff's 1,672 hours of mining and $1,200 costs contributed to the token supply enabling Defendants' sales and listings, directly linking his efforts to their gains.

84. Plaintiff seeks restitution of $4,375,000+ in profits, disgorgement, and costs, to rectify Defendants' unjust enrichment.

**COUNT VII: Violation of California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200**

85. Plaintiff incorporates paragraphs 1–43 by reference.

86. California's Unfair Competition Law (UCL) prohibits unlawful, unfair, or fraudulent business acts or practices (*Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999)).

87. **Unlawful Acts**: Defendants' violations of the Securities Act (Count I), Securities Exchange

Act (Count II), and common law fraud (Count IV) constitute unlawful practices under the UCL's borrowed violations doctrine (*Farmers Ins. Exch. v. Superior Court*, 2 Cal. 4th 377, 383 (1992)).

88. **Unfair Acts**: Defendants' centralized control (three validator nodes), unauthorized 2024 transfer, 2021 secret sales, 2022 listings, and migration delays were unfair, causing Plaintiff harm ($2,012,000 loss, $1,500,000 opportunities) without countervailing benefits, violating consumer protection principles (*South Bay Chevrolet v. Gen. Motors Acceptance Corp.*, 72 Cal. App. 4th 861, 886 (1999)).

89. **Fraudulent Acts**: Defendants' misrepresentations (decentralization, token utility, Mainnet timeline) and omissions (2021 sales, 2022 listings) were likely to deceive reasonable users, inducing Plaintiff's reliance (1,672 hours, $1,200 costs), as confirmed by public complaints (Reddit, X, 2024).

90. Plaintiff seeks restitution of his 6,541 Pi tokens, injunctive relief to halt unauthorized transfers, ensure Mainnet migration, disclose all transactions since 2019, and implement transparency measures, and costs, to address Defendants' UCL violations.

## VI. PRAYER FOR RELIEF

91. Plaintiff respectfully requests the following relief:

A. Compensatory damages of $10,000,000, comprising $2,012,000 for economic loss (5,137 Pi tokens at $307.49/π), $1,500,000 for lost economic opportunities, and $6,488,000 in punitive damages for Defendants' willful misconduct.

B. Restitution of 6,541 Pi tokens to Plaintiff's ZEAT wallet.

C. Disgorgement of Defendants' profits, including at least $4,375,000 from 2021 sales and 2022 listings.

D. Punitive damages to punish and deter Defendants' egregious fraud and retaliation.

E. Injunctive relief to: (a) immediately halt unauthorized token transfers; (b) ensure Mainnet

migration of Plaintiff's 6,541 tokens within 30 days; (c) disclose all token transactions since March 14, 2019, including 2021 sales and 2022 listings; and (d) implement blockchain transparency measures, such as public validator logs.

F. Declaratory judgment that Defendants' actions violated the Securities Act of 1933, Securities Exchange Act of 1934, Sarbanes-Oxley Act, and California law.

G. Permission to advertise for other similarly situated Pi Network users to form a class under FRCP 23(a) and (b)(3), compliant with CRPC 7.1–7.5, through media, online platforms, and cryptocurrency news outlets.

H. Attorneys' fees (40% contingency, subject to FRCP 23(h) if class certification is sought), costs, and pre- and post-judgment interest.

I. Such other relief as the Court deems just and proper.

## VII. DEMAND FOR JURY TRIAL

92. Plaintiff demands a jury trial on all issues triable by jury, pursuant to FRCP 38.

## VIII. CERTIFICATION

93. Pursuant to FRCP 11, undersigned counsel certifies that this complaint is not presented for any improper purpose, is warranted by existing law or a non-frivolous argument for extending law, and is supported by evidentiary materials, including blockchain transaction logs (PiScan, Stellar Explorer), PiScan data (8,127 uniform wallets), public complaints (Reddit r/PiNetwork, X #PiFraud), crypto news reports (CoinChapter, CCN), corporate filings (CA Secretary of State, Cayman Islands Registry), prior litigation records (Santa Clara Case No. 21CV391680), Defendants' ToS, and Plaintiff's blockchain analysis (August 4, 2025), or will likely have support after reasonable discovery.

DATED: October 23, 2025

/s/ Mario Tafur
Mario Tafur
Attorney for Plaintiff

**PROOF OF SERVICE**

I, Jennifer Munguia, am employed in the County of Los Angeles, State of California. I am over the age of 18 and am not a party to this action. My business address is 500 N. Central Ave., Ste. 610 Glendale, CA 91203.

ON OCTOBER 23, 2025, I SERVED THE WITHIN DOCUMENT DESCRIBED AS:
COMPLAINT DEMAND FOR JURY TRIAL

| | |
|---|---|
| _x__ **BY FIRST CLASS MAIL**<br>____ by placing a true copy thereof enclosed in a sealed envelope for deposit with the United States Postal Service, with postage thereon fully prepaid, addressed as follows: | ____ **BY PERSONAL SERVICE**<br><br>____ I delivered a true copy of the aforesaid document by hand to the addressee(s) or the addressee's office.<br><br>____ I caused a true copy of the aforesaid document to be delivered by hand to the offices of the addressee(s) |
| _X__**VIA ELECTRONIC MAIL TO:**<br><br>Kenneth P. Nabity<br>knabity@delfinomadden.com<br><br>Emily McAtee<br>emcatee@delfinomadden.com | ____ **VIA FACSIMILE**<br><br>__ I caused a true copy of the aforesaid document to be transmitted to the recipient at the facsimile machine number last given by that person on a document which that person has filed in the cause and served on the person making this service. |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on a October 23, 2025, at Glendale, California.

Signature: Jennifer Munguia