Mario Tafur, Esq. (SBN: 329899)
mario@thebulldog.law
**BULLDOG LAW, P.C.**
500 N. Central Avenue, Ste. 610
Glendale, CA 91203
Telephone: (949) 649-3007
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| HARRO MOEN | ) Case No.: 5:25-cv-09145-NC |
| Plaintiff(s), | ) |
| vs. | ) **THIRD AMENDED COMPLAINT** |
| SOCIALCHAIN INC., PI COMMUNITY COMPANY, NICOLAS KOKKALIS, CHENGDIAO FAN, and DOES 1-50, | ) **DEMAND FOR JURY TRIAL** |
| Defendant(s). | ) |

Plaintiff Harro Moen ("Plaintiff" or "Moen"), by and through his counsel, Bulldog Law, PC, brings this Third Amended Complaint against Defendants SocialChain Inc., Pi Community Company, Nicolas Kokkalis, Chengdiao Fan, and Does 1-50 (collectively, "Defendants"), and alleges as follows based on personal knowledge as to his own acts, information and belief, extensive investigation of counsel, blockchain transaction logs (PiScan, Stellar Explorer), PiScan data (8,127 uniform wallets), public complaints (Reddit r/PiNetwork: 1,500+ posts; X #PiFraud: 2,000+ posts), crypto news reports (CoinChapter, November 2023; CCN, February 2025), corporate filings (CA Secretary of State File No. 4201964; Cayman Islands Registry), prior litigation records (Santa Clara Case No. 21CV391680), Defendants' Terms of Service (ToS, February 19, 2025, version, attached

- 1 -

as Exhibit A), Defendants' 2019 Whitepaper, and Plaintiff's blockchain analysis (email dated August 4, 2025). This Third Amended Complaint cures the deficiencies identified in the Court's January 15, 2026 Order (ECF No. 29) by pleading with particularity the misleading statements Plaintiff personally saw and relied upon, explaining why those statements were false when made, specifying Plaintiff's reliance and resulting harm, identifying each Defendant's role, and detailing the unauthorized token transfer—including the who, what, when, where, and how. Consistent with the Court's Order and Federal Rule of Civil Procedure 9(b), the Amended Complaint omits the dismissed federal claims and expands the fiduciary duty allegations by citing specific Terms of Service provisions and explaining the duties Defendants undertook.

### INTRODUCTION

1.  This case arises from a multi-year scheme by Defendants to defraud over 60 million users of the Pi Network cryptocurrency platform. Defendants—two Stanford-affiliated computer scientists—published a Whitepaper in March 2019 making specific operational commitments: that the community would govern when the blockchain launched, that community members would operate validator nodes, and that the ecosystem would be built through genuine decentralized participation. These were not aspirational goals. They were the promises that recruited Plaintiff and millions of others to spend years contributing time, effort, and resources to build Defendants' platform.

2.  None of these promises were kept. For over five years, Defendants operated all three validator nodes themselves. No community vote ever occurred. No governance mechanism was ever created. Defendants unilaterally launched an enclosed mainnet in December 2021, opened it to the public on February 20, 2025 without community input, and maintained exclusive centralized control over every user's tokens at all times—including the ability to move tokens in and out of any wallet without the user's knowledge or consent.

3.  While telling 60 million users their tokens had "no value," Defendants privately coordinated the listing of Pi tokens on three cryptocurrency exchanges on December 29, 2022, generating $57.51 million in trading volume on Huobi alone on opening day. Communications from the

exchanges themselves—obtained before the mainnet launched and during this litigation—confirm that the listings were initiated by the project team, executed with the project team's technical cooperation, and maintained through an ongoing collaborative relationship. This occurred one month after Defendants' own counsel documented over $50,000 in legal debt owed by the founders, at a time when Defendant Kokkalis was bouncing checks for $86 and being sued in small claims court for $725. The project was on the brink of financial collapse and had been delayed indefinitely due to the founders' inability to garner investment capital during the McPhilip derivative lawsuit. The founders' self-dealing behavior—issuing themselves 500 million shares each at $0.00005 per share just months after selling SAFE investments at a $20 million valuation—had become known to SAFE purchasers who had invested at a significantly higher valuation than what the founders had issued for themselves.

4. Plaintiff's 5,137 Pi tokens were not stolen by a random hacker. Blockchain records show that Plaintiff's original wallet ending in "ZEAT," used during his KYC process on December 22, 2022, was replaced with a different wallet ending in "KIDS," which was created on February 16, 2024—over a year after Plaintiff locked in his wallet address for token distribution. On April 8, 2024 at 15:32, Plaintiff's verified ZEAT wallet was replaced with the unverified KIDS wallet and received Plaintiff's 5,137 Pi tokens in the form of a claimable balance initiated by the founders' seed wallet ending in "GC5G," also known as Pi Foundation Wallet 2. When the claimable balance was initiated, it was done so using the wallet ending in "3BNJ," also known as Pi Foundation Wallet 11, as the first claimant, which gave the founders complete control and authority over those tokens for a period of 14 days.(Exhibit W-3)

5. Defendant Kokkalis has claimed he was personally involved with the migration process—a duty which he took on himself—and knows that once a person submits their wallet address for KYC verification, that wallet address cannot be changed until the tokens, for which a person has completed their KYC verification, have been transferred to that user's wallet.

6.  On April 27, 2024, another wallet was created ending in "V5FF." The blockchain shows that two days after V5FF was created, it received a total of 70 payments from individual wallets, including 2,567 tokens from the KIDS wallet. This process started on the morning of April 29, 2024 at 05:37 and lasted until 08:21 the same day. Every transaction was performed in sequence using its own separate block. After all 70 wallets completed their payment cycles, the V5FF wallet had a total of 40,866 Pi tokens, which were then sent to another wallet ending in "FZ7P" using two separate payment operations—one payment of 20,000 tokens sent at 08:41 and the remaining 20,866 Pi tokens sent at 08:42, both within a minute of each other on April 29, 2024. (Exhibit W-3)

7.  Each of the 70 wallets share the same characteristics as the KIDS wallet to which Plaintiff's tokens were sent. Each wallet was created between February 5, 2024 and March 13, 2024 and abandoned after the April 29, 2024 payment cycle was finished. A small handful had locked balances which were then transferred to another wallet once the tokens became unlocked. The V5FF wallet was created on February 13, 2024 and has remained dormant since the last transfer of tokens on April 29, 2024 at 08:42. The FZ7P wallet was also collecting tokens from various wallets using the same process as the batch of 70 wallets used for the V5FF wallet. From April 25, 2024 to May 15, 2024, the FZ7P wallet conducted 73 transactions sending a total of 388,300 tokens to another wallet address ending in "HWKY." (Exhibit W-6)

8.  This is just a fraction of the token theft discovered on the blockchain. Most operations consisting of payments larger than 500 Pi tokens can be traced to specific wallets collecting these types of bulk payment operations. Once the mainnet was launched, millions of tokens collected through this process were sent to different exchanges to be cashed in. Some were used to conduct token swaps with BitMart and XT.COM to satisfy trading activity conducted in the two years prior to the mainnet launch. This is not something an exchange would do if the listings were fake, as the founders claimed. With the mainnet firewalled and the founders running the only three validator

nodes on the blockchain, it is implausible that they were not involved—or at the very least aware of—the magnitude of payment activity that was transpiring before open mainnet.(Exhibit W-4)

9.   Plaintiff brings four causes of action: Common Law Fraud, Breach of Fiduciary Duty, Unjust Enrichment, and Violation of California's Unfair Competition Law (Bus. & Prof. Code Section 17200). Each claim is supported by specific facts, dates, blockchain records, exchange communications, and documentary evidence from related litigation, satisfying the particularity requirements of Federal Rule of Civil Procedure 9(b).

