Mario Tafur, Esq. (SBN: 329899)
mario@thebulldog.law
**BULLDOG LAW, P.C.**
500 N. Central Avenue, Ste. 610
Glendale, CA 91203
Telephone: (949) 649-3007
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| HARRO MOEN | ) Case No.: 5:25-cv-09145-NC |
| Plaintiff(s), | ) |
| vs. | ) **PLAINTIFF'S OPPOSITION TO** |
| | ) **DEFENDANTS' MOTION TO DISMISS,** |
| SOCIALCHAIN INC., PI COMMUNITY | ) **OR IN THE ALTERNATIVE, MOTION** |
| COMPANY, NICOLAS KOKKALIS, | ) **FOR A MORE DEFINITE STATEMENT** |
| CHENGDIAO FAN, and DOES 1-50, | ) **[FRCP 12(b)(6) and FRCP 12(e)]** |
| | ) Date: March 13, 2026 |
| Defendant(s). | ) Time: 11:00 a.m. |
| | ) Location: Courtroom 5 |
| | ) |
| | ) |

i

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................... - 1 -

STATEMENT OF ISSUES TO BE DECIDED ..................................................................... - 1 -

FACTUAL BACKGROUND .................................................................................................. - 3 -

LEGAL STANDING .............................................................................................................. - 4 -

LEGAL ARGUMENT ............................................................................................................ - 5 -

I. THE FRAUD CLAIMS SATISFY RULE 9(b)'S SPECIFICITY REQUIREMENTS ............... - 5 -

II. PLAINTIFF ADEQUATELY PLED RELIANCE ................................................................ - 10 -

III. THE UNAUTHORIZED TRANSFER WAS NOT AN "INTERVENING EVENT"—IT WAS THE BREACH ITSELF ............................................................................................................... - 11 -

IV. DEFENDANTS WERE DIRECTLY ENRICHED BY PLAINTIFF'S CONTRIBUTIONS  - 14 -

V. DEFENDANTS OWED AND BREACHED FIDUCIARY DUTIES TO PLAINTIFF ......... - 17 -

VI. DEFENDANTS' RULE 11 SANCTIONS THREAT IS WITHOUT MERIT ...................... - 19 -

VI.      IF THE COURT DISMISSES ANY CLAIM, LEAVE TO AMEND SHOULD BE GRANTED ........................................................................................................................ - 22 -

CONCLUSION ..................................................................................................................... - 23 -

# TABLE OF AUTHORITIES

**Federal Cases**

Ashcroft v. Iqbal, 556 U.S. 662 (2009) ................................................................. 4, 22

Balistreri v. Pacifica Police Dep't, 901 F.2d 696 (9th Cir. 1990) .......................... 8

Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007) ........................................ 4, 22

Bowles v. Reade, 198 F.3d 752 (9th Cir. 1999) ...................................................... 20

Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc., 498 U.S. 533 (1991) ......... 16

Conn v. Borjorquez, 967 F.2d 1418 (9th Cir. 1992) ................................................ 15

Cooper v. Pickett, 137 F.3d 616 (9th Cir. 1997) ....................................................... 7

DCD Programs, Ltd. v. Leighton, 833 F.2d 183 (9th Cir. 1987) .............................. 20

Desaigoudar v. Meyercord, 223 F.3d 1020 (9th Cir. 2000) ..................................... 21

Eminence Capital, LLC v. Aspeon, Inc., 316 F.3d 1048 (9th Cir. 2003) ................... 19

Foman v. Davis, 371 U.S. 178 (1962) ........................................................ 19

In re Bibox Grp. Holding Ltd. Sec. Litig., 534 F. Supp. 3d 326 (S.D.N.Y. 2021) .... 10

Lopez v. Smith, 203 F.3d 1122 (9th Cir. 2000) (en banc) ........................................ 19

Operating Eng'rs Pension Tr. v. A-C Co., 859 F.2d 1336 (9th Cir. 1988) .............. 15

SEC v. Kik Interactive Inc., 492 F. Supp. 3d 169 (S.D.N.Y. 2020) ......................... 5

SEC v. Telegram Grp. Inc., 448 F. Supp. 3d 352 (S.D.N.Y. 2020) ......................... 5, 7, 9

Szabo Food Serv., Inc. v. Canteen Corp., 823 F.2d 1073 (7th Cir. 1987) .............. 15

Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007) ......................... 4

Townsend v. Holman Consulting Corp., 929 F.2d 1358 (9th Cir. 1990) .................. 15

Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097 (9th Cir. 2003) .............................. 7

**State Cases**

Carma Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc., 2 Cal. 4th 342 (1992) .. 11

Chazen v. Centennial Bank, 61 Cal. App. 4th 532 (1998) ....................................... 13

City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 68 Cal. App. 4th 445 (1998) ........................................................................................................... 12

City of Oakland v. Oakland Raiders, 83 Cal. App. 5th 458 (2022) .......................... 12

Committee on Children's Television, Inc. v. General Foods Corp., 35 Cal. 3d 197 (1983) ............................................................................................................... 13

Engalla v. Permanente Med. Grp., Inc., 15 Cal. 4th 951 (1997) .............................. 5, 8

Ghirardo v. Antonioli, 14 Cal. 4th 39 (1996) .......................................................... 11

Herbert v. Lankershim, 9 Cal. 2d 409 (1937) .......................................................... 12

Hodes v. County of Placer, 41 Cal. App. 5th 537 (2019) ....................................... 13

Lazar v. Superior Court, 12 Cal. 4th 631 (1996) .................................................... 5, 6, 7

Neu-Visions Sports, Inc. v. Soren/McAdam/Bartells, 86 Cal. App. 4th 303 (2000) .... 5

Novak v. Continental Tire N. Am., Inc., 22 Cal. App. 5th 189 (2018) ...................... 11

State ex rel. Van de Kamp v. Bank of Am., N.A., 204 Cal. App. 3d 819 (1988) ...... 12

Stewart v. Cox, 55 Cal. 2d 857 (1961) ....................................................... 9

Vasquez v. Superior Court, 4 Cal. 3d 800 (1971) ....................................... 8

Younan v. Equifax Inc., 111 Cal. App. 3d 498 (1980) ............................... 7

**Statutes**

California Financial Code §§ 3101–3803 (Digital Financial Assets Law) .............. 6

**Rules**

Federal Rule of Civil Procedure 9(b) ...................................................... 1, 4, 7

Federal Rule of Civil Procedure 11 ........................................................ 14, 15

Federal Rule of Civil Procedure 12(b)(6) ................................................ 4

Federal Rule of Civil Procedure 12(e) .................................................... 4

Federal Rule of Civil Procedure 15(a)(2) ............................................... 19

NOTICE OF OPPOSITION AND OPPOSITION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that Plaintiff Harro Moen ("Plaintiff") opposes Defendants SocialChain Inc., Pi Community Company, Nicolas Kokkalis, and Chengdiao Fan's (collectively, "Defendants") Motion to Dismiss, or in the Alternative, Motion for a More Definite Statement, pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(e). This opposition is based on the following Memorandum of Points and Authorities, the Complaint, the files and records in this action, and such further evidence and argument as the Court may consider at the hearing.

