Mario Tafur, Esq. (SBN: 329899)
mario@thebulldog.law
**BULLDOG LAW, P.C.**
500 N. Central Avenue, Ste. 610
Glendale, CA 91203
Telephone: (949) 649-3007
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| HARRO MOEN<br><br>Plaintiff(s),<br><br>vs.<br><br>SOCIALCHAIN INC., PI COMMUNITY COMPANY, NICOLAS KOKKALIS, CHENGDIAO FAN, and DOES 1-50,<br><br>Defendant(s). | Case No.: 5:25-cv-09145-NC<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THIRD AMENDED COMPLAINT**<br><br>**Date:** May 20, 2026<br>**Time:** 11:00 a.m.<br>**Courtroom:** 5<br>**Judge:** Hon. Nathanael M. Cousins |

## I. INTRODUCTION

1. Defendants' motion focuses on a single sentence from page 10 of a 51-page document that Defendants themselves submitted under penalty of perjury, while declining to address the exchange emails, the blockchain forensic records, the sworn declarations from the Superior Court proceedings, or the commitments documented on pages 11, 16, 17, 18, 19, 20, and 41 of that same exhibit.

2. The Whitepaper is how Defendants recruited their users. Defendants used it to persuade 60

million people to contribute years of labor, time, and data to build a platform they were told would be decentralized and community-governed. They then used those 60 million people to create the token supply, the trading volume, the user base, and the social proof that made the December 29, 2022 exchange listings possible. When those listings generated $57.51 million in a single day, Defendants retained the benefits while publicly denying involvement, to the same 60 million people whose labor made it possible.

3. Plaintiff's claims are supported by documentary evidence already before this Court. Plaintiff alleges, supported by documentary evidence submitted with the TAC, that three exchanges have confirmed in writing that the December 29, 2022 listings were coordinated with and supported by the project team. Blockchain forensic records submitted with the TAC establish that Defendants' own Pi Foundation Wallet 2 created the wallet that received Plaintiff's tokens. Sworn declarations filed in Santa Clara County Superior Court establish that Defendant Kokkalis had an $86 check returned for nonsufficient funds forty-four days before those listings, while owing his own attorney over $50,000. Defendants' own Exhibit A establishes that material commitments in the Whitepaper were not fulfilled. The record before this Court does not support the assertion that no wrongdoing occurred.

4. Plaintiff's opposition addresses Defendants' motion section by section. This Court is also asked to consider the documented pattern of conduct across Defendants' business relationships, which bears directly on the question of scienter.

## II. DOCUMENTED CONDUCT IS RELEVANT TO SCIENTER AND MOTIVE

5. Evidence of a consistent course of conduct is relevant to establish scienter, knowledge of falsity and intent to deceive, under Federal Rule of Evidence 404(b). The conduct described below is offered not as character evidence but as probative evidence of Defendants' knowledge, motive, and intent, all of which are directly at issue on the fraud claim.

6. Defendants Kokkalis and Fan are husband and wife. Both hold doctoral degrees from Stanford University. Defendant Kokkalis holds a PhD in Computer Science, developed the blockchain curriculum at Stanford, and taught its first decentralized applications course. Defendant Fan holds a PhD in Anthropological Sciences, specializing in social computing and mass participation systems. In 2017, they co-authored "Founder Center: Enabling Access to Collective Social Capital," CSCW 2017 (DOI: 10.1145/2998181.2998244) — peer-reviewed research on designing platforms that leverage collective human trust at scale. Their academic credentials are directly relevant to the scienter inquiry because they demonstrate that Defendants possessed precise technical and behavioral knowledge of what decentralization requires and how users rely on commitments of the kind made in the Whitepaper.

*A. The McPhillip Litigation*

7. The sworn declarations and pleadings filed in Santa Clara County Superior Court Case Nos. 20CV368601 and 21CV391680 document conditions at Pi Network during the period relevant to this case. McPhillip's own filings state:

> "Kokkalis and Fan had marital issues which manifested themselves not only in workplace shouting and screaming but acts of physical aggression towards each other witnessed by Plaintiff… have also impaired my ability to fulfill my role as CEO by forcing me to dedicate an increasing share of my time to resolving interpersonal disputes and managing the resultant hostile workplace." (McPhillip Lawsuit, Nov. 2021.)

8. The working conditions required McPhillip to seek therapy and take time away from the company. He was subsequently fired for that absence. Defendants described his departure publicly without disclosing those circumstances. The derivative litigation also documents that Defendants issued themselves one billion shares at a discounted price without notifying existing investors, acquiring a 97% ownership stake in Pi Network. The lawsuit states: "By selling themselves the

Company and its Pi tokens below market value, the Defendants enriched themselves at the cost of the Company, its investors, the Plaintiff, and its community. At the same time, Defendants violated the company's core tenet, trust." (McPhillip Lawsuit, Nov. 2021.) The lawsuit was settled in October 2023, following the December 2022 exchange listings.

