Harro Moen
22603 N. Gibson Dr.
Maricopa, AZ 85139
Telephone: (520) 213-7503
Email: harromoen@gmail.com
Plaintiff in Pro Per

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| HARRO MOEN, on behalf of all others similarly situated,<br>Plaintiff,<br>v.<br>SOCIALCHAIN INC., PI COMMUNITY COMPANY, NICOLAS KOKKALIS, CHENGDIAO FAN, and DOES 1 through 50, inclusive,<br>Defendants. | Case No. 5:25-cv-09145-NC<br><br>**DECLARATION OF HARRO MOEN IN RESPONSE TO ORDER (ECF 69)**<br><br>Assigned to: Magistrate Judge Nathanael M. Cousins |

I, Harro Moen, declare:

1. I am the Plaintiff in this action. I make this declaration from personal knowledge in response to the Court's Order of October 28, 2026 (ECF 69). It supplements my prior declaration (ECF 64-1). If called as a witness, I could and would testify to these facts.

2. Bulldog Law, P.C., through attorney Mario Tafur, represented me in this action from its filing on October 24, 2025 until July 9, 2026, when the Court conditionally granted counsel's motion to withdraw (ECF 61) and I began proceeding in this Court without counsel. Counsel drafted, signed, and filed the pleadings and handled all communications with opposing counsel. I never spoke with Mr. Tafur about my case. Three calls with him were scheduled; he rescheduled each one, and none took place. I asked counsel's office several times to include me in meetings about my case and to go over the evidence with me. My contact with the firm, by email, text message, and phone, was with David Pricella, whom I understood to handle client intake and administration, and later with paralegal Jennifer Munguia. There are three exceptions, each of which I prepared and sent to counsel: a draft of the amended complaint (ECF 31) in early February 2026, which counsel did not use; a draft of the Third Amended Complaint on March 10, 2026; and, the same day, a draft of the opposition to Defendants' motion to dismiss the

Second Amended Complaint, which counsel filed with the Third Amended Complaint on March 11, 2026 (ECF 36, 37). Other than the authorities in those drafts, I did not select the legal authorities cited in counsel's filings.

3. Between February and May 2025, before suit was filed, I answered three sets of written questions from counsel's office, dozens of questions in total, about the transfer of my tokens, my KYC verification, and Pi Network's Terms of Service. At Mr. Pricella's request, I organized and labeled the evidence I had gathered, which took several days, and sent him hundreds of files, including blockchain records, wallet data, exchange correspondence, and support-ticket history. I also gave him detailed written accounts of the December 29, 2022 exchange listings and the events that followed, and of the transfer of my tokens. Until about the end of October 2025, I continued sending Mr. Pricella updated analysis, drawn from Pi Network's public ledger and block explorer, tracing how diverted tokens, including mine, were routed through sequences of wallets before, during, and after the mainnet launch. My sources also included Pi Network's Whitepaper and website. Mr. Pricella told me that a team of investigators would review this material and that a meeting would be scheduled to go over it with me. No such meeting took place. Mr. Pricella also told me that counsel had sent my draft complaint to another law office for review. I do not know what investigation, if any, counsel performed beyond reviewing the material I provided; counsel's billing records show that Mr. Tafur billed time in April and July 2025 reviewing documents I provided. The drafts counsel sent me drew their facts from the evidence I had provided. Counsel formulated the claims and supplied the citations and legal language, and I relied on counsel's professional judgment in doing so. My investigation is further described in ECF 64-1 ¶¶ 2–10.

4. Within two days of the April 2024 transfer, I reported it through Defendants' support portal: Ticket PINETWORK-1860165 on April 10, 2024 ("You guys sent my Pi to a wallet different from the one I verified") and Ticket PINETWORK-1866593 on April 12, 2024. Each received only an automated reply with wallet-setup instructions (ECF 32-2, Ex. B). Over the following months I pursued recovery through numerous support tickets, in-app chats, and emails. Pi chat

moderators told me that wallet addresses cannot be changed after KYC verification and attributed the loss to user error. I received no substantive response, and the transfer was never reversed. Pi Network has publicly acknowledged the ability to reverse migrations (ECF 36-1, Ex. W-7). My tokens were transferred to a wallet ending "KIDS" that I did not create, control, or enter, and from there to a collection wallet ending "V5FF" (ECF 64-1 ¶ 5). Users had been told that a wallet address could not be changed after KYC verification, and I was not aware of any reported hacking. I later learned that other users had reported the same experience and had been told by moderators that it was their own error. Using Pi Network's block explorer and public ledger, I traced migrated tokens from many users' accounts, including mine, moving in sequence into common wallets within seconds of being claimed, and then onward through further wallets.