**JURISDICTION AND VENUE**

10. This Court has subject matter jurisdiction pursuant to 28 U.S.C. Section 1332(a) (diversity jurisdiction). Plaintiff is a citizen of Arizona. Defendant SocialChain Inc. is a Delaware corporation with its principal place of business in California. Defendant Pi Community Company is a Delaware corporation with its principal place of business in California. Defendant Nicolas Kokkalis is a citizen of California. Defendant Chengdiao Fan is a citizen of California. The amount in controversy exceeds $75,000, exclusive of interest and costs.

11. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. Section 1367.

12. Venue is proper in the Northern District of California pursuant to 28 U.S.C. Section 1391(b) because a substantial part of the events giving rise to the claims occurred in this district, and Defendants reside in this district.

**PARTIES**

8.   **Plaintiff Harro Moen:** is an individual residing in Maricopa County, Arizona. Moen, a 45-year-old retiree with no prior cryptocurrency experience, joined Pi Network on April 15, 2020, via the iOS App Store, creating wallet ZEAT using an invitation code from a friend. Over four years, Moen mined 6,541 Pi tokens through daily check-ins (1,460 sessions, 122 hours), recruiting 25 users (50 hours), and running Pi Node software on a Dell laptop (500+ hours, $1,200 in costs).

Moen has Article III standing: injury-in-fact (economic loss, distress), traceability (Defendants' control/misrepresentations), redressability (damages/restitution) (Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992)).

9.  **Defendant SocialChain Inc.**: is a California corporation (File No. 4201964), headquartered at 1159 Sonora Ct., Suite 140, Sunnyvale, CA 94086. It operates Pi Network's infrastructure, controls validator nodes, manages tokens/wallets, orchestrated 2021 sales and 2022 listings, and dismissed Plaintiff's complaints.

10. **Defendant Pi Community Company**: is a Cayman Islands entity (Registry No. [Pending Discovery]), directed from Sunnyvale by SocialChain Inc., Kokkalis, and Fan. It facilitated 2021 sales and 2022 listings, shielding profits.

11. **Defendant Nicolas Kokkalis**: residing in Sunnyvale, CA, is co-founder/CTO of SocialChain Inc. He authored the 2019 Whitepaper with false decentralization claims and oversaw validator nodes, profiting from sales/listings.

12. **Defendant Chengdiao Fan**: residing in Palo Alto, CA, is co-founder/CEO of SocialChain Inc. She directed operations, including KYC/migration/support, issued misleading notifications, and dismissed complaints, profiting similarly.

13. **Defendants Does 1-50**: Unknown individuals or entities, likely based in California or the Cayman Islands, including blockchain developers who coded validator nodes, support staff who dismissed Plaintiff's complaints, exchange representatives who facilitated 2022 listings, and financial intermediaries who laundered proceeds from 2021 sales. Their identities will be uncovered through discovery, including subpoenas to XT.COM, Huobi, Bitmart, and blockchain analytics firms (e.g., Chainalysis, Elliptic) to trace wallets (e.g., GDQ4...KIDS, V5FF, FZ7P). These Defendants acted in concert with named Defendants, executing California-directed misconduct that directly caused Plaintiff's losses. (Exhibit W-5)

**FACTUAL ALLEGATIONS**

**A. Background of PI Network**

14. In March 2019, Defendants Kokkalis and Fan authored and published the Pi Network Whitepaper, stating: "Build a cryptocurrency and smart contracts platform secured and operated by everyday people"; "Pi's consensus algorithm... creates a native trust layer that scales trust on the web without intermediaries"; "No central authority will be controlling the currency and it will be fully decentralized"; and in Phase 3 (Mainnet), "the system will continue on its own forever," with Pi "connectable to exchanges and... exchanged for other currencies." These statements were false when made because, from launch, the platform was centralized under Defendants' control through three validator nodes (PiScan, 2024 data showing no community governance), with Defendants knowing this (as they designed/operated the nodes) to delay decentralization and profit from secret sales (evidenced by 2021 transfers to entity-controlled wallets).

15. Plaintiff saw and relied on these specific Whitepaper statements on April 14, 2020, via minepi.com. Over four years, he mined 6,541 tokens by daily check-ins, recruiting, and running Node software, incurring $1,200 in costs. Id. at 13. He relied on whitepaper statements viewed on minepi.com April 14, 2020, believing assets secure. In 2021, Defendants sold 2 billion tokens undisclosed, depriving Plaintiff of information. Id. at 14–15. In 2022, they orchestrated listings on XT.COM (June 7, PI/USDT), Huobi (July 15, $13–$14 peak), BitMart (Aug. 10), using fake Stellar-cloned tokens (BitMart's Dec. 19, 2025 announcement: 1:1 "OLD PI: NEW PI" swap; Huobi CEO Zhou: "not credible," delisting Feb. 20, 2025). They denied involvement (@PiCoreTeam X post ID 1608527566872403969, Dec. 29, 2022: "Pi Network isn't affiliated with... any exchange listing"), false as exchanges confirmed founder role; no cease-and-desist despite WIPO actions against others. Listings funded trademarks (USPTO, Jan. 2023) and hires amid insolvency (bounced check, small claims). (Exhibit F-3)

16. In 2023, Defendants approved Plaintiff's migration request following his KYC verification

on December 22, 2022, but deliberately delayed the process despite app promises, such as the January 15, 2023 notification: "Complete KYC and migrate to Mainnet within 3-6 months for full access." Compl. at 13, 15. These delays rendered Plaintiff's tokens illiquid and valueless, breaching fiduciary duties arising from Defendants 'control over user assets and promises of secure handling, analogous to the breach recognized in the court found fiduciary duties in cryptocurrency platforms based on user trust in asset management and security representations. This duty has been recognized in the context of co-ventures where one party exercises dominant control over share business assets, leading to fiduciary obligations to act primarily for the others benefit. *Matter of Lehan v. Montgomery 2025 NY Slip Op 52146(U))*; citing *Meinhard v. Salmon, 249 NY 458 [1928]*) the relationship between plaintiff and defendant is very similar if not analogist to the relationship between two con-ventures as plaintiff was to benefit from mining PI coins so was defendant benefiting from this activity as well. The significant control exercise by Pi Network over the assets especially prior to their migration to Mainnet wallet gives rise to a fiduciary duty owed to plaintiff by defendant.

17. Defendants' node override, exploiting the custodial nature of the system despite app FAQ claims of "noncustodial" wallets (e.g., "You are the sole owner of your Wallet's private key... never comes to Pi's servers," viewed by Plaintiff in-app from 2021-2024). This was false, as no local keys existed, and passphrases were retrieved via the Pi Browser connecting to servers. Plaintiff complained through 12 support tickets, 47 in-app chats, and emails, but Defendants dismissed them as "user error" without investigation. This pattern of bad faith is evidenced by the McPhillips lawsuit (Santa Clara Case No. 21CV391680), revealing a toxic work environment involving physical arguments requiring intervention, dilution of SAFE agreements, unpaid vendors (e.g., Christine Birch), bounced checks (e.g., $86 in November 2022), and small claims for unpaid tenant repairs (~$800 in December 2022). Such conduct demonstrates a history of self-dealing and disregard for obligations, supporting claims of fraudulent concealment and breach of duty, as in Lee

v. Foris Dax, Inc., No. 3:2024cv06194 (N.D. Cal. 2025), where the court addressed UCL claims for misleading statements in cryptocurrency platforms involving deceptive practices and user harm.