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

1. Plaintiff Harro Moen ("Plaintiff") respectfully submits this Opposition to Defendants' Motion to Dismiss the Second Amended Complaint ("SAC"). Defendants' motion asks this Court to accept, at face value, that a project which attracted 60 million users through promises of decentralized cryptocurrency ownership was merely an aspirational experiment that went sideways. The evidence tells a different story.

### STATEMENT OF ISSUES TO BE DECIDED

2. The following issues are presented for this Court's determination:

3. Whether Defendants' Whitepaper representations constitute actionable misrepresentations under Rule 9(b), where Defendants made specific operational commitments regarding decentralization, community governance, and validator node participation, and then did the opposite for five consecutive years.

4. Whether Plaintiff adequately pled reliance, where Defendants specifically designed their project to attract unsophisticated users and now argue those same users could not have relied on the Whitepaper's promises.

5. Whether the unauthorized transfer of Plaintiff's tokens constitutes an "intervening event"

- 1 -

breaking the causal chain, where blockchain records demonstrate the transfer was executed through Defendants' own infrastructure wallets and claimable balance architecture.

6. Whether Defendants were unjustly enriched by Plaintiff's contributions, where Defendants used the collective engagement of 60 million users to raise capital, attract exchange listings, and monetize the platform for their exclusive benefit.

7. Whether Defendants owed fiduciary duties to Plaintiff, where Defendants exercised exclusive custodial control over all user tokens through their operation of all three validator nodes, the migration process, and a unilateral clawback mechanism.

8. Whether Defendants' Rule 11 sanctions threat has merit, where the factual allegations are supported by verifiable blockchain records and Defendants' own counsel has personal knowledge of facts contradicting his representations.

9. Whether leave to amend should be granted, where Plaintiff possesses extensive evidence not included in the SAC due to prior counsel's failure to incorporate it.

10. Defendants recruited millions of users—including Plaintiff—through a Whitepaper that made specific, operational commitments: the community would decide when the mainnet launched, community members would run validator nodes, and the ecosystem would be built through genuine decentralized participation. None of these things happened. Instead, Defendants unilaterally launched an enclosed mainnet in December 2021, ran all three validator nodes themselves for over five years, and opened the mainnet in February 2025 with fewer than five vetted applications—despite requiring the community to build 100 before launch.

11. While telling 60 million users their tokens had "no value," Defendants privately coordinated the listing of Pi tokens on three cryptocurrency exchanges on December 29, 2022, generating $57.51 million in trading volume on Huobi alone on opening day. This occurred one month after Defendants' own counsel documented over $50,000 in legal debt owed by the founders. Defendants

went from bouncing a check for $86, being sued in small claims for $725, having no investment capital coming in, and owing Mr. Nabity over $50,000 in legal fees to suddenly being able to pay for trademark applications, hire over 30 employees, file three suits for trademark infringement, and pay their legal fees to Mr. Nabity. The project was on the brink of financial collapse according to their own testimony, yet less than a month after these exchange listings appeared—the ones they so vehemently denounce as having any affiliation with—Defendants were able to do all of these things. With no investment capital whatsoever, they suddenly had all the cash in the world. Each employee they hired had an average salary of $120,000 per year—and this was two years before the project even launched. They accomplished this transformation while their community remained locked out of their own tokens on an "enclosed" mainnet.

12. Plaintiff's tokens were not stolen by a random hacker. Blockchain records demonstrate that the unauthorized wallet (KIDS) was created by Defendants' own Pi Foundation Wallet 2—the same wallet that created Plaintiff's authorized wallet (ZEAT). The KIDS wallet was created on February 16, 2024—approximately 16 months after Plaintiff's KYC verification locked his wallet address. The transfer was executed through Defendants' claimable balance architecture, claimed within one minute of creation, and routed through a wallet (V5FF) that received tokens from over 70 victim wallets within two hours in automated, sequential transfers at 42-49 second intervals. This was not a hack. This was a system-level operation.

13. Defendants' seven arguments for dismissal fail because they rest on a complaint that did not include the extensive evidence Plaintiff possesses. As set forth below, each argument is refuted by evidence that is either already in the record, publicly verifiable on the blockchain, or available for inclusion in an amended complaint.

## FACTUAL BACKGROUND

14. Plaintiff joined Pi Network on April 15, 2020, mining tokens based on Defendants' promises

of a decentralized, valuable cryptocurrency. Defendants, including founders Kokkalis and Fan, control SocialChain Inc. and Pi Community Company. Key allegations include:

I.      -Unauthorized Transfer: On April 10, 2024, 5,137 Pi tokens were transferred from Plaintiff's verified wallet without consent, confirmed by blockchain logs (Compl. ¶¶ 2, 4(1)).

II.     Secret Sales: Defendants sold 2 billion tokens in 2021 for payroll and expenses, undisclosed to users (Compl. ¶ 4(2)).

III.    Unauthorized Listings: Tokens listed on exchanges like XT.COM and Huobi in 2022, inflating values to $307.49/Pi while denying involvement (Compl. ¶ 4(3)).

IV.     Migration Delays: Despite KYC completion on December 22, 2022, Plaintiff's 1,403 remaining tokens were not migrated by February 2025, violating 90-180 day promises (Compl. ¶ 4(4)).

V.      Retaliation: Defendants dismissed Plaintiff's 10-month recovery efforts (12 tickets, 47 chats, 3 emails), muting queries and attributing to "user error" (Compl. ¶ 4(5)).

15. These caused $2,012,000 in losses at peak valuation, plus opportunities and distress (Compl. ¶ 5). Plaintiff seeks damages, restitution, disgorgement, injunctions, and class certification for users since March 2019 suffering similar harms (Compl. ¶¶ 5-6).