*B. Additional Pattern Instances*

9. The sworn declarations in Case No. 21CV391680 also document: Christine Birch held Pi Network intellectual property during a financially critical period, creating additional constraints documented in Defendant Fan's own declaration; Defendant Kokkalis acquired the pi.app domain through commitments to the owner, including first KYC verification status, that were not fulfilled; Case No. 22SC0884493 (Laplante v. Kokkalis) was pending when Defendant Kokkalis had an $86 check returned for nonsufficient funds in November 2022, and was dismissed within three weeks of the December 2022 exchange listings; and Defendants were sued by employee Swaroop Poudel for unilaterally modifying an employment contract without consent.

*C. The Fireside Token Feature*

10. During the period in which Defendants publicly stated that Pi tokens had no exchange value and were not listed on any exchange, Pi Network operated a Fireside Forum feature requiring users to spend Pi tokens at a rate of 100 Fireside tokens per 1 Pi token to access platform features. During this same period, Pi tokens were reported to trade at approximately $40 per token on certain exchanges including HTX. Users who accepted Defendants' public statements at face value made decisions about the value of their tokens including spending Pi tokens on Fireside access and trading tokens for goods that may have been different had the actual market conditions been disclosed. The Fireside token proceeds were never publicly accounted for.

*D. The Exchange Listings and Huobi's Announcement Record*

11. On December 29, 2022, Pi tokens were listed on three exchanges generating $57.51 million

in trading volume. Defendants publicly denied any involvement. Three exchanges have since confirmed in writing that the listings were coordinated with and supported by the project team.

12. Huobi's own announcement records, available on the exchange's platform, document the following: on December 25, 2022, Huobi posted an announcement regarding community feedback on the potential launch of the Pi Network Mainnet; on December 29, 2022 at 1:28 AM, Huobi announced it would open Pi Network token trading that same day at 17:00 GMT+8; on December 29, 2022 at 22:44, Huobi announced a Pi Network trading contest offering a Porsche 718 and 50,000 USDT as prizes; on January 16, 2023, HTX announced a Pi Network trading competition offering participants 50,000 USDT; and on February 13, 2025, Huobi HTX announced it would support the Pi Network mainnet launch and assist users in exchanging PI for USDT.

13. Such promotions reasonably support an inference of coordination between the exchanges and the project team. The sequence and content of Huobi's announcement record is inconsistent with Defendants' public representation that the listings were unauthorized and that Defendants had no affiliation with the listing exchanges.

*E. Relevance to Scienter*

14. The above documented instances are offered as evidence relevant to scienter, motive, and knowledge of falsity under Federal Rule of Evidence 404(b). Taken together, the record supports a strong inference that Defendants' misrepresentations regarding the exchange listings, the token distribution, and the decentralization commitments were not inadvertent. They occurred against a backdrop of documented financial pressure, concurrent undisclosed investor relationships, and a consistent pattern in which specific commitments made to obtain value were not honored when honoring them became inconvenient.

## **II. ARGUMENT**

15. To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint

must contain sufficient factual allegations, accepted as true, to state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Fraud claims must satisfy the heightened pleading standard of Federal Rule of Civil Procedure 9(b), which requires that the circumstances constituting fraud be stated with particularity. The TAC and its 115 pages of attached documentary evidence satisfy both standards.

## A. PLAINTIFF'S FRAUD CLAIM IS SUFFICIENTLY PLED

### *1. The TAC Satisfies Rule 9(b) Particularity*

16. The Third Amended Complaint pleads fraud with the particularity required by Federal Rule of Civil Procedure 9(b). See *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (requiring the "who, what, when, where, and how" of the alleged misconduct). That court held:

> Rule 9(b) requires that a plaintiff set forth more than neutral facts necessary to identify the transaction. The plaintiff must set forth what is false or misleading about a particular statement, and why it is false. In other words, the complaint must identify the 'who, what, when, and how of the misconduct charged." (Id.)

17. The TAC achieves these requirements.

- In terms of the "Who": Defendants Nicolas Kokkalis and Chengdiao Fan (co-founders, co-authors of the Whitepaper, and executives with exclusive control over validator nodes and the migration process) acting through SocialChain Inc. and Pi Community Company are identified directly..
- "What": Material misrepresentations in the 2019 Whitepaper (updated December 2021 and March 2022) promising (i) community governance of mainnet timing, (ii) community-operated validator nodes, (iii) a fully decentralized system with "no central authority," and (iv) secure, non-custodial wallets — including the July 10, 2022 official X denial of any

involvement in exchange listings stating "Pi is in Enclosed Mainnet with no external connectivity permitted. Pi Network isn't affiliated with and hasn't authorized any exchange listing. Such listings may not operate on real Pi. Participation may result in loss. Trust only official Pi channels."[1] Not only is Pi Network distancing itself from the exchanges listing Pi in this message, it further confirms Defendant's exclusive control of its network and tokens. Defendant's indicate on its website that its vision is to "[b]uild the world's most inclusive peer-to-peer ecosystem and online experience, fueled by Pi, the world's most widely distributed cryptocurrency."[2] Defendant further states on its website that it is "essential to empower real people around the world and disempower malicious actors, bots, or free riders. Pi relies on its community of Pioneers to meritocratically minen Pi tokens using their mobile phones, while Pi KYC serves as a core mechanism to ensure true humanity . . . " (See footnote 2) These statements clearly demonstrate that real people who engage the Pi community in earnest to "meritocratically" mine Pi. However, it is the failure of Defendants to uphold these type statements and arbitrarily took meritocratically mined Pi away from Plaintiff that is precisely what is at issue in this matter.