5. I personally wrote to HTX/Huobi on July 10, 2023, and to BitMart on October 6, 2024 and January 28, 2026, asking how Pi came to be listed in December 2022. Their written responses are in the record (ECF 36-1, Exs. E-2–E-4). I began asking those questions because of what I observed on December 29, 2022: Pi was listed for trading on several exchanges under the same logo and ticker the project uses; later that day Defendants publicly disclaimed the listings; and trading on those exchanges was then suspended. In the period that followed, moderators in Pi Network's community chat removed posts asking about the listings. In writing, a BitMart representative told me that trading was enabled "in accordance with the project team's information and support" (ECF 64-1 ¶¶ 7–9).

6. In August 2025, counsel sent me a revised draft complaint. I reviewed it and asked counsel for a complete revision that incorporated the evidence I had provided. Counsel's office told me the complaint had already been filed and that any changes could be made by filing another complaint. I did not see the final version before counsel filed it on October 24, 2025. Counsel's office sent me a copy on November 26, 2025.

7. Counsel did not consult me about Defendants' first motion to dismiss (ECF 23), counsel's opposition (ECF 24), or Defendants' reply (ECF 28). Counsel's paralegal first sent me those

filings by email on January 13, 2026, after briefing had closed and two days before the Court's order (ECF 29). Until then, I was not aware that any motion practice had taken place in my case.

8. After the Court's January 15, 2026 order, I spent about two weeks preparing a draft amended complaint and an evidence compilation, and I delivered them to counsel between February 1 and February 4, 2026. On February 4, counsel's paralegal sent me a draft amended complaint. The same afternoon I objected in writing that counsel's draft did not use the material I had given counsel. That evening she sent a revised draft. Neither she nor counsel ever explained why counsel's draft had not used the material I provided. The next morning I replied "Thank you" to acknowledge receipt. I did not review or verify the draft's legal citations; I relied on counsel to do so.

9. I did not research, draft, or supply the *Kelly v. Coinbase* citation or the quoted Terms of Service language in the amended complaint (ECF 31). Neither appears in any material I provided to counsel.

10. Counsel did not copy me on, forward to me, or tell me about opposing counsel's February 9, 2026 email identifying those errors, or Mr. Tafur's February 11, 2026 reply (ECF 43-5). Counsel did not consult me before filing the Second Amended Complaint and its exhibits on February 11, 2026 (ECF 32). I did not review or approve that filing or its exhibits, and I was not told why it was filed. Counsel's office told me the filing consisted only of exhibits to accompany the amended complaint. I would not have approved those exhibits had I been asked. I did not know that counsel filed it without leave of court.

11. I first learned that citation and quotation issues had been raised from Defendants' motion to dismiss (ECF 33), filed February 25, 2026. On March 19, 2026, I asked counsel's paralegal by text message about the "hallucinations allegation." She did not mention the February 9–11 emails. I first saw those emails when Defendants filed them on March 24, 2026 (ECF 43-5). Counsel never told me about or forwarded to me any of counsel's communications with opposing counsel, including the March 2026 emails about the filing of the Third Amended Complaint

(ECF 62-1 ¶¶ 16–17). I learned of each of those communications only from Defendants' filings, after the fact.

12. On March 11, 2026, I asked counsel's paralegal by text message to hold off filing the Third Amended Complaint until I could review it. When I asked whether it had been filed, she told me by text that it had been filed and that, if need be, counsel could file another complaint. I did not review or approve the Third Amended Complaint as filed (ECF 36), and I did not know that counsel would file it without a motion for leave to amend.

13. On March 20, 2026, I wrote to counsel objecting to the citation errors and to counsel's filing of evidence and briefs without consulting me. I then began seeking new counsel.