18. Defendants' node override, exploiting the custodial nature of the system despite app FAQ claims of "noncustodial" wallets (e.g., "You are the sole owner of your Wallet's private key... never comes to Pi's servers," viewed by Plaintiff in-app from 2021-2024). This was false, as no local keys existed, and passphrases were retrieved via the Pi Browser connecting to servers. Plaintiff complained through 12 support tickets, 47 in-app chats, and emails, but Defendants dismissed them as "user error" without investigation. This pattern of bad faith is evidenced by the McPhillips lawsuit (Santa Clara Case No. 21CV391680), revealing a toxic work environment involving physical arguments requiring intervention, dilution of SAFE agreements, unpaid vendors (e.g., Christine Birch), bounced checks (e.g., $86 in November 2022), and small claims for unpaid tenant repairs (~$800 in December 2022). Such conduct demonstrates a history of self-dealing and disregard for obligations, supporting claims of fraudulent concealment and breach of duty.

19. For the unauthorized transfer (¶4a), Defendants SocialChain Inc. and Pi Community Company used their validator nodes to execute the transaction without Plaintiff's passphrase or approval, as Plaintiff had enabled two-factor authentication and never shared credentials. This breached the ToS (Section 4: "[Y]ou are responsible for keeping and maintaining the security of your password"), but Defendants overrode user security via centralization, contrary to Whitepaper promises.

21. Defendants' ToS (Ex. A, §12: ". If you have passed SocialChain's KYC process ("KYC") and fulfilled other relevant requirements as set forth in these Terms, you may obtain Pi cryptocurrency in your Mainnet wallet ("Mainnet Wallet") on the Pi Mainnet Blockchain (the "Pi Mainnet Blockchain") (such migrated Pi is referred to herein as "Migrated Pi")."; §4: "[Y]ou are responsible for keeping and maintaining the security of your password", and Pi Network employs measures to protect user assets") created fiduciary duties by undertaking to act for users' benefit in

handling/migrating tokens, reposing trust (e.g., duty to disclose sales/listings as material to asset value; duty to timely migrate per promises; duty to prevent unauthorized transfers via secure controls). This forms a confidential relationship per Bhatia v. Silvergate Bank, 725 F.Supp.3d 1079, 1121 (S.D. Cal. 2024), where similar asset promises imposed duties.

**B.  The Pi Network Whitepaper and Its Specific Commitments**

22. In March 2019, Defendants Kokkalis and Fan published the Pi Network Whitepaper (the "Whitepaper"), a detailed technical document designed to recruit users to the Pi Network platform. The Whitepaper was updated in December 2021 and again in March 2022.

23. The Whitepaper made the following specific operational commitments:

a.  Community Governance of Mainnet Timing. The Whitepaper represented that the Pi Network community would decide when the mainnet blockchain launched. Defendants stated the community would collectively govern the transition from testnet to mainnet through a democratic process.

b.  Validator Node Decentralization. The Whitepaper stated that the "Pi core team will host several nodes on the test net, but will encourage more Pioneers to start their own nodes on the testnet," with the clear implication that community-operated validator nodes would be selected and established before the mainnet launched.

c.  Ecosystem Development Requirements. The Whitepaper described an ecosystem development model requiring the community to build 100 applications before the mainnet would open to ensure genuine decentralized utility.

d.  Attention Marketplace. The Whitepaper described a planned "Attention Marketplace" system to monetize user engagement, with tokens serving as currency for user attention.

24. These were not vague aspirational goals. They were specific operational commitments made

in a detailed technical document used to recruit 60 million users worldwide. The Whitepaper contained zero risk disclosures, zero conflict of interest disclosures, and no disclaimers of any kind.

25. Plaintiff read and relied upon the Whitepaper's representations when he joined Pi Network on April 15, 2020. As a user with no prior cryptocurrency experience, Plaintiff understood the Whitepaper's plain-language promises to mean that he would participate in building a decentralized cryptocurrency platform that he and other community members would collectively own and govern.

**C.  The December 29, 2022 Exchange Listings**

26. On December 29, 2022, Pi tokens were simultaneously listed on three cryptocurrency exchanges: XT.com, Huobi (now HTX), and BitMart. (Exhibit E-1)

27. On launch day, the Pi token reached a high of approximately $307 across all three exchanges, generating $57.51 million in trading volume on Huobi alone on opening day.

28. This occurred during what Defendants publicly described as an "enclosed mainnet" with "no external connectivity." Defendants publicly denounced these listings, and moderators immediately began scrubbing the community chatroom of any conversation relating to these exchange listings. Plaintiff and other users were banned from the chatroom for asking questions about the listings. No user was allowed to mention the existence of these exchange listings without fear of being kicked off the platform. Users were told that Pi was not listed on any exchanges—even though the token was being publicly traded on three platforms using the exact same logo and stock ticker that Pi Network uses today. Traders were buying and selling the token at $307 per token when the founders issued their statement denouncing the listings. Moments later, all three exchanges suspended trading for the Pi token.

29. Defendants' public denials of involvement in these listings are directly contradicted by the exchanges' own records:

a. On July 10, 2023, Huobi (now HTX) customer service confirmed in writing that token listings on their platform are "determined by the project party after contacting us and undergoing evaluation and review." (Exhibit E-2)

b. On January 28, 2026, BitMart customer support confirmed that Pi Network (PI) was listed on December 29, 2022, and that "trading was enabled at that time in accordance with the project team's information and support." BitMart further stated that it "lists and supports tokens based on the project team's official disclosures and technical arrangements at the time." (Exhibit E-2)

c. On January 18, 2024, HTX published a press release through PRNewswire stating it was acting "in collaboration with Pi Network"—more than a year after the listings Defendants publicly denounced as unauthorized. (Exhibit E-5) (Exhibit E-6)

d. On March 21, 2025, BitMart announced a 1:1 token swap from old PI tokens to new mainnet PI tokens, confirming that the tokens originally listed were real assets supplied by the project team that required migration to the new blockchain. (Exhibit W-7)

30. Defendants never filed suit against any exchange for trademark infringement or sought to recover the $57.51 million in trading volume those exchanges generated. Their selective enforcement is addressed in Section D below.

**D. Defendants' Financial Motive**

31. In June 2020, Defendants Kokkalis, Fan, and former co-founder Vince McPhilip each received 500 million shares of SocialChain Inc. at $0.00005 per share—without informing the Pi Network community.

32. In November 2021, Defendants unilaterally issued themselves 1 billion additional shares at a heavily discounted price without informing existing investors or determining fair market value.

33. By late 2022, Defendants were financially desperate. Under sworn declaration in Case No.

21CV391680 (Superior Court of California, County of Santa Clara), Defendant Fan testified that as of May 2020, Pi Network had "two months of runway left" (Fan Decl., Para. 22), ad revenue of "less than $5,000" per month (id.), and faced a "serious possibility" of insolvency by July 2020 (id. at Para. 23). An "unexpectedly high" AWS bill equaled the entire month of expenses (id. at Para. 22). Defendants "could not find any investors" and "bills were coming due" (id. at Para. 25). They could not afford a formal business valuation, which would have cost "tens of thousands of dollars" (id. at Para. 24). A venture capital investor told Defendants to "stop hiring, don't expect to get any more money and cut cut if you can" (id. at Para. 16). By mid-April 2020, "there were no prospects for additional funding" (id. at Para. 17). Defendants Fan and Kokkalis are husband and wife, meaning the financial distress was shared household distress. (Exhibit F-2)  Specifically:

a.  On November 15, 2022—just forty-four days before exchange listings appeared—Defendant Kokkalis bounced Check No. 1130 in the amount of $86.00 to the Superior Court of California, County of Santa Clara, for nonsufficient funds (Case No. 21CV391680, docket entry November 15, 2022). The court listed his address as "No Known Address." He was assessed a $50.00 administrative penalty and banned from writing checks to the court for one year. He resubmitted with certified funds on December 1, 2022. Nicolas Kokkalis—co-founder and CTO of a project claiming over 35 million users—could not cover an $86 check.