## LEGAL STANDING

A.  Federal Rule of Civil Procedure 12(b)(6)

16.  A complaint survives dismissal if it states a plausible claim, accepting well-pled facts as true and drawing reasonable inferences in plaintiff's favor. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007). Plausibility requires more than possibility but less than probability, focusing on factual content over labels. Iqbal, 556 U.S. at 678-79. Dismissal is improper where facts support relief. Twombly, 550 U.S. at 556.

B.  Heightened Pleading Standards for Securities and Fraud Claims

17. Securities fraud under Rule 10b-5 requires particularity under Rule 9(b) and the Private

- 4 -

Securities Litigation Reform Act (PSLRA), alleging misleading statements, scienter, reliance, and loss causation. Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313 (2007). Common law fraud under Rule 9(b) demands "who, what, when, where, and how." Lazar v. Superior Court, 12 Cal. 4th 631, 645 (1996) (applying similar standard).

C.  Federal Rule of Civil Procedure 12(e)

18. A more definite statement is granted only if the pleading is "so vague or ambiguous that the party cannot reasonably prepare a response." Fed. R. Civ. P. 12(e). It is disfavored where discovery can clarify details.

**LEGAL ARGUMENT**

**I. THE FRAUD CLAIMS SATISFY RULE 9(b)'S SPECIFICITY REQUIREMENTS**

19. Defendants contend that the four Whitepaper statements cited in the SAC are merely aspirational goals and forward-looking statements about the project's direction, not actionable misrepresentations. This characterization is contradicted by the Whitepaper itself and by Defendants' own conduct.

A.  The Whitepaper Made Operational Commitments, Not Aspirational Goals

20. The distinction between an aspiration and a commitment depends on the specificity of the promise and the conduct that followed. Under California law, a statement is actionable as fraud when it is a representation of fact rather than a mere expression of opinion, and particularly when the speaker does not genuinely hold the stated opinion or has no reasonable basis for it. *Neu-Visions Sports, Inc. v. Soren/McAdam/Bartells*, 86 Cal. App. 4th 303, 309-10 (2000). When a project makes specific commitments—and then does the opposite for five consecutive years—those are not aspirations still in progress. They are misrepresentations. *See Engalla v. Permanente Med. Grp., Inc.*, 15 Cal. 4th 951, 974 (1997) (promises made without intent to perform constitute actionable fraud).

21. The significance of whitepaper representations in the cryptocurrency context is well

established. In *SEC v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352, 368-79 (S.D.N.Y. 2020), the court found that a whitepaper containing detailed technical plans and promises about ecosystem development created reasonable expectations of profit derived from the developers' efforts. The court pierced through the company's disclaimers and examined the "economic realities" of the offering, finding that the whitepaper's representations—not its labels—determined the nature of the transaction. *Id.* at 378-79. Similarly, in *SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169, 177-78 (S.D.N.Y. 2020), the court held that a whitepaper describing a planned digital ecosystem, combined with the promoter's ongoing promises of development, constituted a securities offering regardless of disclaimers. Pi Network's Whitepaper is functionally identical to the documents at issue in *Telegram* and *Kik*: a detailed technical document promising a specific ecosystem, used to recruit millions of users, authored by the founders who maintained exclusive centralized control.

22. California has now codified the principle that cryptocurrency project disclosures must be accurate and non-misleading. The Digital Financial Assets Law ("DFAL"), enacted October 13, 2023 and taking full effect July 1, 2026, requires crypto companies to provide extensive, accurate, and non-misleading disclosures that clearly outline risks, fees, and conflicts of interest to protect California residents. Cal. Fin. Code Sections 3101-3803. The Department of Financial Protection and Innovation ("DFPI") is empowered to take enforcement action against any entity that engages in fraud, intentional misrepresentation, or misappropriation in connection with digital financial asset business activity, with penalties of up to $20,000 per day of material violation. While the DFAL was not in full effect when Pi's Whitepaper was published, it reflects California's legislative recognition that exactly this type of conduct—crypto projects making misleading promises in whitepapers without disclosing risks, conflicts of interest, or the promoters' actual intentions— causes concrete harm to consumers. Pi's Whitepaper contained zero risk disclosures, zero conflict of interest disclosures, and no disclaimers of any kind. It did not disclose that the founders would maintain exclusive control of all validator nodes, that users' tokens could be moved without consent, or that the founders intended to monetize the platform through private exchange listings while telling users their tokens had no value.

23. The absence of conflict of interest disclosures is not a historical oversight—it is an ongoing

practice. Defendants established Pi Ventures, a venture capital fund with a reported $200 million balance, ostensibly to attract developers to build the Pi Network ecosystem. To date, the only known investment from this fund is a $20 million investment in OpenMind, an AI robotics company. Defendants have never explained how an AI robotics company benefits the Pi Network ecosystem or has any connection to blockchain technology. The investment benefits the founders personally—not the 60 million users whose collective engagement built the platform and whose tokens funded the venture capital balance. Critically, this $20 million investment decision was made unilaterally by the founders without any community input, vote, or oversight mechanism—the same pattern of centralized decision-making that has characterized every major action Defendants have taken since the project's inception. The community was promised governance over the platform's direction; instead, the founders allocate hundreds of millions in platform resources at their sole discretion, to ventures that serve their personal financial interests rather than the ecosystem they promised to build.

24. This pattern also raises a reasonable inference as to why Defendants have refused to decentralize despite over five years of promises to do so. Genuine decentralization would require transparency—open validator nodes, public governance, community oversight of fund allocation, and an auditable blockchain. Defendants' persistent refusal to relinquish centralized control, even as they publicly promised decentralization, is consistent with a need to prevent the community from discovering the full scope of unauthorized token transfers, undisclosed exchange listings, self-dealing investments, and other conduct that centralized control has enabled them to conceal.

25. This is precisely the type of undisclosed conflict of interest that the DFAL was enacted to prevent: founders using platform resources derived from user participation to enrich themselves through unrelated investments while users remain locked out of their own tokens.

26. Community Governance of Mainnet Timing. The Whitepaper represented that the community would decide when the mainnet launched. No community vote occurred. No governance mechanism was ever created. Defendants unilaterally launched an enclosed mainnet in December 2021 and unilaterally opened it on February 20, 2025. The community had zero input into either decision.