- "When": Whitepaper published March 2019 and viewed by Plaintiff on April 14–15, 2020; exchange-listing denial posted July 10, 2022; unauthorized wallet replacement and token transfer executed April 8–29, 2024. These identify specific dates when Defendant made misrepresentations or violated its fiduciary responsibility to Plaintiff.
- "Where": The misrepresentations appeared on minepi.com, in the Pi Network mobile app (including FAQ and notifications), and on Defendants' official X account — all of which Plaintiff personally reviewed. Defendant's assertion that this prong has not been satisfied is clearly contradicted by publicly available evidence.

[1] Pi Network Exchange Announcement on X: https://x.com/PiCoreTeam/status/1608527566872403969
[2] Pi Vision: https://minepi.com/about/

- "How": Defendants used these specific promises to induce Plaintiff (and over 60 million users) to contribute 1,672+ hours of labor, $1,200 in out-of-pocket costs, node operation, and recruitment of 25 users. Once Plaintiff had fully performed, Defendants maintained exclusive control via their three validator nodes, replaced Plaintiff's verified ZEAT wallet with the KIDS wallet they created via Pi Foundation Wallet GC5G, and executed the transfer without Plaintiff's passphrase or consent. An archived snapshot of the Defendant's website from April 2020, clearly demonstrates that Defendant was actively recruiting people, especially those who found engaging in cryptocurrency difficult and "risky" leaving many people out of the "cryptocurrency revolution."[3] Notably, Defendant's own URL "minepi.com" in and of itself tells potential users that mining pi is what Pi Network is the primary focus of Pi Network.

18. These allegations are supported by the Whitepaper itself (Fan Decl., Ex. A), blockchain records (PiScan), and Plaintiff's personal declaration of reliance.

***2. Defendants' Motion Addresses One Sentence of a 51-Page Exhibit***

19. Defendants' motion argues that Plaintiff's decentralization claims reflect a failure to read or acknowledge the 2019 Whitepaper. (ECF 46 at 10.) The motion quotes one sentence from page 10 and argues it disclosed permanent centralized control. The complete document, which Defendants submitted, contains the following on page 41 of Defendants' own Exhibit A:

> "Like on any blockchain, Nodes are at the heart of the decentralization of Pi. In Pi, instead of relying on centralized institutional nodes, we decided to open up the Nodes to any Pioneer with a computer connected to the internet… Because the Nodes are critical to the decentralization, security, and longevity of the Pi

[3] Wayback Machine Snapshot April 2020 on minepi.com webpage: https://web.archive.org/web/20200416155355/https://minepi.com/

blockchain, Node-operating Pioneers will receive additional mining rewards." (Fan Decl. Ex. A at 41 (emphasis added).)

20. This language is written in the past tense "we decided" describing a decision already made. Seven years later, zero community nodes operate on the mainnet consensus layer. Courts applying the incorporation by reference doctrine consider documents in their entirety. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018). The complete Whitepaper contains commitments on pages 11, 16, 17, 18, 19, 20, and 41 that the motion does not address. Decentralization is a key feature that Defendant touts about the Pi Network, and that fact is prominently displayed and discussed in publicly available materials produced and controlled by Defendant. These representations were false when made because Defendants designed and operated the centralized validator nodes from the outset and never intended to relinquish control. The table below illustrates how disingenuous Defendant's position is:

| Whitepaper Page | Defendants' Selective Quoting / Emphasis (MTD p. 10) | Full Language & Context (Fan Decl., Ex. A) | Plaintiff's Reliance |
|---|---|---|---|
| **Page 10** | Single sentence Defendants rely on to argue the Whitepaper "disclosed" permanent centralized control | Early-phase description of testnet operations (core team hosting nodes during development) | Defendants take one isolated sentence out of context while ignoring dozens of contrary promises of *future* decentralization throughout the document. |
| **Page 41** | — | "Like on any blockchain, Nodes are at the heart of the decentralization of Pi. In Pi, instead of relying on centralized institutional nodes, we decided to open up the Nodes to any Pioneer | Present-tense commitment ("we decided") to community-operated nodes. Seven years later, zero community nodes operate on mainnet consensus. |

| Whitepaper Page | Defendants' Selective Quoting / Emphasis (MTD p. 10) | Full Language & Context (Fan Decl., Ex. A) | Plaintiff's Reliance |
|---|---|---|---|