14. In summary, I learned of each of the following only after it had been filed or sent: (a) Defendants' first motion to dismiss, counsel's opposition, Defendants' reply, and the Court's January 15, 2026 order (ECF 23, 24, 28, 29), none of which counsel told me about until I asked whether anything was happening in my case; counsel's paralegal then sent me ECF 23, 24, and 28 on January 13, 2026, after briefing had closed; (b) the Second Amended Complaint (ECF 32), filed February 11, 2026, which counsel's office described to me as exhibits only, and which I did not learn was a new complaint filed to correct citation errors until after Defendants' motion to dismiss (ECF 33) was filed on February 25, 2026; (c) opposing counsel's February 9, 2026 email and Mr. Tafur's February 11, 2026 reply (ECF 43-5), which I first saw when Defendants filed them on March 24, 2026; and (d) counsel's March 2026 emails with opposing counsel about the filing of the Third Amended Complaint (ECF 62-1 ¶¶ 16–17), which I first saw when Defendants filed them on July 23, 2026.

15. Defendants' brief (ECF 62) and Mr. Nabity's declaration (ECF 62-1) challenge the factual basis of five allegations. The basis for each was as follows. (a) *The $86 returned check.* The Santa Clara County Superior Court issued a Notice of Returned Check for non-sufficient funds in *McPhillip v. Kokkalis*, Case No. 20CV368601 (check #1130, $86.00), served November 15, 2022 (ECF 64-1 ¶ 6, Ex. 1). Mr. Nabity alleges that the $86 was owed by Defendants, with Dr. Kokkalis named first, and states only that he cannot recall who issued the check (ECF 62-1 ¶ 24).

(b) *The $50,000 in fees.* Mr. Nabity's own declaration in *McPhillip v. Pi Community Company*, Case No. 21CV391680 identified more than $50,000 in fees and costs Defendants had incurred and projected costs exceeding $200,000; I relied on those figures (ECF 64-1 ¶ 6; ECF 62-1 ¶ 25). Both allegations rested on the court records themselves, including Defendant Fan's sworn declarations in the McPhillip litigation describing the company's finances (ECF 64-1 ¶ 6, Exs. 1–3). Mr. Nabity's declaration attaches no record showing who issued the $86 check or that the fees had been paid. Counsel never forwarded to me Mr. Nabity's April 8, 2026 email challenging these two allegations (ECF 62-1 ¶ 26). Had I been shown evidence that either allegation was inaccurate, I would have asked counsel to remove it. (c) *The December 2022 exchange listings.* The exchange notices Defendants cite were listing announcements issued before deposits and withdrawals opened. Trading was nonetheless enabled. On January 28, 2026, BitMart told me in writing that Pi "was listed on BitMart on December 29, 2022, and trading was enabled at that time in accordance with the project team's information and support," and that BitMart "lists and supports tokens based on the project team's official disclosures and technical arrangements at the time" (ECF 36-1, Ex. E-4). On July 10, 2023, Huobi (now HTX) told me in writing that "[t]he currency of a project is determined by the project party after contacting us and undergoing evaluation and review," and that "pi supports spot trading" (ECF 36-1, Ex. E-2). XT.com linked to Pi Network's own website in connection with its listing (ECF 64-1 ¶ 7, Ex. 12). (d) *The per-token price.* Defendants state that Pi "has never traded at over $3" (ECF 62 at 10). Public exchange price records show launch-period trading at prices up to approximately $330.65 per token (ECF 64-1 ¶ 10, Ex. 13). (e) *The validator nodes.* The allegation was not that Defendants operated validator nodes, which the Whitepaper discloses, but that they operated all of them. It came from my review of Pi Network's public block explorer, which showed only three validator nodes, all operated by Defendants (ECF 64-1 ¶ 11(b)). Pi Network's published roadmap stated that Nodes "play an essential decentralized role in the Pi ecosystem by running the blockchain, contributing to the security and validation of transactions," that "Pioneers who run nodes are rewarded," that "[e]very Pioneer can also apply to be a Node," that the Core Team

would select Nodes and SuperNodes, and that the initial node was "the first step toward building the Pi Testnet and eventually the fully decentralized mainnet." The Whitepaper itself, as archived on March 24, 2024, likewise described the "Community Node operators running the Testnet" and stated that "having an open port is one of the prerequisites for being a Super Node."

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 10, 2026, at Maricopa, Arizona.



/s/ Harro Moen

Harro Moen

Plaintiff in Pro Per