b.  On December 8, 2022—just twenty-one days before exchange listings appeared—Defendant Kokkalis was sued in small claims court by Jonathan Laplante for $725 in emergency repairs that Kokkalis had promised to reimburse as a landlord but failed to pay (Laplante v. Kokkalis, Santa Clara County Superior Court, filed December 8, 2022). The court's certified mail to Kokkalis was returned unclaimed. The case was settled less than three weeks after the December 29, 2022 exchange listings—at a time when Kokkalis could not previously cover an $86 check. (Exhibit F-1)

c. Defendants could not secure investment capital because of the ongoing McPhilip derivative lawsuit.

d. McPhilip's attorney documented that Defendants were pressuring McPhilip to participate in a secret share sale specifically to fund their legal defense.

e. By September 2022, Defendants' own counsel, Kenneth Nabity, had documented over $50,000 in outstanding attorneys' fees in the McPhilip lawsuit alone (Nabity Decl., Case No. 21CV391680, Para. 4), with projected costs through conclusion exceeding $200,000 (id. at Para. 7). (Exhibit F-5)

34. One month later, on December 29, 2022, Pi tokens appeared on three exchanges with $57.51 million in trading volume on Huobi alone on opening day—while the community remained locked out on the enclosed mainnet.

35. Less than three weeks after the exchange listing incident, the project came back to life. Defendants' financial picture transformed completely:

a. Kokkalis resolved his small claims dispute for $725.

b. Defendants began to aggressively expand their operation to over 35 employees, most with an average salary of approximately $125,000 per year.

c. Using the same law firm (Coblentz Patch Duffy & Bass LLP) and attorney (Sabrina A. Larson) that handled their trademark registrations, Defendants initiated WIPO arbitration proceedings against an individual in Vietnam (Case D2022-3538, filed September 26, 2022) and an individual in Nigeria (Case D2023-2191, filed May 19, 2023) for operating small websites using the Pi Network name. In both proceedings, Pi Community Company asserted common law trademark rights in "PI NETWORK" and "PI," claimed over 50 million app downloads and over 1 million social media followers, and argued that unauthorized use of their marks caused consumer confusion. Both resulted in domain transfers. Yet Defendants took no

comparable action—no cease and desist letters, no WIPO arbitrations, no trademark infringement lawsuits, no requests for injunctive relief—against billion-dollar cryptocurrency exchanges that were allegedly using the same trademark, logo, and ticker symbol without authorization and generating millions in trading volume. The same arguments Defendants made against individuals operating small websites apply with far greater force to exchanges listing a "PI" token using the Pi Network logo—yet Defendants never made them. (Exhibit F-3) (Exhibit F-4)

d. When it came to taking any action against the three exchanges, however, Defendants never did. Not one Cease and Desist letter was sent to any of these platforms during the two years they listed Pi as an asset. Over $57 million in equity was siphoned away from the Pi Network community, and the founders showed zero interest in getting to the bottom of what happened. If what the founders claim is true—that these exchanges independently listed their token without authorization—that would be the first time anything like this has ever happened in the history of cryptocurrency. If exchanges were permitted to list tokens without developer cooperation, there would be no incentive to developing a token if it can be pirated in the manner the founders want this Court to believe occurred.

e. The McPhilip lawsuit was settled in November 2023—immediately before court-ordered discovery of the founders' financial records would have commenced.

**E. Pattern of Breach of Contract and Bad Faith Toward Associates**

36. Defendants' conduct toward Plaintiff is not an isolated incident but part of a documented pattern of breach of contract and bad faith toward individuals who work with or for them. Former co-founder Vincent McPhilip filed a derivative action against Defendants in Santa Clara County Superior Court (Case No. 20CV368601), accusing them of financial mismanagement, mishandling $20 million in funds, and removing him from the project without following internal governance

procedures. McPhilip alleged that Defendants had promised him equity shares in SocialChain Inc. but subsequently attempted to substitute Pi tokens in place of the promised shares—a bait-and-switch that demonstrates the same pattern of making commitments and then unilaterally changing the terms once the other party has contributed value.

37. The McPhilip litigation revealed critical details about Defendants' corporate structure and control, including the self-dealing share issuances described in paragraph 24 above, the founders' inability to secure outside investment, and the degree to which Kokkalis and Fan exercised unilateral control over all corporate and blockchain decisions. The court filings confirm that SocialChain and Pi Community Company operate as a single entity under the founders' exclusive direction—the same centralized control that Plaintiff alleges in this Complaint.

### E. The Unauthorized Transfer of Plaintiff's Tokens

38. Plaintiff completed KYC verification on December 22, 2022. At that point, his authorized wallet address (ending in "ZEAT") was locked and assigned to his account. Pi Network's own moderators confirmed in platform communications that wallet addresses cannot be changed after KYC verification.(Exhibit W-1)

39. On or about April 10, 2024, 5,137.39 Pi tokens were transferred from Plaintiff's account—not to his authorized ZEAT wallet, but to an unauthorized wallet ending in "KIDS."

40. The KIDS wallet was created approximately 16 months after Plaintiff's KYC verification date. This means someone changed Plaintiff's assigned wallet destination to an address that did not exist when his account was verified.

41. Blockchain records confirm that the KIDS wallet was created by Defendants' Pi Foundation Wallet 2—the same infrastructure wallet that created Plaintiff's authorized ZEAT wallet. Pi Foundation Wallet 2 is used to create user wallets as part of the migration process.

42. The transfer was executed through Pi Network's Stellar-based claimable balance mechanism (CAP-0035). When Plaintiff's claimable balance was created, it was claimed within one minute and immediately forwarded. This timing is too short for manual human claiming—it requires automated scripts monitoring claimable balance creation in real time.

43. The receiving wallet (ending in "V5FF") processed tokens from over 70 victim wallets

within a two-hour window, with transfers executing at sequential 42-49 second intervals. This automated, batch processing is the hallmark of a system-level operation, not an individual hack. (Exhibit W-5)

44. V5FF is only one of hundreds of wallets involved in ongoing token theft. Hundreds, possibly thousands of wallets were created to facilitate thefts identical to Plaintiff's, with over two thousand reported incidents from users whose tokens were stolen in the same manner.

45. Under the Stellar claimable balance protocol, Pi Network's Foundation wallet (ending in "3BNJ") is listed as the first claimant on every user's claimable balance with a 14-day priority reclaim window. This means the Foundation has the technical capability to reclaim any user's tokens within 14 days of migration.

46. Defendants exercised this exact capability during the opening days of the mainnet in February-March 2025, conducting "reverse migrations "pulling tokens back out of user wallets without notice. Pi Network publicly acknowledged this capability and admitted using it for other users. Defendants refused to exercise the same capability for Plaintiff. (Exhibit W-7)

47. After the unauthorized transfer, Plaintiff's original authorized ZEAT wallet sent 10 Pi back to Pi Foundation Wallet 2—proving that Pi Network still controlled that wallet after the transfer.

**F.  Pi Ventures and Undisclosed Conflicts of Interest**

48. Defendants established Pi Ventures, a venture capital fund with a reported $200 million balance, ostensibly to attract developers to build the Pi Network ecosystem. (Exhibit P-1)

49. To date, the only known investment from this fund is a $20 million investment in OpenMind, an AI robotics company. Defendants have never explained how an AI robotics company benefits the Pi Network ecosystem or has any connection to blockchain technology.

50. This investment decision was made unilaterally by the founders without any community input, vote, or oversight mechanism—the same pattern of centralized decision-making that has characterized every major action Defendants have taken since the project's inception.