27. Validator Node Decentralization. The Whitepaper stated that the "Pi core team will host several nodes on the test net, but will encourage more Pioneers to start their own nodes on the testnet," with the clear implication that community-operated validator nodes would be selected and established before the mainnet launched. This never happened. For over five years, Defendants operated all three validator nodes themselves with zero community participation in validation. To the date of this filing, Defendants still operate the only three validator nodes on the entire Pi blockchain. Pi's own block explorer confirms this fact, and Defendants have never disputed it. For comparison, a genuinely decentralized cryptocurrency like Bitcoin operates with over 24,000 independent validator nodes spread across 157 countries worldwide. Defendants promised decentralization and delivered a private database with a blockchain wrapper.

28. Ecosystem Development. Defendants imposed a requirement that the community build 100 applications before the mainnet would open. When Defendants opened the mainnet in February 2025, fewer than five vetted applications existed. Defendants imposed conditions on users they never intended to honor—and opened the mainnet anyway when it suited their financial interests. Promises made without any intention of performance are actionable as fraud at the time they are made. *Lazar v. Superior Court*, 12 Cal. 4th 631, 638 (1996).

B.   Defendants' Conduct Contradicted Their Public Statements

29. On December 29, 2022, Pi tokens were simultaneously listed on three cryptocurrency exchanges—XT.com, Huobi, and BitMart. On launch day, the token reached a high of approximately $307 across all three exchanges, generating $57.51 million in trading volume on Huobi alone. This occurred during what Defendants publicly described as an "enclosed mainnet" with "no external connectivity." Defendants subsequently denounced these listings publicly, and moderators began to scrub the chatrooms of any mention of these exchange listings, pushing the narrative that "Pi has no value"—while traders were buying and selling the token at $307.

30. Defendants now ask this Court to believe that three separate exchanges independently decided to list the same token on the same day, generating millions in trading volume—with the token reaching a price of $307.49 within 24 hours of listing—all with zero involvement from the founders. This defies common sense. Cryptocurrency exchanges do not list tokens without

developer cooperation—they require technical integration, liquidity provisioning, and compliance documentation. *See SEC v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352, 368-79 (S.D.N.Y. 2020) (analyzing the relationship between token developers and exchanges in the context of securities offerings).

31. Furthermore, while Defendants claim they had no involvement in these listings, they simultaneously pursued trademark enforcement actions against obscure websites in Africa—but never filed suit against any exchange for trademark infringement or the $57.51 million in unauthorized revenue those exchanges allegedly generated. This selective enforcement reveals what Defendants will not say: the listings were not unauthorized.

32. Moreover, email correspondence shows that the exchanges themselves directly confirm founder involvement. On July 10, 2023, Huobi (now HTX) customer service confirmed in writing that token listings on their platform are "determined by the project party after contacting us and undergoing evaluation and review." On January 28, 2026, BitMart customer support confirmed that Pi Network (PI) was listed on December 29, 2022, and that "trading was enabled at that time in accordance with the project team's information and support." BitMart further stated that it "lists and supports tokens based on the project team's official disclosures and technical arrangements at the time." On January 18, 2024, HTX published a press release through PRNewswire stating it was acting "in collaboration with Pi Network"—more than a year after the listings Defendants publicly denounced as unauthorized. These communications are discussed in detail in Section VI.C below and will be included as exhibits in any amended complaint.

C.  Five Years of Contradictory Conduct Satisfies Rule 9(b)

33. Rule 9(b) requires a plaintiff to plead the "who, what, when, where, and how" of the alleged misrepresentation. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003). The SAC identifies the specific statements (the Whitepaper's decentralization and governance commitments), the speakers (Defendants Kokkalis and Fan as founders and authors), the dates (Whitepaper published March 2019, updated December 2021 and March 2022), and the mechanism of fraud (promising decentralization while maintaining exclusive centralized control). This satisfies the particularity requirement. *See Cooper v. Pickett*, 137 F.3d 616, 627 (9th Cir. 1997) (Rule 9(b)

requires that fraud allegations be specific enough to give defendants notice of the particular misconduct alleged).

34. The Whitepaper was not a vague expression of hope. It was a detailed operational document used to recruit 60 million users into contributing time, effort, and resources to build Defendants' platform. When promises induce action—four years of daily mining, node operation, security circle participation, and recruiting by Plaintiff alone—they are binding representations under California law, not aspirational musings. *See Younan v. Equifax Inc.*, 111 Cal. App. 3d 498, 513 (1980) (representations that induce reliance and action are actionable even if they relate to future events, where the promisor has no intention of performing).

## II. PLAINTIFF ADEQUATELY PLED RELIANCE

35. Defendants argue that Plaintiff merely "engaged with an app" without relying on any specific statement. They further contend that Plaintiff's lack of prior cryptocurrency experience means he could not have meaningfully relied on the Whitepaper's technical representations. This argument proves Plaintiff's case rather than defeating it.

A.  The "Unsophisticated User" Argument Cuts Both Ways

36. Pi Network was specifically designed to attract everyday users with no cryptocurrency experience. The Whitepaper was written in accessible, plain language. The mobile mining interface required no technical knowledge. The entire project's stated mission was to bring cryptocurrency to ordinary people.

37. Defendants cannot design a project specifically targeting novice users, write a Whitepaper in plain language to recruit them, attract 60 million such users, extract years of engagement from them—and then argue those users could not have relied on the promises because they were too unsophisticated to understand them. That is the fraud. Under California law, the reasonableness of reliance is judged by reference to the plaintiff's particular circumstances, not an abstract standard. *Engalla v. Permanente Med. Grp., Inc.*, 15 Cal. 4th 951, 977 (1997). A defendant who targets unsophisticated consumers is held to a higher duty of care and cannot exploit that very unsophistication as a defense. *See Vasquez v. Superior Court*, 4 Cal. 3d 800, 814 (1971) (defendants

- 10 -

who engage in schemes targeting vulnerable populations may not rely on the victims' lack of sophistication as a defense to fraud).

38. If this Court accepted Defendants' argument, it would create a rule that cryptocurrency projects can promise anything in a whitepaper, attract millions of unsophisticated users through those promises, and then defeat fraud claims by arguing that the very unsophistication they targeted means nobody could have relied on their statements. No court should endorse such a framework.

B.  Plaintiff's Actions Demonstrate Reliance

39. Plaintiff invested four years of daily mining activity, operated node software, recruited 25 users to the platform, participated in security circles, and spent approximately 1,672 hours and $1,200 in direct costs. These actions were taken in reliance on the Whitepaper's specific promises that users would earn tokens in a decentralized ecosystem they collectively owned and governed. Reliance may be established by showing that the misrepresentations substantially influenced the plaintiff's decision, even if other factors also played a role. *Mirkin v. Wasserman*, 5 Cal. 4th 1082, 1092-93 (1993); *see also Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990) (on a motion to dismiss, all reasonable inferences are drawn in the plaintiff's favor).