| Whitepaper Page | Defendants' Selective Quoting / Emphasis (MTD p. 10) | Full Language & Context (Fan Decl., Ex. A) | Plaintiff's Reliance |
|---|---|---|---|
| **Page 10** | Single sentence Defendants rely on to argue the Whitepaper "disclosed" permanent centralized control | Early-phase description of testnet operations (core team hosting nodes during development) | Defendants take one isolated sentence out of context while ignoring dozens of contrary promises of *future* decentralization throughout the document. |
| **Page 41** | — | "Like on any blockchain, Nodes are at the heart of the decentralization of Pi. In Pi, instead of relying on centralized institutional nodes, we decided to open up the Nodes to any Pioneer with a computer connected to the internet… Node-operating Pioneers will receive additional mining rewards." | Present-tense commitment ("we decided") to community-operated nodes. Seven years later, zero community nodes operate on mainnet consensus. |
| **Page 20** | — | Currency "will be fully decentralized" with "no central authority will be controlling the currency" and exchange connectivity would begin in open mainnet phase. | Direct promise of full decentralization and open exchange access — directly contradicted by Defendants running the only three validator nodes for over five years and secretly coordinating 2022 listings during "enclosed mainnet." |
| **Pages 18–19** | — | Promises a "Provisional Governance Model" and "Constitutional Convention" through which community members would govern the platform. | No community vote, no governance mechanism, and no Constitutional Convention ever occurred. |
| **Page 23** | — | Core Team token allocation "gets unlocked at the same pace as the community progressively mines more and more Pi." | Entire 20 billion token Core Team allocation allegedly unlocked in a single December 2021 batch — contrary to the promised proportional unlock schedule. |
| **Page 11** | — | Stellar Consensus Protocol "had | Undermines any later excuse |

| Whitepaper Page | Defendants' Selective Quoting / Emphasis (MTD p. 10) | Full Language & Context (Fan Decl., Ex. A) | Plaintiff's Reliance |
|---|---|---|---|
| | | been extensively tested for several years" and gave the team "a quite large degree of confidence in it." | of technical unreadiness for community nodes over the next eight years. |
| **Pages 16–17** — | | "Attention Marketplace" system to monetize user engagement, with Pi tokens serving as currency for user attention. | Never built; users' attention and labor were monetized by Defendants through undisclosed exchange listings and venture funding instead. |

***2. Defendants' Own Exhibit Documents Unfulfilled Commitments***

21. Page 11: The Whitepaper states the Stellar Consensus Protocol had been "extensively tested for several years" and gave Defendants "a quite large degree of confidence in it." (Fan Decl. Ex. A at 11.) This is difficult to reconcile with the position that technical unreadiness prevented community node deployment over the subsequent eight years.

22. Pages 16-17: The Whitepaper promises an opt-in advertising marketplace where users monetize their attention. (Fan Decl. Ex. A at 16-17.) This was not built.

23. Pages 18-19: The Whitepaper promises a Provisional Governance Model and a Constitutional Convention through which community members would govern the platform. (Fan Decl. Ex. A at 18-19.) No community vote was held on any material platform decision.

24. Page 20: The Whitepaper states the currency would be "fully decentralized" with "no central authority" controlling it, and that exchange connectivity would begin in the open mainnet phase. (Fan Decl. Ex. A at 20.) The founders operate the only three validator nodes. The December 29, 2022 exchange listings occurred during the Enclosed Network period, when the Whitepaper explicitly stated exchange connectivity would not be permitted.

25. Page 41: As quoted above, Defendants stated they "decided" to open nodes to any Pioneer.

This was not implemented.

26. Page 23 — Token Distribution: The Whitepaper states the Core Team's allocation gets unlocked "at the same pace as the community progressively mines more and more Pi," with only the proportional amount unlockable at any given time. (Fan Decl. Ex. A at 23.) Blockchain records support the inference that on December 28, 2021, the entire 20 billion token Core Team allocation was distributed through an automated batch process before the public mainnet opened. This was not disclosed.

***3. Token Distribution — Motive, Means, and Supply***

27. The pre-launch distribution of Defendants' token allocation supports several reasonable inferences. It constitutes a departure from the distribution commitment in Defendants' own exhibit. It also establishes that when Pi tokens appeared on three exchanges on December 29, 2022, Defendants held the only unlocked mainnet tokens. Every other user's tokens remained locked. A token cannot be listed on an exchange without a supply being provided. This supports a reasonable inference that Defendants were the source of that supply. The same automated infrastructure used to create thousands of batch wallets is the same type documented in the forensic records as having created the unauthorized KIDS wallet that replaced Plaintiff's authorized ZEAT address.

***4. The Token Transfer — What the Documentary Record Shows***

28. Defendants' motion states on page 5 that Plaintiff alleges his tokens were "transferred from his wallet to an unknown address without his authorization." (ECF 46 at 5.) The blockchain forensic records submitted with the TAC establish that this characterization is incorrect in two respects.

29. First, Plaintiff's token transfer claim is supported by documented on-chain evidence, not unsupported assertions. Second, the destination address is identified in those records. Blockchain forensic records submitted with the TAC identify the KIDS wallet by name and address and

establish that it was created by Defendants' own Pi Foundation Wallet GC5G approximately two months before Plaintiff's tokens were migrated to it.