51. The investment benefits the founders personally—not the 60 million users whose collective engagement built the platform and whose tokens funded the venture capital balance.

**G. Founder Wallet Cashouts at Mainnet Launch**

52. On February 20, 2025, when the mainnet opened to the public, founder-associated wallets (ending in "GALIT7ME" and "GCCDKBMG") began cashing out Pi tokens to cryptocurrency exchanges MEXC and Gate.io within seven days of the mainnet opening—while regular users' tokens remained locked, unmigrated, or stolen.

53. Although this Complaint does not assert standalone securities claims, the securities-like characteristics of Pi tokens are directly relevant to Defendants' scienter, their fiduciary obligations, and the unlawfulness of their conduct.

54. Under the test established by SEC v. W.J. Howey Co., 328 U.S. 293, 298-99 (1946), an investment contract exists where there is (1) an investment of money or value, (2) in a common enterprise, (3) with an expectation of profits derived from the efforts of others. Pi tokens satisfy all three elements:

a. Investment of Value. Plaintiff and 60 million other users invested time, effort, device resources, and data through daily mining, node operation, security circle participation, and recruitment—all at Defendants' direction and for Defendants' benefit.

b. Common Enterprise. All users participated in a single, centralized platform controlled exclusively by Defendants, who operated all three validator nodes, controlled the migration process, and determined when and whether users could access their tokens.

c. Expectation of Profits from Others' Efforts. The Whitepaper explicitly promised that tokens would have value derived from Defendants' development of the ecosystem, including the Attention Marketplace, mainnet launch, and exchange listings. Users had no independent ability to create value—all value depended entirely on Defendants' actions.

55. Federal courts have found substantially identical token offerings to constitute securities. In SEC v. Telegram Grp. Inc., 448 F. Supp. 3d 352, 368-79 (S.D.N.Y. 2020), the court held that tokens promised through a whitepaper containing detailed technical plans created reasonable expectations

of profit from the developers' efforts, and that the court would pierce through disclaimers to examine the "economic realities" of the transaction. In SEC v. Kik Interactive Inc., 492 F. Supp. 3d 169, 177-78 (S.D.N.Y. 2020), the court reached the same conclusion for a whitepaper describing a planned digital ecosystem.

56. Defendants—both of whom hold advanced degrees from Stanford University's Computer Science Department—knew or should have known that Pi tokens bore the hallmarks of securities. Despite this knowledge, Defendants included zero risk disclosures, zero conflict of interest disclosures, and no disclaimers in the Whitepaper. They did not register the tokens with the SEC or any state regulator. They did not provide the disclosures required of securities issuers. This deliberate omission demonstrates that Defendants knowingly concealed the true nature of what they were offering in order to avoid regulatory scrutiny while extracting maximum value from their users.

57. California's Digital Financial Assets Law ("DFAL"), enacted October 13, 2023 and taking full effect July 1, 2026, now requires crypto companies to provide extensive, accurate, and non-misleading disclosures that clearly outline risks, fees, and conflicts of interest. Cal. Fin. Code Sections 3101-3803. The DFPI is empowered to take enforcement action against any entity that engages in fraud, intentional misrepresentation, or misappropriation in connection with digital financial asset business activity, with penalties of up to $20,000 per day of material violation. Pi's Whitepaper violated the very standards California has now enacted into law.

**H. Plaintiff's Damages**

58. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered the following damages:

a.   Loss of 5,137.39 Pi tokens transferred to the unauthorized KIDS wallet, valued at approximately $2,012,000 at peak market rates.

b.  Illiquidity and diminished value of Plaintiff's remaining 1,403 Pi tokens, which were not migrated despite KYC completion in December 2022, in violation of Defendants' 90-180 day migration promises.(Exhibit W-1)

c.  Approximately 1,672 hours and $1,200 in direct costs expended over four years in reliance on Defendants' fraudulent representations.

d.  Emotional distress resulting from the loss of tokens and Defendants' retaliatory dismissal of Plaintiff's complaints.

**Plaintiff's Experience**

59. On April 15, 2020, at 14:22 UTC, Plaintiff downloaded the Pi Network iOS app (version 1.2.3) from the Apple App Store, created a wallet (ZEAT) using an invitation code provided by a friend, and began mining Pi tokens. Over four years (April 15, 2020–April 10, 2024), Plaintiff mined 6,541 Pi tokens through: (a) 1,460 daily check-ins, tapping the app's mining button for 5 minutes daily (122 hours total); (b) security circle contributions, recruiting 25 users and managing their onboarding through in-app referrals (50 hours); and (c) node operations, running Pi Node software on a dedicated Dell Latitude E6430 laptop (4GB RAM, Intel Core i5, 500+ hours, requiring constant uptime with a 50 Mbps internet connection). Plaintiff incurred $1,200 in electricity and data costs ($25/month x 48 months) and dedicated over 1,672 hours, relying on Defendants' representations of decentralization and a projected $25/π value (Kokkalis, X, July 2020).

60. On December 22, 2022, at 21:23 UTC, Plaintiff completed KYC verification through the Pi Network app, submitting a scanned Arizona driver's license, U.S. passport, selfie, and proof of address (utility bill), as required by ToS Section 14. Defendants' support team approved his KYC on January 15, 2023, at 09:47 UTC, via an in-app notification, promising Mainnet migration of his 6,541 Pi tokens within 90 days (by April 15, 2023). Despite this assurance, no tokens were migrated by April 2024, leaving Plaintiff's entire balance vulnerable.

61. On April 10, 2024, at 15:32 UTC, Plaintiff discovered that 5,137.397257 Pi tokens were transferred from his ZEAT wallet to an unknown address (GDQ4...KIDS), as recorded in blockchain transaction logs (PiScan, April 11, 2024,). The transfer, valued at $2,012,000 ($307.49/π, September 2022) or $8,579 ($1.67/π, February 2025), occurred without Plaintiff's authorization or notification, despite his KYC-locked wallet. Subsequent transfers moved 2,567 tokens to wallet V5FF (created February 27, 2024, 15:03 UTC) on April 29, 2024, at 06:49 UTC, and then to FZ7P in two transactions on the same day, remaining dormant as of September 30, 2024, per Plaintiff's blockchain analysis (email, August 4, 2025). (Exhibit W-2) (Exhibit W-6)

62. Plaintiff initiated a 10-month recovery effort from April 13, 2024, to February 15, 2025, expending 15 hours across: (a) 12 support tickets submitted via support@socialchain.app (e.g., ticket # [REDACTED], April 13, 2024, detailing GDQ4...KIDS transfer); (b) 47 in-app chat interactions with moderators (e.g., Grunchking, who dismissed Plaintiff's claims as "user error" on April 16, 2024, and muted further queries); and (c) three emails to Defendants (May 10, June 15, January 20, 2025). Defendants provided generic responses, citing ToS Section 14.2 ("security protocols") without investigating or providing evidence of user error. Plaintiff's blockchain analysis, shared with counsel on August 4, 2025, confirmed the transfer was executed by a validator node controlled by SocialChain Inc., contradicting Defendants' claims.

63. Plaintiff's remaining 1,403.602743 Pi tokens have not been migrated to the Mainnet as of February 28, 2025, despite repeated assurances, further devaluing his holdings and causing emotional distress from Defendants' dismissive responses.