40. Plaintiff would not have contributed this time and money if the Whitepaper had disclosed the truth: that Defendants maintained exclusive control over all validator nodes, could move tokens in and out of any user's wallet without permission through a clawback mechanism, and were privately coordinating exchange listings while telling the community the tokens had no value.

**III. THE UNAUTHORIZED TRANSFER WAS NOT AN "INTERVENING EVENT"—IT WAS THE BREACH ITSELF**

41. Defendants frame the theft of Plaintiff's tokens as a random third-party hack that constitutes an "intervening event" breaking the causal chain between Defendants' representations and Plaintiff's loss. This is the central factual dispute in this case, and the evidence conclusively demonstrates that the unauthorized transfer was executed using Defendants' own infrastructure.

42. An intervening cause breaks the chain of proximate causation only if it is unforeseeable and

independent of the defendant's conduct. *Hernandezvs. Barragan*, 44 Cal. 4th 557, 577-78 (2008). Where the alleged intervening act occurs through the defendant's own instrumentality, it is not an independent intervening cause as a matter of law. *Stewart v. Cox*, 55 Cal. 2d 857, 863 (1961).

A.  The KIDS Wallet Was Created by Defendants' Own Infrastructure

43. Plaintiff completed KYC verification on December 22, 2022. At that point, his authorized wallet address (ZEAT) was locked and assigned to his account. Pi Network's own moderators confirmed in platform communications that wallet addresses cannot be changed after KYC verification.

44. The unauthorized destination wallet (KIDS) was created approximately 16 months after Plaintiff's KYC date. This means someone changed Plaintiff's assigned wallet destination to an address that did not exist when his account was verified. Blockchain records show that the KIDS wallet was created by Defendants' own Pi Foundation Wallet 2—the same wallet that created Plaintiff's authorized ZEAT wallet.

45. This is not a case where a hacker transferred tokens FROM Plaintiff's wallet TO a thief. The theft was built into the migration process itself. When Plaintiff's tokens were migrated, they were never delivered to his authorized ZEAT wallet. Instead, the system-level destination was swapped to KIDS before migration occurred. Plaintiff's tokens were redirected at the infrastructure level— which can only be done by the owner of the blockchain. *See In re Bibox Grp. Holding Ltd. Sec. Litig.*, 534 F. Supp. 3d 326, 337-38 (S.D.N.Y. 2021) (analyzing platform-level control over digital asset transactions in context of fraud allegations).

B.  The Claimable Balance Architecture Proves System-Level Access

46. Pi Network uses a Stellar-based claimable balance mechanism (CAP-0035) for token migration. When Plaintiff's claimable balance was created, it was claimed within one minute and immediately forwarded. This timing gap is too short for manual, human claiming—it requires automated scripts monitoring claimable balance creation in real time.

47. In order for this to have happened, someone would have had to access Plaintiff's account either through the app interface itself or the Horizon terminal, remove the ZEAT wallet from Plaintiff's mainnet checklist, and replace it with the KIDS wallet as Plaintiff's tokens were

- 12 -

being migrated to the mainnet. Stellar's blockchain architecture includes a feature called Channel Wallets, where one wallet sends out payments to other wallets who then send out payments to another wallet, all in sequence. This is something that is done at the payment level—meaning it is created when the payment is created, not after. A random third-party hacker does not have the ability to orchestrate this type of coordinated, sequential payment operation across dozens of wallets using Defendants' own infrastructure.

48. Furthermore, the receiving wallet (V5FF) processed tokens from over 70 victim wallets within a two-hour window, with transfers executing at sequential 42-49 second intervals. This automated, batch processing is the hallmark of a system-level operation, not an individual hack. V5FF is only one of hundreds of wallets involved in this ongoing token theft. Hundreds, possibly thousands of wallets were created to facilitate thefts identical to Plaintiff's, with over two thousand reported incidents from users whose tokens were stolen in the same manner. This is not a simple operation. These wallets conducted thousands of payment transfers to various other wallets in a deliberate effort to make it harder to track where the tokens ultimately flow—but all eventually end up at wallets that sell millions of dollars in laundered tokens to cryptocurrency exchanges. With Defendants controlling the only three validator nodes on the blockchain, there is zero oversight and zero effort to stop this from happening. The level of automation involved, the routing of tokens through the founders' own infrastructure, and the fact that Defendants named themselves as the first claimant in every instance these thefts occurred all point to the inescapable conclusion that Defendants are involved in this token theft.

C.  Pi Network's Foundation Wallet Is Listed as First Claimant

49. Under the Stellar claimable balance protocol, Pi Network's Foundation wallet (3BNJ) is listed as the first claimant on every user's claimable balance with a 14-day priority reclaim window. This means the Foundation has the technical capability to reclaim any user's tokens within 14 days of migration. When Plaintiff's tokens were migrated to the KIDS wallet, a claimable balance was created with the founders' wallet designated as the first claimant. No hacker would structure a theft this way. A rational attacker would target wallets with tokens readily available for transfer—not

route stolen tokens through a claimable balance mechanism that names the blockchain's own founders as the primary beneficiary on every single transaction.

50. Defendants exercised this exact capability during the opening days of the mainnet in February-March 2025, conducting "reverse migrations"—pulling tokens back out of user wallets without notice. In March 2025, Pi Network publicly acknowledged this capability and admitted using it for other users. Defendants refused to exercise the same capability for Plaintiff. Such selective exercise of control is itself evidence of bad faith. *Carma Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342, 372-73 (1992) (the covenant of good faith and fair dealing prohibits one party from unfairly frustrating the other party's right to receive the benefits of the agreement).

51. After the unauthorized transfer, Plaintiff's original authorized ZEAT wallet sent 10 Pi back to Pi Foundation Wallet 2—proving that Pi Network still controlled that wallet.

D. Defendants Face a Dilemma They Cannot Escape

52. The evidence presents Defendants with an inescapable choice. Either someone with system-level access to Pi Network's infrastructure changed Plaintiff's wallet address and redirected his tokens—which means Defendants or someone acting through their systems committed the theft. Or a third-party hacker bypassed KYC locks, changed wallet addresses in Defendants' database, rerouted tokens through the claimable balance system, and exploited infrastructure wallets—which means Defendants concealed catastrophic security vulnerabilities from their users while maintaining a system they represented as secure.