30. The motion further states on page 6 that "Plaintiff offers no facts to suggest any wrongdoing from Defendants related to the transfer of his Pi tokens." (ECF 46 at 6.) The TAC and its 115 pages of attached forensic evidence establish the following documented sequence: Defendants' own Pi Foundation Wallet 2 created the KIDS wallet; the KIDS wallet replaced Plaintiff's authorized ZEAT address on his KYC checklist within Pi Network's own platform, an action requiring access to systems controlled by Defendants; Defendants were listed as first claimant on Plaintiff's claimable balance with a fourteen-day priority window; and the transfer executed through a sequence of automated channel wallets Defendants exclusively operate. These facts are documented in the exhibits attached to the TAC. Defendants' response to the transfer of Plaintiff's tokens is essentially to simply shrug their shoulders and claim they have done nothing wrong. Defendant is free to disagree with Plaintiff, but the arbitrary transfer of Plaintiff's tokens and Defendants' indications that it cannot return the tokens is completely at odds with all of Defendants' representations behind what the Pi Network is purported to be: a community of everyday people who can "meritocratically" mine Pi with their phones. There is nothing meritocratic about being asked to mine Pi tokens, mine them, and then have them transferred permanently away without any means of recourse or even self-help the Plaintiff may have had available.

31. Defendants argue that Plaintiff fails to allege reliance or causation. (MTD at 12–13.) This is incorrect. Plaintiff expressly pleads both elements with the required specificity.

32. Plaintiff joined Pi Network on April 15, 2020, after personally reading the Whitepaper on minepi.com the previous day. (TAC ¶ 15, 25.) As an individual with no prior cryptocurrency experience, he reasonably relied on the Whitepaper's specific, repeated promises of (i) community governance of mainnet timing, (ii) community-operated validator nodes, (iii) a fully decentralized

system with "no central authority," and (iv) secure, non-custodial wallets. (See Whitepaper Comparison Table, supra, at pages 11, 16–20, 23, 41 of Fan Decl., Ex. A.) Those promises induced Plaintiff to contribute 1,672 hours of labor, $1,200 in out-of-pocket costs, daily mining for over four years, recruitment of 25 users, and operation of node software. Plaintiff would not have made these contributions had he known Defendants intended to maintain exclusive centralized control through three validator nodes they alone operated, never implement community governance, and secretly coordinate exchange listings while publicly denying involvement. (TAC ¶¶ 15, 25, 81.)

33. This reliance was justifiable. The reasonableness of reliance is judged by reference to the plaintiff's particular circumstances. Engalla v. Permanente Med. Grp., Inc., 15 Cal. 4th 951, 977 (1997). A defendant who targets unsophisticated consumers cannot exploit that unsophistication as a defense to fraud. Vasquez v. Superior Court, 4 Cal. 3d 800, 814 (1971). Plaintiff's lack of cryptocurrency experience and the Whitepaper's complete absence of risk disclosures or conflict-of-interest warnings made his reliance reasonable.

34. Proximate causation is also clearly alleged. But for Defendants' misrepresentations, Plaintiff would not have (a) continued mining and contributing labor after the 2022 exchange listings, (b) completed KYC verification and designated his verified ZEAT wallet on December 22, 2022, or (c) left his tokens in Defendants' custodial system. Instead, Defendants used their exclusive control over the validator nodes and migration process to replace Plaintiff's authorized ZEAT wallet with the KIDS wallet they created via Pi Foundation Wallet GC5G, then executed the unauthorized transfer on April 8–29, 2024. (TAC ¶¶ 4–8, 19, 87.) The token transfer and resulting $2,012,000 economic loss (valued at peak market price) were the direct and foreseeable result of Defendants' fraud. See Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 343–44 (2005) (causation adequately pled where complaint alleges plaintiff would not have acted but for the misrepresentation).

35. These allegations satisfy the reliance and causation requirements for common-law fraud under California law. Lazar v. Superior Court, 12 Cal. 4th 631, 638 (1996).

***5. The Reasonable Expectations Created by Defendants' Own Language***

36. Defendant Kokkalis holds a Stanford PhD in Computer Science and taught Stanford's first decentralized applications course. His expertise is directly relevant to whether the language in the Whitepaper, "we decided to open up the Nodes to any Pioneer"; "no central authority will be controlling the currency", created reasonable expectations that users were entitled to rely on, and whether those expectations were fulfilled. When a document tells users that community node operation is a decided outcome, users have a reasonable basis to expect that outcome to be pursued. The implied covenant of good faith and fair dealing prohibits a party from taking the benefits of a relationship while rendering its core promise illusory. *Comunale v. Traders & General Insurance Co.*, 50 Cal. 2d 654, 658 (1958).

***6. Financial Distress Supports a Strong Inference of Scienter***

37. The financial record documented in sworn declarations in Santa Clara County Superior Court Case No. 21CV391680 supports a strong inference of scienter. By May 2020, Pi Network faced a "serious possibility" of insolvency by July, with monthly ad revenue of "less than $5,000." (Fan Decl., Case No. 21CV391680, Para. 22-23.) By September 2022, Defendants had incurred over $50,000 in attorneys' fees in the McPhillip litigation with $200,000 more projected should the case proceed to trial. (Nabity Decl., Case No. 21CV391680, Paras. 4, 7.) On November 15, 2022, an $86 check from Defendant Kokkalis was returned for nonsufficient funds. (Notice of Returned Check, Case No. 20CV368601.) Twenty-eight days later, three exchanges simultaneously listed Pi tokens generating $57.51 million in trading volume. The exchange listings provide a plausible

explanation for the transition from the financial conditions documented in those declarations to the period of workforce expansion, trademark filings, and litigation settlement that followed.