**Defendant's Misconduct**

64. Unauthorized Token Transfers: The April 10, 2024, transfer of 5,137.397257 Pi tokens from Plaintiff's ZEAT wallet to GDQ4...KIDS was executed by Defendants' three validator nodes, controlled by SocialChain Inc. from Sunnyvale servers, as confirmed by PiScan logs (April 11, 2024). Plaintiff's August 4, 2025, blockchain analysis revealed a pattern of laundering through

multiple wallets (GDQ4...KIDS to V5FF to FZ7P), indicating deliberate manipulation. PiScan data (2024) further identifies 8,127 wallets with uniform 2,000,001 Pi balances, suggesting systemic, centralized allocation by Defendants, inconsistent with their promised decentralized blockchain. (Exhibit W-2)

65. Secret Token Sales (2021): In 2021, Defendants sold 2 billion Pi tokens in undisclosed transactions, generating an estimated $4,375,000 for payroll (35 employees at $125,000/year, 2022) and $6,000,000 in trademark filings (USPTO, 2022) and legal expenses, as evidenced by settlement documents in Santa Clara Case No. 21CV391680. Blockchain logs (PiScan, 2021) show large transfers to wallets controlled by SocialChain Inc. and Pi Community Company (e.g., wallet [REDACTED]). Defendants failed to disclose these sales to Plaintiff, violating securities laws and depriving him of material information critical to his mining decisions.

66. Unauthorized Exchange Listings (2022): Defendants facilitated Pi token listings on XT.COM (June 7, 2022, PI/USDT pair, deposits "TBD"), Huobi (July 15, 2022, $13–$14/π peak), and Bitmart (August 10, 2022), inflating valuations to $307.49/π (CoinMarketCap, September 30, 2022). Defendants publicly denied involvement, labeling listings "fake" in an X post (@PiCoreTeam, July 10, 2022), but blockchain data and their $4,375,000 payroll expansion suggest insider trading and trading fee profits. CoinChapter (November 2023) reported "insider manipulation," noting Plaintiff's exclusion from these gains.

67. Deliberate Migration Delays: Defendants failed to migrate Plaintiff's remaining 1,403.602743 Pi tokens to the Mainnet by February 28, 2025, despite his KYC approval on January 15, 2023, and repeated app notifications promising migration within 90–180 days (e.g., notifications on March 1, June 15, September 10, 2023). Defendants' centralized validators, controlled from Sunnyvale, stalled migration, rendering Plaintiff's tokens illiquid, as reported by CCN (February 2025, "Pi Network: Why Your Coins May Be Worthless").

68. Retaliation Against Complaints: Defendants dismissed Plaintiff's 10-month recovery effort,

refusing to investigate the 2024 transfer or provide blockchain evidence, instead citing "user error" (ToS Section 14.2) and muting his in-app queries (e.g., Grunchking, April 16, 2024). This retaliation was in bad faith and further supports Plaintiff's claims for fraud and breach of fiduciary duty.

69. **Evidence Supporting Misconduct**:

1. **Blockchain Logs**: PiScan (2024) confirms the GDQ4...KIDS transfer (April 10, 2024) and 2 billion π sales (2021) to wallets linked to Defendants.

2. **PiScan Data**: 8,127 wallets with uniform 2,000,001 Pi balances (2024), indicating centralized manipulation.

3. **Public Complaints**: Reddit (r/PiNetwork, 1,500+ posts, 2024) and X (#PiFraud, 2,000+ posts, 2024) report similar losses, with users like AKE1974 and DaCovid noting unauthorized transfers.

4. **Crypto News**: CoinChapter (November 2023) and CCN (February 2025) document systemic issues.

5. **Plaintiff's Analysis**: Moen's August 4, 2025, email identifies wallet pathways (GDQ4...KIDS to V5FF to FZ7P) and a $125,000,000 exchange deposit wallet, confirming Defendants' laundering.

6. **Financial Gains**: Defendants' $4,375,000 payroll (2022), $6,000,000 in expenses (Santa Clara Case No. 21CV391680), and trademark filings (USPTO, 2022) evidence profits.

**Plaintiff's Harm**

70. Plaintiff suffered a $2,012,000 economic loss from the 2024 transfer of 5,137.397257 Pi tokens, calculated at $307.49/π (CoinMarketCap, September 2022), or $8,579 at $1.67/π (CoinGecko, February 2025). The failure to migrate his remaining 1,403.602743 tokens devalued his holdings further, costing $431,837 at peak valuation or $2,344 at current valuation.

71. Plaintiff lost economic opportunities valued at $1,500,000, representing the potential profits

from trading his 6,541 tokens during the 2022 peak, foregone due to Defendants' misrepresentations and delays. Plaintiff incurred $1,200 in electricity and data costs and 1,672 hours of effort, expecting token value based on Defendants' promises.

72. Plaintiff experienced severe emotional distress, including anxiety and frustration, from Defendants' dismissive responses and the loss of his four-year investment, exacerbated by their refusal to investigate or rectify the 2024 transfer.

73. Plaintiff's August 4, 2025, blockchain analysis confirms Defendants' centralized control over validator nodes, enabling the unauthorized transfer and contradicting their decentralization claims, further supporting his claims of fraud and harm.

**Defendants' Defenses and Plaintiff's Rebuttal**

74. In their May 13, 2025, response to Plaintiff's April 14, 2025, demand letter, Defendants, through counsel Kenneth P. Nabity, denied liability, asserting: (a) the April 2024 transfer resulted from Plaintiff's error in wallet management; (b) 2022 exchange listings were "fake" and not native Pi tokens; (c) no material misstatements were made in the whitepaper or public statements; (d) Sarbanes-Oxley does not apply, as SocialChain Inc. is not a registered public company and Plaintiff is not an employee; and (e) the ToS arbitration clause and class action waiver (Section 15) are enforceable, precluding litigation and class claims.

75. Plaintiff rebuts these defenses as follows:

- **User Error**: Blockchain logs (PiScan, April 11, 2024) and Plaintiff's analysis (August 4, 2025) confirm the 2024 transfer was executed by Defendants' validator nodes, not Plaintiff, who had a KYC-locked wallet (ZEAT, approved January 15, 2023). PiScan's 8,127 uniform wallets further evidence centralized manipulation, negating user error claims.

- **"Fake" Listings**: Defendants' $4,375,000 payroll expansion (2022) and blockchain data showing large token movements to exchange-linked wallets contradict their "fake" listing

claim. CoinChapter (November 2023) reported insider trading, consistent with Plaintiff's exclusion from profits.

- **No Misstatements**: The 2019 whitepaper's "decentralized governance" claim and Kokkalis' $25/\pi$ prediction (X, July 2020) were false, as three validator nodes controlled all transactions (PiScan, 2024). Defendants' app notifications (2021–2023) promising "imminent" Mainnet launches were misleading, as Plaintiff's tokens remain unmigrated.

- **Arbitration/Class Waiver**: The ToS provisions are unenforceable due to:

  o **Procedural Unconscionability**: The adhesive, browsewrap ToS (Section 1) lacked negotiation, and the arbitration clause, added in March 2022 (Wayback Machine), was not prominently disclosed to Plaintiff, who joined in 2020. The 30-day opt-out (Section 15.6) was illusory, requiring proactive monitoring (*Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 114 (2000)).

  o **Substantive Unconscionability**: The clause favors Defendants, allowing court access for intellectual property disputes (Section 15.5) while forcing users into arbitration, and blocks unwaivable securities rights (*McMahon v. Shearson/Am. Express, Inc.*, 482 U.S. 220, 227 (1987)).

  o **Lack of Mutual Assent**: The browsewrap "continued use" consent (Section 1) lacks affirmative agreement, and Plaintiff was not notified of 2022 ToS updates (*Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014)).

  o **Defendants' Waiver**: Defendants litigated Santa Clara Case No. 21CV391680 (2021–2022) without invoking arbitration, settling claims related to Pi Network operations, waiving enforcement (*St. Agnes Med. Ctr. v. PacifiCare of Cal.*, 31 Cal. 4th 1187, 1196 (2003)).

o **Public Policy**: The class waiver undermines adjudication of systemic fraud potentially affecting 60 million users, favoring federal court resolution (*Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 246 (2013) (Kagan, J., dissenting)).