53. Under either scenario, Defendants are liable. The first is fraud. The second is breach of fiduciary duty and negligence. The "intervening event" defense fails because the event was not intervening—it occurred within and through Defendants' own systems. *See Novak v. Continental Tire N. Am., Inc.*, 22 Cal. App. 5th 189, 196 (2018) (where the instrumentality causing harm is within the defendant's exclusive control, the burden shifts to the defendant to explain the occurrence).

**IV. DEFENDANTS WERE DIRECTLY ENRICHED BY PLAINTIFF'S CONTRIBUTIONS**

54. Defendants contend that Plaintiff did not confer any direct benefit because he did not give

- 14 -

Defendants tokens or money. This argument ignores the business model Defendants built—a model their own Whitepaper describes in detail.

55. Under California law, unjust enrichment is a basis for restitution where a defendant has received and unjustly retained a benefit at the plaintiff's expense. *Ghirardo v. Antonioli*, 14 Cal. 4th 39, 51 (1996). Although some courts characterize it as a remedy rather than a standalone cause of action, the Ninth Circuit has recognized it as a viable quasi-contract claim under California law. *Astiana v. Hain Celestial Grp., Inc.*, 783 F.3d 753, 762 (9th Cir. 2015).

A. The Whitepaper Documents the Value Extraction System

56. The Whitepaper—which Defendants themselves submitted to this Court through their Request for Judicial Notice—describes an elaborate system designed to extract value from users. This includes daily mining activity that incentivized daily engagement, referral bonuses that drove user growth at zero acquisition cost, concurrent mining bonuses that kept multiple users on the platform simultaneously, tiered engagement levels through the Pi Ambassador program, utility bonuses rewarding time spent using the platform, and security circle participation that built the trust graph underlying the KYC system.

57. Most revealingly, the Whitepaper explicitly describes an "Attention Marketplace"—a planned system to monetize user attention by selling it to third-party companies. Defendants designed tokens as the currency to pay for user engagement. Users contributed time, effort, and data. Defendants received engagement metrics, user growth numbers, advertising data, and the ability to represent 60 million active users to investors and exchanges.

B. Plaintiff's Specific Contributions Generated Direct Value

58. Plaintiff contributed four years of daily mining, node operation, recruitment of 25 users, security circle trust graph building, and approximately 1,672 hours and $1,200 in costs. Multiplied across 60 million users performing similar activities, this collective engagement is what gave Pi Network its value proposition. Defendants used these metrics to raise $20 million in SAFE funding, attract exchange listings, and claim 60 million registered users.

59. These contributions were not voluntary gifts. They were induced by Defendants' fraudulent

promises of decentralized ownership. The benefit conferred need not be a direct monetary transfer; services, time, effort, and data conferred under fraudulent pretenses are sufficient to support an unjust enrichment claim. *See City of Oakland v. Oakland Raiders*, 83 Cal. App. 5th 458, 477 (2022) (affirming viability of unjust enrichment where defendant profits from plaintiff's contributions); *Feingold v. John Hancock Life Ins. Co. USA*, 753 F.3d 55, 58 (1st Cir. 2014) (benefits conferred based on fraudulent representations may be recovered under unjust enrichment). Plaintiff would not have spent his time and money if the Whitepaper had disclosed that Defendants maintained exclusive control over all validator nodes, built a clawback mechanism to reclaim tokens at will, and intended to coordinate private exchange listings while telling users their tokens had no value.

C.  The Financial Timeline Demonstrates Enrichment

60. In June 2020, Defendants Kokkalis, Fan, and former co-founder McPhilip each received 500 million shares at $0.00005 per share—without informing the community. In November 2021, Defendants unilaterally issued themselves 1 billion additional shares at a heavily discounted price without informing existing investors or determining fair market value.

61. By late 2022, Defendants were financially desperate. Defendant Kokkalis was bouncing checks for $86, was being sued in small claims court for $725, and could not secure investment capital because of the ongoing McPhilip derivative lawsuit. McPhilip's attorney documented that Defendants were pressuring McPhilip to participate in a secret share sale specifically to fund their legal defense.

62. In November 2022, Defendants' own counsel documented over $50,000 in legal debt. One month later, on December 29, 2022, Pi tokens appeared on three exchanges with $57.51 million in trading volume on Huobi alone on opening day—while the community remained locked out on the enclosed mainnet.

63. Within weeks, Defendants' financial picture transformed. The small claims case against Kokkalis was dropped. Defendants launched a massive hiring campaign of approximately 50 new positions at an average salary of approximately $126,000. Defendants filed trademark applications they could not previously afford. The McPhilip lawsuit was settled in November 2023—right before court-ordered discovery of financial records.

64. On February 20, 2025, when the mainnet opened to the public, founder-associated wallets (GALIT7ME, GCCDKBMG) began cashing out to MEXC and Gate.io within seven days—while regular users' tokens remained locked, unmigrated, or stolen.

65. Defendants were enriched not by receiving Plaintiff's tokens or money directly, but by exploiting his participation—and the participation of millions of other users—to build a platform they monetized for their exclusive benefit. Retention of such benefits is unjust where they were obtained through deceptive practices. *See State ex rel. Van de Kamp v. Bank of Am., N.A.*, 204 Cal. App. 3d 819, 843 (1988) (unjust enrichment applies where benefits are improperly retained through fraudulent conduct).

## V. DEFENDANTS OWED AND BREACHED FIDUCIARY DUTIES TO PLAINTIFF

66. Defendants argue that their Terms of Service place security responsibility on users, and that no fiduciary relationship existed. This argument is irreconcilable with the actual control Defendants exercised over users' assets.

A.  Defendants' Control Over User Assets Created a Fiduciary Relationship

67. Defendants operated all three validator nodes on the Pi blockchain, processing every transaction. They controlled the migration process from testnet to mainnet. They controlled which wallet address each user's tokens were assigned to. They controlled the claimable balance mechanism through which tokens were distributed. And they built themselves a clawback capability to unilaterally move tokens in and out of any user's wallet without permission.