***7. Professional Expertise Supports an Inference of Knowledge***

38. Under Ninth Circuit precedent, a defendant's expertise in the field of the alleged misrepresentation supports an inference of scienter. *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072 (9th Cir. 2010); *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 985 (9th Cir. 1999). Defendant Kokkalis's background in blockchain systems is relevant to whether the decentralization representations were made with knowledge of their practical meaning. Defendant Fan's expertise in social computing and mass participation is relevant to whether she understood how users would rely on those representations.

***8. Selective Trademark Enforcement Is Relevant to the Authorization Question***

39. Defendants pursued trademark proceedings against an individual in Vietnam (Case D2022-3538), an individual in Nigeria (Case D2023-2191), and Gene Simmons for use of Pi Network's name and logo, while taking no action against Huobi, BitMart, or XT.COM, exchanges that used the identical logo and "PI" ticker and organized commercial promotions including a Porsche 718 giveaway in Pi Network's name. A trademark holder's decision to pursue enforcement against small-scale uses while not acting against large-scale commercial uses of the identical mark supports a reasonable inference regarding the authorization status of those large-scale uses. *Levi Strauss & Co. v. Shilon*, 121 F.3d 1309, 1312 (9th Cir. 1997).

***9. The Prior Securities Ruling Does Not Foreclose Remaining Claims***

40. The Court's prior ruling that Pi tokens were not securities in this case does not foreclose Plaintiff's remaining common law claims. Anti-fraud provisions apply to material misstatements regardless of whether an investment contract exists. The prior ruling was also entered without the

benefit of the complete investment record: Defendants raised $800,000 through SAFE instruments between September 2019 and February 2020, and received institutional investment from 137 Ventures, Designer Fund, and Ulu Ventures in November 2023, none of which was disclosed to the user community. SAFE instruments constitute investment contracts under *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), and required SEC registration or a valid exemption. To the extent the prior ruling rested on an incomplete record, leave to amend to fully plead this theory is warranted.

***10. Causation — The Token Transfer***

41. Defendants argue the token transfer is "an intervening event unrelated to reliance on misrepresentations." (ECF 46 at 13.) An intervening event in fraud causation refers to an independent act by a third party breaking the causal chain. The blockchain forensic records establish that no independent third party is identified as the cause of the events documented in the TAC. Defendants' own Pi Foundation Wallet 2 created the KIDS wallet. That wallet replaced Plaintiff's authorized address within Pi Network's own platform. Defendants were listed as first claimant on the resulting claimable balance. The transfer executed through automated channel wallets Defendants exclusively operate.

**B. PLAINTIFF'S BREACH OF FIDUCIARY DUTY CLAIM IS SUFFICIENTLY PLED**

42. Plaintiff's fiduciary duty claim rests on exclusive custodial control. Under California law, a fiduciary duty arises by operation of law when one party holds another's property in exclusive control. *City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 68 Cal. App. 4th 445, 459 (1998); *Herbert v. Lankershim*, 9 Cal. 2d 409, 483 (1937). Every Pi token prior to mainnet migration existed in a custodial environment controlled exclusively by Defendants. Users could not create a mainnet wallet without Defendants' KYC approval. Users could not migrate tokens without

Defendants initiating the migration. Users had no independent means to access, move, or protect their tokens without Defendants' cooperation. This is the factual predicate for the custodial duty.

43. Defendants' exclusive custodial control, combined with the unilateral clawback capability they built into the protocol, created a fiduciary relationship as a matter of law. By retaining the power to move tokens in and out of any user's wallet without consent or passphrase, Defendants occupied a position of "power coupled with trust" that gives rise to fiduciary obligations independent of any contractual disclaimer. *Herbert v. Lankershim*, 9 Cal. 2d 409, 483 (1937); *City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 68 Cal. App. 4th 445, 459 (1998). The Terms of Service cannot negate duties that arise from the factual reality of Defendants' total dominion over user assets. See *Hodges v. County of Placer*, 41 Cal. App. 5th 537, 546 (2019) (contractual waivers of fiduciary duties are unenforceable where the relationship independently gives rise to fiduciary obligations).

44. The Terms of Service password provision addresses user-side account security. It does not Address, and cannot authorize, Defendants' use of their own infrastructure to replace a user's designated migration wallet, list themselves as first claimant on that user's token balance, and transfer those tokens through a network they exclusively operate. No terms of service provision can authorize that conduct with respect to the assets the provision governs. Defendants also built a unilateral clawback mechanism into the protocol and exercised it following the February 2025 mainnet launch, conducting reverse migrations that removed tokens from users' wallets. A party that builds and exercises a unilateral mechanism to reclaim assets from another party's possession holds a custodial power carrying custodial obligations.