<u>**CAUSES OF ACTION**</u>

**FIRST CAUSE OF ACTION: COMMON LAW FRAUD**

76. Plaintiff incorporates by reference paragraphs 1 through 75 as though fully set forth herein.

77. Under California law, the elements of common law fraud are: (1) a misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (scienter); (3) intent to defraud (intent to induce reliance); (4) justifiable reliance; and (5) resulting damage. *Lazar v. Superior Court*, 12 Cal. 4th 631, 638 (1996). Federal Rule of Civil Procedure 9(b) requires fraud to be pled with particularity—the "who, what, when, where, and how" of the alleged misrepresentation. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003). Promises made without any intention of performance are actionable as fraud at the time they are made. *Engalla v. Permanente Med. Grp., Inc.*, 15 Cal. 4th 951, 974 (1997).

78. Defendants made the following material misrepresentations of fact:

a. **WHO:** Defendants Nicolas Kokkalis and Chengdiao Fan, as co-founders and co-authors of the Pi Network Whitepaper, and through the corporate entities SocialChain Inc. and Pi Community Company.

b. **WHAT:** Defendants represented in the Whitepaper that (i) the community would govern mainnet launch timing; (ii) community members would operate validator nodes; (iii) the ecosystem would be built through decentralized participation requiring 100 applications; and (iv) user tokens would be secure in a decentralized system. Defendants further represented on July 10, 2022 via an official X (Twitter) post that they had no involvement in exchange listings, while privately coordinating those listings.

c. **WHEN:** The Whitepaper was published in March 2019 and updated in December 2021 and March 2022. The exchange denial was made on July 10, 2022. The unauthorized token transfer occurred on or about April 10, 2024.

d. **WHERE:** The misrepresentations were disseminated through the Pi Network mobile application and website, accessible worldwide including in this District, and through social media platforms.

e. **HOW:** Defendants used the Whitepaper and public statements to induce Plaintiff and 60 million other users to contribute time, effort, data, and resources to build the Pi Network platform. Defendants then (i) maintained exclusive centralized control over all validator nodes for over five years; (ii) secretly coordinated exchange listings generating $57.51 million in trading volume while telling users their tokens had no value; (iii) redirected Plaintiff's tokens through their own infrastructure wallets; and (iv) dismissed Plaintiff's complaints and falsely attributed the transfer to "user error."

79. At the time these representations were made, Defendants knew they were false. Defendants knew they intended to maintain exclusive control over all validator nodes. Defendants knew they were coordinating exchange listings while publicly denying involvement. Defendants knew the KIDS wallet was created by their own Pi Foundation Wallet 2. As set forth in paragraphs 45 through 49, Defendants also knew that Pi tokens bore the hallmarks of securities under the *Howey* test, yet deliberately omitted all disclosures required of securities issuers in order to avoid regulatory scrutiny.

80. Defendants made these representations with the intent to induce Plaintiff and other users to contribute time, effort, and resources to build the Pi Network platform, thereby enriching Defendants.

81. Plaintiff justifiably relied on Defendants' representations. As a user with no prior cryptocurrency experience who was specifically targeted by Defendants' plain-language marketing, Plaintiff invested four years of daily mining activity, operated node software, recruited 25 users, participated in security circles, and spent approximately 1,672 hours and $1,200 in direct costs. The reasonableness of reliance is judged by reference to the plaintiff's particular circumstances. *Engalla*, 15 Cal. 4th at 977. A defendant who targets unsophisticated consumers cannot exploit that unsophistication as a defense to fraud. *See Vasquez v. Superior Court*, 4 Cal. 3d 800, 814 (1971).

82. As a direct and proximate result of Defendants' fraud, Plaintiff suffered damages including

the loss of 5,137.39 Pi tokens, the illiquidity of his remaining tokens, and 1,672 hours and $1,200 in wasted time and costs.

83. Defendants' conduct was willful, malicious, and oppressive, warranting an award of punitive damages.

### SECOND CAUSE OF ACTION: BREACH OF FIDUCIARY DUTY

84. Plaintiff incorporates by reference paragraphs 1 through 75 as though fully set forth herein.

85. A fiduciary relationship existed between Defendants and Plaintiff by virtue of Defendants' exclusive custodial control over Plaintiff's digital assets. Specifically:

    a.  Defendants operated all three validator nodes on the Pi blockchain, processing every transaction.

    b.  Defendants controlled the migration process from testnet to mainnet, including which wallet address each user's tokens were assigned to.

    c.  Defendants controlled the claimable balance mechanism through which tokens were distributed.

    d.  Defendants built themselves a clawback capability to unilaterally move tokens in and out of any user's wallet through the Stellar claimable balance protocol's 14-day priority reclaim window.

    e.  Users had no ability to independently access, move, or protect their assets without Defendants' system.

86. This level of exclusive, unilateral control over Plaintiff's assets created a fiduciary relationship regardless of what Defendants' Terms of Service purported to disclaim. A fiduciary relationship arises wherever one party reposes trust and confidence in another, who thereby gains influence and superiority over the first. *Herbert v. Lankershim*, 9 Cal. 2d 409, 483 (1937). Where an entity exercises exclusive control over another's assets, a fiduciary duty exists. *City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 68 Cal. App. 4th 445, 459 (1998). In the

cryptocurrency context, courts have recognized fiduciary duties when platforms exercise custodial control over user assets. *See Bhatia v. Silvergate Bank et al.*, No. 3:23-cv-01406-RBM-BLM (S.D. Cal. Mar. 20, 2024). A company cannot disclaim fiduciary duties that arise from the factual nature of the relationship. *Committee on Children's Television, Inc. v. General Foods Corp.*, 35 Cal. 3d 197, 216 (1983). Contractual waivers of fiduciary duties are unenforceable where the nature of the relationship gives rise to fiduciary obligations independent of contract. *Hodes v. County of Placer*, 41 Cal. App. 5th 537, 546 (2019). The securities-like nature of Pi tokens, as set forth in paragraphs 45 through 49, further heightens Defendants' fiduciary obligations, as entities operating what functions as an investment contract owe a duty of care and disclosure to the investors whose assets they control.

87. Defendants breached their fiduciary duties by:

a. Allowing or facilitating the unauthorized transfer of 5,137.39 Pi tokens from Plaintiff's account to the KIDS wallet, which was created by Defendants' own Pi Foundation Wallet 2.

b. Refusing to exercise their clawback capability to recover Plaintiff's tokens, while exercising that same capability for other users during the February-March 2025 mainnet launch.

c. Maintaining exclusive centralized control while representing to users that the platform was decentralized.

d. Secretly coordinating exchange listings while telling users their tokens had no value.

e. Using the Pi Ventures fund—built from user engagement—to invest $20 million in an unrelated AI robotics company (OpenMind) without community input or disclosure.

(Exhibit P-1)

88. Defendants' selective exercise of their clawback capability—using it for some users during the mainnet launch while refusing to use it for Plaintiff—constitutes bad faith. A fiduciary must act in the best interests of the beneficiary and may not exercise discretion selectively to the beneficiary's detriment. *Chazen v. Centennial Bank*, 61 Cal. App. 4th 532, 541 (1998). The

covenant of good faith and fair dealing prohibits one party from unfairly frustrating the other party's right to receive the benefits of the agreement. *Carma Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342, 372-73 (1992).

89. As a direct and proximate result of Defendants' breach of fiduciary duty, Plaintiff suffered the damages described in paragraph 75.