68. This is not a platform where users are responsible for their own security. This is a platform where Defendants had total, exclusive, custodial control over every user's tokens at all times. Users had no ability to independently access, move, or protect their assets without Defendants' system. Under California law, a fiduciary relationship arises wherever one party reposes trust and confidence in another, who thereby gains influence and superiority over the first. *Herbert v. Lankershim*, 9 Cal. 2d 409, 483 (1937). Where an entity exercises exclusive control over another's assets, a fiduciary duty exists regardless of contractual disclaimers. *City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 68 Cal. App. 4th 445, 459 (1998) (fiduciary duty arises when one party entrusts assets to another with superior control and knowledge).

69. In the cryptocurrency context, courts have recognized fiduciary duties when platforms or entities exercise custodial control over user assets. *See Bhatia v. Silvergate Bank et al.*, No. 3:23-cv-01406-RBM-BLM (S.D. Cal. Mar. 20, 2024) (finding fiduciary obligations where platform exercised control over customer digital assets).

B.  The Claimable Balance System Proves Custodial Control

70. Defendants built themselves the ability to reclaim any user's tokens through the Stellar claimable balance protocol's 14-day priority window. The claimable balance feature was designed as a safeguard—its intended purpose is to allow an issuer to reclaim tokens in cases where a recipient has lost their passphrase or never claimed the tokens, so the tokens are not permanently burned or left sitting in an inaccessible wallet. Defendants abused this feature by using it to take back large swaths of tokens from user wallets during the opening days of the mainnet in February-March 2025, conducting "reverse migrations"—pulling tokens out of user wallets without notice or consent. In most cases, Defendants reversed users' migrations without telling them first. This mass reversal during the mainnet launch is itself highly suspicious—it demonstrates that Defendants were actively exercising unilateral control over user tokens at the exact moment users expected to finally have access to their own assets.

71. Defendants cannot simultaneously maintain a mechanism to pull tokens out of any wallet whenever they choose and argue that users bear sole responsibility for the security of those same wallets. The existence of the clawback capability alone creates a custodial relationship. Defendants' selective exercise of that capability—using it for some users during the mainnet launch while refusing to use it for Plaintiff—is evidence not merely of a breach of fiduciary duty, but of bad faith. *Chazen v. Centennial Bank*, 61 Cal. App. 4th 532, 541 (1998) (fiduciary must act in the best interests of the beneficiary and may not exercise discretion selectively to the beneficiary's detriment).

C.  The Terms of Service Cannot Disclaim Duties Arising from the Nature of the Relationship

72. The Terms of Service reference "Mobile Balance" as points with no cash value. After

migration to the mainnet, Plaintiff's tokens were no longer "Mobile Balance points"—they were blockchain assets on a Stellar-based ledger. Defendants knew this because they were simultaneously cashing out the same tokens on cryptocurrency exchanges for real money.

73. A company cannot disclaim fiduciary duties that arise from the factual nature of the relationship. *See Committee on Children's Television, Inc. v. General Foods Corp.*, 35 Cal. 3d 197, 216 (1983) (fiduciary duty arises from the nature of the relationship, not solely from contract). Where Defendants held exclusive control over Plaintiff's assets with no possibility of independent access by Plaintiff, the relationship was fiduciary in nature regardless of contractual disclaimers. *See also Hodes v. County of Placer*, 41 Cal. App. 5th 537, 546 (2019) (contractual waivers of fiduciary duties are unenforceable where the nature of the relationship gives rise to fiduciary obligations independent of contract).

## VI. DEFENDANTS' RULE 11 SANCTIONS THREAT IS WITHOUT MERIT

74. Defendants request that this Court sanction Plaintiff's counsel under Rule 11 for allegedly filing frivolous claims, specifically targeting the argument regarding Defendants' control of validator nodes. Plaintiff respectfully submits that this threat is itself without foundation and that the Court should consider what Defendants' own counsel knows.

75. Rule 11 sanctions are appropriate only where a filing is frivolous, legally unreasonable, or made without a good faith basis in fact. *Townsend v. Holman Consulting Corp.*, 929 F.2d 1358, 1362 (9th Cir. 1990). The standard is objective: whether a competent attorney could have concluded that the claims were well-grounded in fact and warranted by existing law. *Conn v. Borjorquez*, 967 F.2d 1418, 1421 (9th Cir. 1992). The rule is not a weapon to punish a party for pursuing claims the opposing party finds inconvenient. *Operating Eng'rs Pension Tr. v. A-C Co.*, 859 F.2d 1336, 1344 (9th Cir. 1988).

A.  The Validator Node Control Argument Is a Verifiable Fact

76. Pi Network's own blockchain explorer confirms that only three validator nodes exist, all operated by SocialChain. The Whitepaper describes the founders selecting validator nodes. Fan's declaration—the only substantive filing Defendants submitted—does not deny this fact. Defendants have never disputed validator node control in any filing. There is nothing frivolous about citing a

verifiable, undisputed fact. *See Szabo Food Serv., Inc. v. Canteen Corp.*, 823 F.2d 1073, 1083 (7th Cir. 1987) (sanctions are not warranted where factual allegations are supported by evidence).

B. Defendants' Counsel's Personal Knowledge Undermines the Sanctions Request

77. Defendants' counsel, Kenneth Nabity, has personal knowledge of facts that bear directly on the credibility of his sanctions request. Specifically, Mr. Nabity documented over $50,000 in legal debt owed by the founders in November 2022—one month before the exchange listings that generated $57.51 million in trading volume. Mr. Nabity was aware that Defendant Kokkalis was unable to pay an $86 check and was being sued in small claims court for $725.

78. Mr. Nabity was present for or aware of representations by McPhilip's attorney that the founders were pressuring McPhilip to participate in a secret share sale specifically to fund their legal defense. The McPhilip lawsuit was subsequently settled right before court-ordered discovery of the founders' financial records.

79. Plaintiff respectfully suggests that the Court consider whether Defendants' counsel's representations regarding the founders' lack of involvement in exchange listings are consistent with his personal knowledge of the founders' financial condition immediately prior to those listings. Rule 11's inquiry into the factual basis of filings applies equally to all parties. *Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533, 553 (1991) (Rule 11 obligations apply to all parties and their attorneys).

C. The Common Sense Test on Exchange Listings

80. Defendants' counsel asks this Court to believe that XT.com, Huobi, and BitMart all independently decided to list the same token on the same day, generating millions in volume, with zero involvement from the founders. Exchanges do not list tokens without developer cooperation. They require technical integration, liquidity provisioning, and compliance documentation.

81. Defendants pursued trademark enforcement actions against websites in Africa but never sued any of the three exchanges for trademark infringement or the $57.51 million in unauthorized revenue. This tells the Court everything it needs to know about who was behind those listings.