45. The circumstances of the Terms of Service acceptance are also relevant to this claim. Users who contributed tokens, time, and data over multiple years were subsequently required to agree to an updated Terms of Service as a non-negotiable condition of migrating their accumulated tokens.

This requirement was not disclosed at the commencement of the relationship. Users who declined lost access to every token they had accumulated. Standard KYC programs verify identity. They do not condition access to previously earned assets on the acceptance of new liability disclaimers as a take-it-or-leave-it condition imposed at the only moment of collection.

46. Under California law, economic duress renders a contract voidable when one party commits a wrongful act sufficiently coercive to cause a reasonably prudent person, faced with no reasonable alternative, to agree to an unfavorable contract. *CrossTalk Productions, Inc. v. Jacobson*, 65 Cal. App. 4th 631, 644 (1998). Withholding access to property that is lawfully due constitutes the requisite wrongful act. *Rich & Whillock, Inc. v. Ashton Development, Inc.*, 157 Cal. App. 3d 1154, 1158 (1984). Users' only means of recovering years of accumulated contributions was through their token balances, establishing the no-reasonable-alternative element. A contract obtained under those conditions is voidable. Conditioning the migration of pre-existing token balances on acceptance of a new liability disclaimer is also procedurally and substantively unconscionable. *Graham v. Scissor-Tail, Inc.*, 28 Cal. 3d 807, 820 (1981); *Armendariz v. Foundation Health Psychcare Services*, 24 Cal. 4th 83, 114 (2000).

***Response to Anticipated Counterarguments on the Terms of Service***

47. Adequate legal remedy. The reasonable alternative analysis under California law is practical, not theoretical. *CrossTalk Productions*, 65 Cal. App. 4th at 644. Individual users holding small token balances faced no practical litigation alternative against a venture-capital-backed company with retained counsel. This is among the reasons this case is pled as a class action.

48. Voluntary participation. The Terms of Service conditioning migration on a liability release was not presented at the commencement of the user relationship. It was presented years later, at the only moment users could access their accumulated tokens. Economic duress requires that the

wrongful act cause the signing of the unfavorable agreement, the timeline here satisfies that element.

49. Industry standard terms. Cases enforcing clickwrap agreements in the digital asset context, including the *Celsius* bankruptcy proceedings, are distinguishable. In *Celsius*, users deposited assets under terms that were in place from the beginning of the relevant relationship and that explicitly addressed the consequences of that deposit. Here, tokens were accumulated under terms that did not condition migration on a liability release. The reasoning in *Celsius* depended on what the terms said when the relationship commenced, which here did not include a migration liability disclaimer.

***The Terms of Service Does Not Reach Pre-Agreement Harm or Conduct It Does Not Address***

50. Exchange listing harm. Plaintiff completed KYC verification and designated his authorized ZEAT wallet on December 22, 2022, seven days before the December 29, 2022 exchange listings. At that point, Plaintiff had fully performed every obligation required of him. A prospective liability waiver presented years later does not release claims arising from conduct that predated it, particularly where the plaintiff had already fully performed before the relevant harm occurred.

51. Token transfer. The KIDS wallet was created by Defendants' own Pi Foundation Wallet 2 approximately two months before it appeared on Plaintiff's KYC checklist in place of his authorized ZEAT wallet. No Terms of Service provision addresses Defendants' use of their own infrastructure to replace a user's designated wallet. A liability provision cannot bar claims for conduct outside its scope.

52. Documented harm. Plaintiff contributed 1,672 hours of documented labor, $1,200 in direct costs, and recruited 25 users. The financial harm resulting from being locked out of the exchange market Defendants created , while that market reached a peak price of $307.49 per token, is a documented consequence of Defendants' conduct. Under California law, a party cannot contractually disclaim liability for fraudulent conduct.

53. Defendants' reliance on *Lee v. Foris DAX, Inc.*, No. 24-CV-06194-WHO, 2025 WL 2578239 (N.D. Cal. Sept. 5, 2025) is misplaced. Pi Network is not a cryptocurrency exchange. It is a privately controlled platform whose founders held every user's token in a closed custodial environment, controlled every migration, approved every wallet, and built a unilateral clawback mechanism into the protocol. The relationship is categorically different from an exchange where users independently hold and trade their own assets.

54. Regarding Fan's declaration in ECF 48: Fan declares Pi Community Company is a "Cayman Islands exempted company." Under Cayman Islands law, "exempted" refers to exemption from certain local tax and reporting requirements and has no bearing on civil liability in United States federal courts. Pi Community Company was named as a defendant in Case No. 21CV391680 and in the Swaroop Poudel litigation. Additionally, Fan's declaration was signed February 25, 2026 for the SAC motion and filed April 9, 2026 for the TAC motion, the body still references the Second Amended Complaint throughout.