## THIRD CAUSE OF ACTION: UNJUST ENRICHMENT

90. Plaintiff incorporates by reference paragraphs 1 through 75 as though fully set forth herein.

91. Under California law, unjust enrichment is a basis for restitution where a defendant has received and unjustly retained a benefit at the plaintiff's expense. *Ghirardo v. Antonioli*, 14 Cal. 4th 39, 51 (1996). The Ninth Circuit has recognized unjust enrichment as a viable quasi-contract claim under California law. *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015). Unjust enrichment is viable where a defendant profits from a plaintiff's contributions. *City of Oakland v. Oakland Raiders*, 83 Cal. App. 5th 458, 477 (2022). Benefits conferred based on fraudulent representations may be recovered. *Feingold v. John Hancock Life Ins. Co. USA*, 753 F.3d 55, 58 (1st Cir. 2014).

92. Plaintiff conferred benefits on Defendants by contributing four years of daily mining activity, node operation, recruitment of 25 users, security circle trust graph building, and approximately 1,672 hours and $1,200 in direct costs. These contributions, multiplied across 60 million users, gave Pi Network its value proposition and enabled Defendants to raise $20 million in SAFE funding, attract exchange listings, and claim 60 million registered users.

93. Defendants were enriched by Plaintiff's contributions and the contributions of millions of other users. Specifically:

    a. Defendants used collective user engagement metrics to raise $20 million through SAFE instruments.

    b. Defendants coordinated exchange listings generating $57.51 million in trading volume on Huobi alone on opening day.

c. Defendants launched a hiring campaign of approximately 50 positions at $126,000 average salary funded by revenues derived from the platform users built.

d. Defendants established a $200 million Pi Ventures fund and invested $20 million in an unrelated company.

e. Founder-associated wallets began cashing out tokens to exchanges within seven days of the mainnet opening, while users' tokens remained locked or stolen.

94. Defendants' retention of these benefits is unjust because they were obtained through fraudulent representations regarding decentralization, community governance, and the security of user tokens. As set forth in paragraphs 70 through 75, Defendants operated what amounts to an unregistered securities offering, extracting value from users through an investment contract structure while deliberately omitting the disclosures that would have informed users of the true nature of the transaction. Plaintiff would not have contributed his time and resources if the Whitepaper had disclosed that Defendants intended to maintain exclusive centralized control, coordinate secret exchange listings, and build themselves a mechanism to move tokens in and out of any user's wallet without permission.

95. Plaintiff is entitled to restitution and disgorgement of Defendants' ill-gotten gains.

**FOURTH CAUSE OF ACTION: VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW (Cal. Bus. & Prof. Code § 17200)**

96. Plaintiff incorporates by reference paragraphs 1 through 52 as though fully set forth herein.

97. Defendants engaged in unlawful, fraudulent, and unfair business acts and practices in violation of California Business and Professions Code Section 17200 et seq. The UCL broadly prohibits any unlawful, fraudulent, or unfair business act or practice, and a plaintiff has standing if they suffered an economic injury caused by the practice. *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 323 (2011).

98. Unlawful Prong. The unlawful prong incorporates violations of other laws as predicate acts. Defendants' conduct violates California common law prohibitions against fraud (Cal. Civ. Code Sections 1572, 1709-1710) and breach of fiduciary duty, as set forth in the First and Second Causes

of Action. Additionally, as set forth in paragraphs 45 through 49, Defendants' operation of what functions as an unregistered securities offering—without registration, required disclosures, or compliance with federal or state securities laws—constitutes an independent unlawful act. Defendants' operation of a digital financial asset business without required disclosures also violates California's Digital Financial Assets Law (Cal. Fin. Code Sections 3101-3803), which requires crypto companies to provide accurate, non-misleading disclosures clearly outlining risks, fees, and conflicts of interest.

99. Fraudulent Prong. The fraudulent prong requires conduct "likely to deceive" members of the public. *People v. McKale*, 25 Cal. 3d 626, 635 (1979). Defendants engaged in conduct likely to deceive members of the public by:

a. Publishing a Whitepaper containing specific commitments regarding decentralization and community governance that Defendants never intended to honor.

b. Publicly denying involvement in exchange listings while privately coordinating those listings and profiting from $57.51 million in trading volume.

c. Telling users their tokens had "no value" while simultaneously cashing out those same tokens on cryptocurrency exchanges.

d. Representing the platform as secure and decentralized while maintaining exclusive centralized control and a unilateral clawback mechanism.

100.        Unfair Prong. The unfair prong encompasses conduct that offends public policy or is immoral, unethical, or substantially injurious, tethered to legislative policies. *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal. 4th 163, 186-87 (1999). Defendants' conduct offends public policy and is substantially injurious to consumers. Defendants exploited the trust and engagement of 60 million users to build a platform they monetized for their exclusive benefit, while those users remained locked out of their own tokens. Defendants' systematic delays in KYC verification—with only 17.5 to 19 million users verified out of over 60 million registered since 2021—have rendered millions of users' tokens illiquid, violating policies against fraudulent schemes and unfair competition.

101.        Plaintiff suffered injury in fact and lost money or property as a result of Defendants'

unfair business practices, including the loss of 5,137.39 Pi tokens and the diminished value and illiquidity of his remaining tokens.

102.     Plaintiff is entitled to restitution and injunctive relief pursuant to Cal. Bus. & Prof. Code Section 17203.

## PRAYER FOR RELIEF

103.     Plaintiff respectfully requests the following relief:

A.  Compensatory damages of $10,000,000, comprising $2,012,000 for economic loss (5,137 Pi tokens at $307.49/$\pi$), $1,500,000 for lost economic opportunities, and $6,488,000 in punitive damages for Defendants' willful misconduct.

B.  Restitution of 6,541 Pi tokens to Plaintiff's ZEAT wallet.

C.  Disgorgement of Defendants' profits, including at least $4,375,000 from 2021 sales and 2022 listings.

D.  Punitive damages to punish and deter Defendants' egregious fraud and retaliation.

E.  Injunctive relief to: (a) immediately halt unauthorized token transfers; (b) ensure Mainnet migration of Plaintiff's 6,541 tokens within 30 days; (c) disclose all token transactions since March 14, 2019, including 2021 sales and 2022 listings; and (d) implement blockchain transparency measures, such as public validator logs.

F.  Permission to advertise for other similarly situated Pi Network users to form a class under FRCP 23(a) and (b)(3), compliant with CRPC 7.1–7.5, through media, online platforms, and cryptocurrency news outlets.

G.  Attorneys' fees (40% contingency, subject to FRCP 23(h) if class certification is sought), costs, and pre- and post-judgment interest.

H.  Such other relief as the Court deems just and proper.

## VII. DEMAND FOR JURY TRIAL

104.     Plaintiff demands a jury trial on all issues triable by jury, pursuant to FRCP 38.

## VIII. CERTIFICATION

105.     Pursuant to Federal Rule of Civil Procedure 11, undersigned counsel certifies that this Third Amended Complaint is not presented for any improper purpose, that the claims and legal contentions are warranted by existing law or by a non-frivolous argument for extending, modifying, or reversing existing law, and that the factual allegations have evidentiary support or will likely have evidentiary support after a reasonable opportunity for discovery. Such support includes, among other things, blockchain transaction records, validator and wallet data, public statements and disclosures by Defendants, exchange communications, corporate filings, prior litigation records, screenshots of Defendants' applications and FAQs, and Plaintiff's forensic blockchain analysis.

DATED: March 11, 2026

　　　　　　　　　　　　　　　　　　　　　　　　 /s/ Mario Tafur
　　　　　　　　　　　　　　　　　　　　　　　　Mario Tafur
　　　　　　　　　　　　　　　　　　　　　　　　Attorney for Plaintiff