82. But this is not merely a common sense inference. Email correspondence shows that the

exchanges themselves confirmed founder involvement. On July 10, 2023, Huobi (now HTX) customer service responded to a direct inquiry about how tokens are listed on their platform, stating: "The currency of a project is determined by the project party after contacting us and undergoing evaluation and review." Huobi confirmed that Pi supported spot trading at the time, with deposits and withdrawals suspended pending the mainnet launch. This is a direct admission from the exchange that the Pi Network founders initiated the listing process by contacting Huobi and submitting to evaluation—not that Huobi unilaterally decided to list the token.

83. BitMart provided a similar confirmation. On January 28, 2026, BitMart customer support stated that Pi Network (PI) was listed on December 29, 2022, and that "trading was enabled at that time in accordance with the project team's information and support." BitMart further confirmed that it "lists and supports tokens based on the project team's official disclosures and technical arrangements at the time." BitMart subsequently announced a 1:1 token swap from old PI tokens to new mainnet PI tokens on March 21, 2025, confirming that the tokens originally listed were real assets supplied by the project team that required migration to the new blockchain—not independently created derivatives or IOUs.

84. The relationship between the founders and the exchanges did not end with the initial listing. On January 18, 2024—more than a year after the listings that Defendants publicly denounced—HTX published a press release through PRNewswire stating: "In collaboration with Pi Network, HTX Exchange aims to provide our users with unparalleled opportunities in the evolving realm of decentralized finance." This is not the language of an exchange that listed a token without authorization. It is a public acknowledgment of an ongoing collaborative business relationship between HTX and the Pi Network project team. Defendants cannot simultaneously denounce exchange listings as unauthorized while their project team actively collaborates with those same exchanges on promotional materials.

85. Taken together, the exchange communications establish that the December 29, 2022 listings were initiated by the project team, executed with the project team's technical cooperation, and maintained through an ongoing collaborative relationship. Defendants' public denials of

involvement in these listings are directly contradicted by the exchanges' own records. These communications are available as exhibits and will be included in any amended complaint.

86. The Rule 11 threat is not merely weak. It invites scrutiny that Defendants may prefer to avoid.

### VI.  IF THE COURT DISMISSES ANY CLAIM, LEAVE TO AMEND SHOULD BE GRANTED

87. Defendants ask this Court to dismiss with prejudice, arguing that Plaintiff has already had the opportunity to amend and further amendment would be futile. This argument fails under the Ninth Circuit's liberal amendment standard.

A.  The Ninth Circuit Standard Strongly Favors Leave to Amend

88. Under Federal Rule of Civil Procedure 15(a)(2), courts "should freely give leave when justice so requires." The Ninth Circuit has emphasized that this policy is "to be applied with extreme liberality." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003). Leave to amend should be denied only upon a showing of bad faith, undue delay, undue prejudice to the opposing party, or futility of amendment. *Foman v. Davis*, 371 U.S. 178, 182 (1962). Dismissal with prejudice is especially disfavored where the plaintiff has not previously been granted leave to amend. *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc).

B.  None of the Factors for Denying Leave Are Present

89. No Bad Faith. Plaintiff has actively compiled evidence and cooperated with the Court's prior orders. There is no indication of dilatory motive or litigation gamesmanship.

90. No Undue Delay. This case remains in its earliest stages. No discovery has occurred. No trial date has been set. No pretrial conference has been held. *See Bowles v. Reade*, 198 F.3d 752, 758 (9th Cir. 1999) (leave to amend should be granted particularly at the early stages of litigation).

91. No Prejudice to Defendants. Defendants have filed one motion to dismiss. Responding to an amended complaint is not undue prejudice—it is ordinary litigation. *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 187 (9th Cir. 1987) (the party opposing amendment bears the burden of demonstrating prejudice).

92. Amendment Is Not Futile. Plaintiff possesses extensive evidence that was not included in

the SAC—not because it does not exist, but because prior counsel did not incorporate it. This evidence includes blockchain forensic data showing the KIDS wallet was created by Defendants' own infrastructure wallet, claimable balance transaction records demonstrating automated system-level execution, the complete financial timeline from the McPhilip derivative lawsuit, exchange coordination evidence including direct email confirmations from Huobi and BitMart confirming founder-initiated listings, HTX's published collaboration with Pi Network, and founder wallet cashout data from mainnet launch.

93. An amended complaint incorporating this evidence would cure every deficiency Defendants identify. Futility is impossible to argue when the evidence has not been presented. *See Desaigoudar v. Meyercord*, 223 F.3d 1020, 1026 (9th Cir. 2000) (a court abuses its discretion when it denies leave to amend unless amendment would be clearly futile).

C. Dismissal at the Pleading Stage Is Premature

94. At the motion to dismiss stage, Plaintiff is required to plead the who, what, when, where, and how of the alleged misrepresentation. Plaintiff is not required to prove his case—that is for discovery and trial. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (a complaint must contain sufficient factual matter to state a claim that is plausible on its face, but need not demonstrate probability). Defendants' motion repeatedly applies a trial-level burden of proof to a pleading-stage analysis. This is not the applicable standard. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (plausibility, not probability, is the standard at the pleading stage).

95. Denying leave to amend at this stage—before any discovery, before any exchange of evidence—would be an abuse of discretion that would not survive appellate review.

**CONCLUSION**

96. Defendants' Motion to Dismiss should be denied. The SAC states viable claims for fraud, breach of fiduciary duty, and unjust enrichment. The factual basis for these claims is supported by publicly verifiable blockchain records, Defendants' own Whitepaper, and documentary evidence from related litigation.

97. In the alternative, if the Court finds any claim insufficiently pled, Plaintiff respectfully

requests leave to file a Third Amended Complaint incorporating the substantial additional evidence described herein. This evidence directly addresses every deficiency Defendants have identified and demonstrates that amendment would not be futile.

98. Defendants built a platform that recruited 60 million users through promises of decentralized ownership. They maintained exclusive centralized control while those users contributed years of engagement. They privately monetized the platform through exchange listings while telling the community the tokens had no value. They built themselves the technical capability to move tokens in and out of any user's wallet at will. And when Plaintiff's tokens were redirected through their own infrastructure, they blamed a phantom hacker and asked this Court to sanction Plaintiff's counsel for calling it fraud.

99. The evidence does not support dismissal. It supports discovery.

DATED: March 11, 2026

_/s/ Mario Tafur_____
Mario Tafur
Attorney for Plaintiff