## C. PLAINTIFF'S UNJUST ENRICHMENT CLAIM IS SUFFICIENTLY PLED

55. Defendants' own motion acknowledges the financial outcomes relevant to this claim: $20 million through SAFE instruments, $57.51 million in Huobi trading volume alone, a $200 million Pi Ventures fund, and a workforce expansion to approximately 50 positions. (ECF 46 at 14-15.) Plaintiff's 1,672 hours of documented labor, $1,200 in direct costs, node operations, security circle participation, and recruitment of 25 users plausibly establishes that Plaintiff's contributions, and those of the broader user class, enabled the platform's growth and the financial outcomes Defendants acknowledge. Defendants retained those benefits while publicly denying involvement in the exchange listings and while users remained locked out of the market those listings created. *City of Oakland v. Oakland Raiders*, 83 Cal. App. 5th 458, 477 (2022).

**D. PLAINTIFF'S UCL CLAIM IS SUFFICIENTLY PLED**

56. California's Unfair Competition Law prohibits unlawful, unfair, or fraudulent business practices. Cal. Bus. & Prof. Code § 17200. Plaintiff's UCL claim is supported under all three prongs. Under the fraudulent prong: Defendants represented Pi Network as decentralized while operating the only three validator nodes, and denied exchange involvement while their own exchange partners confirmed coordination. Under the unlawful prong: the underlying common law fraud constitutes an unlawful practice independently actionable under the UCL. Under the unfair prong: the documented harm to users substantially outweighs any utility in Defendants' conduct. *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.*, 20 Cal. 4th 163, 187 (1999).

**E. OBJECTION TO DEFENDANTS' REQUEST FOR JUDICIAL NOTICE**

57. Plaintiff does not contest the authenticity of the Whitepaper submitted as Defendants' Exhibit A. Plaintiff contests Defendants' selective characterization of its contents. Judicial notice of a document's authenticity does not require the Court to adopt one party's reading of its meaning. *Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001). The Court may consider the complete 51-page document, including the commitments on pages 11, 16, 17, 18, 19, 20, and 41.

**F. DEFENDANTS' ALTERNATIVE MOTION FOR A MORE DEFINITE STATEMENT IS WITHOUT MERIT**

58. Defendants' 24-page brief responds to specific paragraphs by number, specific wallet addresses, specific dates, specific exchange communications, and specific legal theories contained in the TAC. A complaint that generates a detailed point-by-point response provides adequate notice under FRCP 12(e). The motion for a more definite statement should be denied.

**G. LEAVE TO AMEND SHOULD BE GRANTED IF ANY CLAIM IS DISMISSED**

59. Leave to amend should be freely granted where amendment would not be futile. *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003). Amendment here would not be futile. Plaintiff has blockchain forensic evidence, exchange communications, sworn declarations from public court records, and documentary evidence of the complete investment structure that was not fully presented in prior briefing. Additional evidence is available to be furnished as required.

**CONCLUSION**

60. Plaintiff respectfully requests that this Court deny Defendants' Motion to Dismiss in its entirety. Three questions raised by the documentary record before this Court are not addressed by Defendants' motion.

61. First: Huobi's own announcement records document that on December 29, 2022, the same day Pi tokens were listed, Huobi organized a Pi Network trading contest offering a Porsche 718 and 50,000 USDT as prizes. On January 16, 2023, HTX organized a Pi Network trading competition offering 50,000 USDT to participants. On February 13, 2025, Huobi HTX announced it would support the Pi Network mainnet launch and assist users in exchanging PI for USDT. During this same period, Defendants filed trademark enforcement proceedings against individuals in Vietnam and Nigeria for small-scale use of Pi Network's name and logo, and pursued claims against Gene Simmons, while taking no action against these exchanges. Organizing a contest offering a Porsche 718 as a prize requires coordinated planning and a commercial relationship with the project. Defendants' motion does not provide an explanation for how these promotions occurred if the exchange listings were unauthorized and Defendants had no affiliation with the listing exchanges.

62. Second: The Whitepaper submitted as Defendants' own Exhibit A states on page 41 that Defendants "decided" to open node operation to any Pioneer with a computer. Seven years have passed. The project has grown to 60 million users, raised $20 million in SAFE funding, attracted

institutional venture capital, and launched a $200 million Pi Ventures fund. Defendants' motion does not provide an explanation for why zero community validator nodes have been authorized to participate in mainnet consensus during that time, or what decision-making process produced that outcome.

63. Third: Blockchain forensic records submitted with the TAC establish that the KIDS wallet — which appeared on Plaintiff's KYC checklist in place of his authorized ZEAT wallet — was created by Defendants' own Pi Foundation Wallet 2 approximately two months before Plaintiff's tokens were migrated to it. Following that migration, the tokens transferred through a sequence of additional wallets created and operated through the same infrastructure, bypassing the KYC-verified authorization that Pi Network represents as governing token migration. Plaintiff completed KYC verification and designated his authorized wallet seven days before the December 29, 2022 exchange listings. He had fully performed every required step. Defendants' motion does not provide an explanation for how a wallet created by Defendants' own infrastructure came to replace his KYC-authorized wallet designation, or what process authorized that substitution.

60. The TAC and its supporting exhibits plausibly state claims for relief under Rule 12(b)(6). Defendants' motion should be denied

DATED: April 23, 2026

*/s/ Mario Tafur*
Mario Tafur
Attorney for Plaintiff